Redacted Version

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order (Bid Protest)**

**No. 13-308C**
**(Judge Miller)**

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**CHARLES F. DAY & ASSOCIATES**

**Plaintiff,**
**v.**
**THE UNITED STATES,**

**Defendant.**

## DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

**STUART F. DELERY**
**Acting Assistant Attorney**
**General**

**JEANNE E. DAVIDSON**
**Director**

**DEBORAH A. BYNUM**
**Assistant Director**

**SONIA M. ORFIELD**
**Trial Attorney**
**U.S. Department of Justice**
**Commercial Litigation Branch**
**Civil Division**
**Ben Franklin Station**
**P.O. Box 480**
**Washington, D.C. 20044**
**Telephone: (202) 353-0534**
**Facsimile: (202) 305-2118**
**Email: sonia.m.orfield@usdoj.gov**

**May 17, 2013**                    **Attorneys for Defendant**

# <u>TABLE OF CONTENTS</u>

**PAGE**

STATEMENT OF THE ISSUES...................................................................... 2

STATEMENT OF THE CASE...................................................................... 2

    I.      Nature Of The Case ........................................................................ 2

    II.     Statement Of Facts ......................................................................... 2

          A.     Master Fitness Training Course Services for The Physical Readiness Division.......................................................................... 3

          B      Request For Task Order Proposals ................................................ 4

          C.     Award Decision ............................................................................ 5

          D.     Task Order Award And Subsequent Protest At Government Accountability Office....................................................................... 6

ARGUMENT ................................................................................................ 6

    I.      This Court Does Not Possess Jurisdiction To Decide Day's Protest.......... 6

          A.     Standards For Decision On Motion To Dismiss ............................ 7

               1.      RCFC 12(b)(1) ................................................................. 7

               2.      RCFC 12(b)(6) ................................................................. 8

          B.     FASA Divests The Court Of Subject Matter Jurisdiction ............. 9

               1.      The Court's Jurisdiction Over Typical Bid Protests........... 9

               2.      The History and Purpose of the FASA ............................ 10

               3.      The Bar on Protests of Individual Task Orders for Multiple Award IDIQ Contracts ...................................... 12

               4.      FASA Divests The Court Of Subject Matter Jurisdiction Over Day's Complaint . ................................ 13

          C.     Other Statutes Cited By The Plaintiff Do Not Confer Jurisdiction On This Court............................................................ 15

               1.      The Procurement Integrity Act ........................................ 16

i

# TABLE OF CONTENTS
## -continued-

PAGE

2.      The Trade Secrets Act....................................................... 16

3.      The Economic Espionage Act of 1996 ............................ 17

4.      The Parties Cannot Confer Jurisdiction By Agreement ...................................................................... 18

D.      Day Also Fails to State Claim Under The Alternate Statutory Authorities Cited............................................................... 18

1.      Procurement Integrity Act.................................................18

2.      The Trade Secrets Act....................................................... 21

3.      The Economic Espionage Act of 1996 ............................ 22

E.      Day's Claim Must Be Dismissed Because It Cannot Establish Standing....................................................... 23

CONCLUSION................................................................................................ 26

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*A& D Fire Prot., Inc. v. United States*,
72 Fed. Cl. 126 (2006) ............................................................................ 11, 13, 15

*Animal Legal Def. Fund v. Quigg*,
932 F.2d 920 (Fed. Cir. 1991)................................................................... 23

*ATI Indus. Automation, Inc. v. Applied Robotics, Inc.*,
801 F. Supp.2d 419 n.6 (M.D.N.C. 2011) ................................................ 17

*Atwood Agency v. Black*,
374 S.C. 68 (2007)..................................................................................... 22

*Bath Iron Works Corp. v. United States*,
27 Fed. Cl. 114 (1992), ............................................................................. 7

*Bell Atl. Corp. v Twombly*,
550 U.S. 544 (2007).................................................................................... 9

*Boston Edison Co. v. United States*,
64 Fed. Cl. 167 (2005) ......................................................................... 23, 24

*Boyd v. Univ. of Ill.*,
No. 96 Civ. 9327, 1999 WL 782492 (S.D.N.Y. Sept. 30, 1999) ................ 17

*Brown v. CitiCorp*,
No. 97 CV 6337, 1998 WL 341610 (N.D. Ill. June 22, 1998).............. 17, 22

*Bussie v. United States*,
96 Fed. Cl. 89 (2011) ................................................................................ 23

*C.F. McKing Consulting Corp. v. United States*,
78 Fed. Cl. 715 (2007) .............................................................................. 19

*Central Arkansas Maintenance, Inc. v. United States*,
68 F.3d 1338 (Fed. Cir. 1995)................................................................... 16

*Cooper Square Realty Inc. v. Jensen*,
No. 04 Civ. 01011 2005 WL 53284 (S.D.N.Y. Jan 10, 2005)................... 17

# TABLE OF AUTHORITIES
## -continued-

**CASE(s)**                                                              **PAGE(s)**

*DataMill v. United States,*
    91 Fed. Cl. 740 (2010) ........................................................................... 8, 10, 11, 12

*Dawnwood Properties/78 v. United States,*
    53 Fed.Cl. 168 (2002) ..................................................................................... 24

*Digital Techs., Inc. v. United States,*
    89 Fed. Cl. 711 (2009) ............................................................................... 10, 11

*Fernandez de Iglesias v. United States,*
    96 Fed. Cl. 352 (2010) ...................................................................................... 23

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust,*
    463 U.S. 1 (1983) ................................................................................................ 8

*Global Computer Enters., Inc. v. United States,*
    88 Fed. Cl. 350 (2009) ................................................................................ 11, 12

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.,*
    490 F.3d 940 (Fed. Cir. 2007) .......................................................................... 7

*Gould v. Control Laser Corp.,*
    866 F.2d 1391 (Fed. Cir. 1989) ...................................................................... 18

*Group Seven Assocs., LLC v. United States,*
    68 Fed. Cl. 28 n. 5 (2005) ............................................................................ 11, 12

*Holley v. United States,*
    124 F.3d 1462 (Fed. Cir. 1997) ........................................................................ 7

*Hutchens v. United States,*
    89 Fed. Cl. 553 (2009) ....................................................................................... 9

*Ind. Mich. Power Co. v. United States,*
    422 F.3d 1369 (Fed. Cir. 2005) ...................................................................... 23

*Info. Tech. Applications Corp. v. United States,*
    316 F.3d 1312 (Fed. Cir. 2003) ...................................................................... 25

*Int'l Mgmt. Servs., Inc. v. United States,*
    80 Fed. Cl. 1 (2008) ........................................................................................... 7

iv

# TABLE OF AUTHORITIES
## -continued-

**CASE(s)**                                                                                      **PAGE(s)**

*Iowa Film Production Services v. Iowa*,
  818 N.W.2d 207 (2012) ...................................................................................... 21, 22

*Ironclad/EEI v. United States*,
  78 Fed. Cl. 351 (2007) ............................................................................................ 23

*Joshua v. United States*,
  17 F.3d 378 (Fed. Cir. 1994)................................................................................... 17

*Labatt Food Serv. v. United States*,
  577 F.3d 1375 (Fed. Cir. 2009)............................................................................... 25

*Landmark Land Co. v. Federal Deposit Ins. Corp.*,
  256 F.3d 1365 (Fed. Cir. 2001)............................................................................... 23

*Levine v. U.S.*,
  453 F.3d 1348 (Fed. Cir., 2006).............................................................................. 23

*Lockheed Corp. v. Widnall*,
  113 F.3d 1225 (Fed.Cir.1997).................................................................................. 14

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)................................................................................................. 23

*McCullough v. United States*,
  76 Fed. Cl. 1 (2006) ................................................................................................ 17

*McNutt v. Gen. Motors Acceptance Corp.*,
  298 U.S. 178 (1936)................................................................................................... 8

*MED Trends, Inc. v. United States*,
  102 Fed. Cl. 1 (2011) ............................................................................. 10, 12, 13, 15

*Mendes v. United States*,
  88 Fed. Cl. 759 (2009) ............................................................................................ 17

*Mitchell v. Maurer*,
  293 U.S. 237, (1934).................................................................................................. 7

*Mobile Medical International Corp. v. United States*,
  95 Fed. Cl. 706 (2010) ................................................................................ 16, 19, 21

# TABLE OF AUTHORITIES
## -continued-

**CASE(s)**                                                           **PAGE(s)**

*Myers Investigative and Sec. Servs., Inc. v. United States,*
   275 F.3d 1366 (Fed. Cir. 2002)................................................................. 8, 25

*Omega World Travel, Inc. v. United States,*
   82 Fed. Cl. 452 (2008) ............................................................................. 20

*Perez v. United States,*
   156 F.3d 1366 (Fed. Cir. 1998)................................................................. 8, 9

*Red River Commc'ns, Inc. v. United States,*
   109 Fed. Cl. 497 (2013) ............................................................................ 14

*Rex Service Corp. v. United States,*
   448 F.3d 1305 (Fed. Cir. 2006)................................................................. 16, 24

*Reynolds v. Army & Air Force Exch. Serv.,*
   846 F.2d 746 (Fed. Cir. 1988)................................................................... 8

*Rivera v. United States,*
   105 Fed. Cl. 644 (2012) ............................................................................ 7, 8

*Roton Barrier, Inc. v. Stanley Works,*
   79 F.3d 1112 (Fed. Cir. 1996)................................................................... 21

*Savantage Fin. Servs., Inc. v. U.S.,*
   81 Fed. Cl. 300 (2008) .............................................................................. 13

*Scheuer v. Rhodes,*
   416 U.S. 232(1974)................................................................................... 8

*Sicom Sys., Ltd. v. Agilent,*
   Tech., 427 F.3d 971 (Fed. Cir. 2005)........................................................ 23

*Solute Consulting v. United States,*
   103 Fed. Cl. 783 (2012) ............................................................................ 10, 13

*Sunbelt Rentals, Inc. v. Head & Engquist Equipment, L.L.C.,*
   2003 WL 21017456 ................................................................................... 22

*Synetics, Inc. v. United States,*
   45 Fed. Cl. 1 (1999) .................................................................................. 19

vi

# TABLE OF AUTHORITIES
## -continued-

**CASE(s)**                                                           **PAGE(s)**

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
   587 F.3d 1339 (Fed. Cir. 2009).................................................................... 21

*United Pac. Ins. Co. v. Roche*,
   380 F.3d 1352 (Fed. Cir. 2004).................................................................... 18

*United States v. IBM Corp.*,
   892 F.2d 1006 (Fed. Cir. 1989).................................................................... 25

*United States v. Sherwood*,
   312 U.S. 584 (1941).................................................................................. 7

*United States v. Testan*,
   424 U.S. 392 (1976).................................................................................. 7

*Warth v. Seldin*,
   422 U.S. 490(1975)................................................................................ 24

*Weeks Marine, Inc. v. United States*,
   575 F.3d 1352 (Fed. Cir. 2009).................................................................... 24

*Wildflower Int'l, Ltd. v. United States*,
   105 Fed. Cl. 362 (2012) ......................................................................... 9, 13

## FEDERAL STATUTES AND REGULATIONS

10 U.S.C. § 2303(a)(2)................................................................................ 11
10 U.S.C. § 2304............................................................................... passim
18 U.S.C. § 1836........................................................................... 17, 23
18 U.S.C. §§ 1831-1839 ..................................................................... 17
28 U.S.C § 1491................................................................................ passim
31 U.S.C. § 3551............................................................................... 24
41 U.S.C. § 2101....................................................................... 2, 19, 20
41 U.S.C. § 2102(a)(1)..................................................................... 20
41 U.S.C. § 2106............................................................................. 20
41 U.S.C. § 253.............................................................................. passim
41 U.S.C. § 4101(2) ........................................................................ 12
41 U.S.C. § 4106................................................................... 1, 12, 13, 15
41 U.S.C. § 423 ........................................................................... 2, 21

# TABLE OF AUTHORITIES
## -continued-

**FEDERAL STATUTES AND REGULATIONS**                          **PAGE(s)**

41 U.S.C. §§7101-7109 ................................................................................................... 15


**REGULATIONS**


48 C.F.R. § 16.505(b)(5) ............................................................................................. 4, 13
48 C.F.R. § 2.101 ........................................................................................................... 12
48 C.F.R. § 33.101 ......................................................................................................... 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHARLES F. DAY & ASSOCIATES,  )
                            )
          Plaintiff,         )
                            )
     v.               )      No. 13-308
                            )      (Judge Miller)
THE UNITED STATES,        )
                            )
         Defendant.     )

DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Pursuant to the Court's order dated May 2, 2013, and Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss the complaint filed by Charles F. Day & Associates (Day) for lack of jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted.  Day's complaint should be dismissed for lack of jurisdiction because it is a challenge to the issuance of a task order, and the Federal Acquisition Streamlining Act (FASA), Pub. L. No. 103–355, 108 Stat. 3243 (1994) (codified at 41 U.S.C. § 4106), expressly states that this Court does not possess jurisdiction to entertain such challenges.

Nor is Day able to establish jurisdiction for its claim based under the other statutory schemes that it invokes: the Procurement Integrity Act, the Trade Secrets Act, and the Economic Espionage Act of 1996.  Moreover, Day also fails to state a claim under any of these alternate statutory authorities and cannot establish standing because it lacks the requisite economic interest.  Thus, its Complaint should be dismissed under RCFC 12(b)(6) as well.

1

## STATEMENT OF THE ISSUES

1.      Whether this Court possesses jurisdiction to entertain Day's complaint, which states a challenge to the issuance of a task order, when FASA, 10 U.S.C. § 2304c(e), expressly states that this Court does not possess jurisdiction to entertain such challenges.

2.      Whether Day's allegations regarding the Procurement Integrity Act, 41 U.S.C. § 423 (2006) (recodified at 41 U.S.C. §§ 2101 – 2107); the Trade Secrets Act, 18 U.S.C. § 1905 (2006); and the Economic Espionage Act of 1996, 18 U.S.C. § 1832; otherwise allow it to establish jurisdiction.

3       Whether Day states a claim under the Procurement Integrity Act, the Trade Secrets Act, and the Economic Espionage Act of 1964.

4.      Whether Day can establish standing where the task order was to be awarded on a lowest price technically acceptable basis and Day had the fourth lowest cost.

## STATEMENT OF THE CASE

I.      <u>Nature Of The Case</u>

Day is one of the awardees for an Indefinite Delivery/Indefinite Quantity (IDIQ) contract with the Mission and Installation Contracting Command, MCO Center, Ft. Bragg.  Day is challenging the award of a task order to Anautics, by the Army, for Master Fitness Trainer Course services.  Compl. 4.

II.     Statement Of Facts

      A.     Master Fitness Training Course Services for The Physical Readiness
            Division

The Master Fitness Training Course (MFTC) is a 20-day (164 hours) course to

train and certify small unit leaders in exercises, drills, and activities in accordance with

Field Manual 7-22, Army Physical Readiness Training dated August 2010.  A. 95[1].  It

was developed by the Army Training and Doctrine Command (TRADOC) Physical

Readiness Division (PRD) to implement Army physical readiness training doctrine,

policy, and procedures.  A. 96.  It is intended to support the development of Army

personnel and units and thereby enhance expeditionary forces' abilities to conduct full

spectrum operations.  A. 95.

      As a practical matter, the course will train selected generating and operating force

non-commissioned officers, warrant officers, and commissioned officers in all aspects of

the Army's Physical Readiness Training (PRT) doctrine to perform as the unit

commander's PRT advisor.  *Id.* .  Graduates will be expected to assist in the development

of unit and individual physical readiness training programs based on exercise science to

include instruction in: human anatomy, physiology and kinesiology; body composition,

diet, performance nutrition and weight control; stress management, behavior

modification, substance abuse, cardiovascular disease risk, environmental considerations,

Army Physical Readiness Program policy and regulations, exercise prescription, physical

readiness training techniques, reconditioning, equipment and facilities; and functional

screening and physical readiness testing.  A. 96.  This includes the conduct of PRT

exercises, activities, and drills within Basic Combat Training, Advanced Individual

---

[1] "A._" refers to a page in the Appendix attached hereto.

Training, One Station Unit Training, Basic Officer Leadership Courses, as well as Active and Reserve component units throughout the Army.  *Id.*.

The contractor selected for the task order was required to provide a professionally trained staff to conduct the MFTC Army wide.  A. 95.  The course was to be conducted in a resident course setting locally at Fort Jackson, SC and via Mobile Training Team (MTT) at both Continental United States (CONUS) and Outside the Continental United States (OCONUS) host sites not located within an identified combat zone.  A. 96.  OCONUS locations include, but are not limited to, United States Army Europe (USAREUR) in Germany and United States Army Pacific (USARPAC) in Korea, Hawaii, Alaska, and Japan.  *Id.*.

B        Request For Task Order Proposals

On October 2, 2012, the Mission and Installation Contracting Command (MICC) – Fort Jackson, the contracting office for the PRD, issued Request for Task Order Proposal (RTOP) No. W9124C-13-R-TOR1  on a competitive basis providing fair opportunity under FAR 16.505(b) to all Suite 1 small business contract holders of the Maneuver Center of Excellence (MCoE) Training and Support Services multiple award indefinite delivery/indefinite quantity (IDIQ) contract (hereinafter the "MCoE contract").  Compl. at 4; A. 9, 79.  The MCoE contract, issued by the MICC-Fort Bragg, is a nonpersonal services contract to provide support services for the United States Army Maneuver Center of Excellence in its mission to develop training strategies, doctrine, capabilities, analysis, and instruction and products for current and future forces.  A. 4.  The MCoE contract includes seven task areas: (1) General Technical and Analytical Support, (2) Training Development Support, (3) Doctrine Development Support, (4)

Capability Development Support, (5) Training Instruction Support, (6) Simulations and Analysis Support, and (7) Support Services.  Compl. at 4; A. 4.  The MFTC requirements are within the scope of Task Area 5 of the MCoE contract.  A.7, 79.  The RTOP was issued to all seven contract holders under Suite 1 of the MCoE contract.  *Id.*  The RTOP was amended twice; the substance of the amendments is not relevant to this motion. Compl. at 5.

The RTOP called for the award of a one-year task order, which included separately priced phase-in and initial train-up periods, with two option years.  A. 80, 7, 10-16.  The Contract Line Item Numbers (CLIN) were structured as firm fixed price, with one reimbursable CLIN for travel expenses.  A. 88-94.  Attachment 3 to the RTOP contained the performance work statement, which outlined the procurement's technical requirements.  RTOP at A. 95-119.  The RTOP incorporated by reference FAR provision 52.233-2, Service of Protest, and added, "[t]he value of this task order is expected to exceed $10,000,000.00 and therefore the General [sic] Accountability Office (GAO) has exclusive jurisdiction of any protest (as defined in section 33.101) in accordance with Section 843 of the Fiscal Year 2008 National Defense Authorization Act (NDAA)."  A. 83; Compl. at 6.

C.    Award Decision

In accordance with Attachment 4 of the RTOP, the task order resulting from the RTOP was to be awarded to the offer determined to provide "the lowest priced, technically acceptable response to satisfy the requirements of this RTOP and the PWS." RTOP at 52; Compl. at 4, 5  The Government received five task order proposals by the October 19, 2012 deadline, including one from Day and one from Anautics, Inc.

Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order

(Anautics).  A 131.  Following discussions, all five offers were determined to be technically acceptable.  *Id.*  The evaluated prices for the five proposals were: Anautics - $9,702,656.56, Offeror B - ███████████, Offeror C - ███████████, Day - $10,944,642.26, and Offeror E - ███████████.  *Id.*

> D.    Task Order Award And Subsequent Protest At Government Accountability Office

On December 4, 2012, the Army awarded task order number W91247-12-D-0001-2K06 to Anautics as the lowest priced, technically acceptable offeror.  The Army notified Day that Anautics was selected for award on December 4, 2012, and provided a written post-award de-briefing to Day on December 6, 2012, with a follow-up provided on December 10, 2012.  Compl. at 5.  On December 14, 2012, Day protested the decision to award the task order to Anautics at the GAO.  Compl. at 5.  On the Army's motion, the GAO dismissed the protest on January 2, 2013 because the GAO did not have jurisdiction over the protest of the issuance of a task order valued at less than $10 million dollars.  Compl. at 5.  On May 1, 2013, Day filed this action.  Compl. at 1.

## ARGUMENT

I.    This Court Does Not Possess Jurisdiction To Decide Day's Protest

Day cannot establish jurisdiction over its bid protest in this Court.  Jurisdiction is not available under the Tucker Act, 28 U.S.C. 1491, because FASA provides a clear jurisdictional bar to challenging the issuance of a task order.  Day's allegations regarding the Procurement Integrity Act, the Trade Secrets Act, and the Economic Espionage Act of 1996 do not allow it to overcome this jurisdictional hurdle.  In addition, the parties cannot confer jurisdiction on this Court by agreement, as Day seems to allege.  Compl. at 17-18.

A.    Standards For Decision On Motion To Dismiss

    1.    RCFC 12(b)(1)

Subject matter jurisdiction is a threshold issue.  *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 4 (2008).  A court is obligated to satisfy itself of its own jurisdiction. *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec.*, 490 F.3d 940, 944 (Fed. Cir. 2007) (citing *Mitchell v. Maurer*, 293 U.S. 237, 244, (1934)).  Here, the Court's jurisdictional analysis must lead to the conclusion that dismissal of Day's claims is required under RCFC 12(b)(1).

Dismissal under RCFC 12(b)(1) is appropriate where the Court of Federal Claims has not been granted power to adjudicate a specific area of substantive law raised by the plaintiff.  *See Rivera v. United States* 105 Fed. Cl. 644, 648 (2012); *see also* RCFC 12(b)(1).  It is well settled that this Court is one of limited jurisdiction. *Bath Iron Works Corp. v. United States*, 27 Fed. Cl. 114, 122 (1992), *aff'd*, 20 F.3d 1567 (Fed. Cir. 1994) (citation omitted).  Its authority to grant relief against the United States is limited by the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976).  "[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued… and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). "[I]n a Court of Claims context . . . waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.*  (citations omitted).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.

7

Cir. 1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9–

10 (1983)). When considering a motion to dismiss for lack of subject matter jurisdiction

under RCFC 12(b)(1), the court assumes the truth of all undisputed facts as alleged in the

complaint and draws all reasonable inferences in the non-movant's favor. *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236(1974). "[O]nce the ... court's subject matter jurisdiction [is]

put in question it [is] incumbent upon [the plaintiff] to come forward with evidence

establishing the court's jurisdiction." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d

746, 748 (Fed. Cir. 1988).

The plaintiff bears the burden of proving, by a preponderance of the evidence, that

the Court possesses jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S.

178, 189 (1936); *Myers Investigative and Sec. Servs., Inc. v. United States*, 275 F.3d

1366, 1369 (Fed. Cir. 2002) (citation omitted). If the Court concludes that it lacks

subject matter jurisdiction, then it must dismiss the claim. RCFC 12(b)(1); *DataMill v.*

*United States*, 91 Fed. Cl. 740,751 (2010) (citations omitted). As we demonstrate below,

dismissal under RCFC 12(b)(1) is appropriate here because the jurisdictional basis argued

by Day does not establish jurisdiction in this Court under the facts of its case.      2.

## 2.   RCFC 12(b)(6)

A motion to dismiss under RCFC 12(b)(6) challenges whether the plaintiff has

stated a claim upon which relief can be granted. *Rivera,* 105 Fed. Cl. at 648; RCFC

12(b)(6). A 12(b)(6) motion must be granted when the facts asserted by the claimant do

not under the law entitle him to a remedy. *Perez v. United States*, 156 F.3d 1366, 1370

(Fed. Cir. 1998). When considering a motion to dismiss under RCFC 12(b)(6), "the court

'must assess whether the complaint adequately states a claim and whether plaintiffs can

allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief." *Hutchens v. United States*, 89 Fed. Cl. 553, 562 (2009) (*quoting Bell Atl. Corp. v Twombly*, 550 U.S. 544, 557 (2007)).

In considering such a motion, the court assumes "all well-pled factual allegations as true and makes all reasonable inferences in favor of… the nonmovant." *Perez,* 156 F.3d at 1370. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citations omitted). Rather, the allegations must raise the likelihood of a right to relief beyond the merely speculative level when accepting plaintiff's facts as true and making all reasonable inferences in plaintiff's favor. *Id.* Here, a dismissal under 12(b)(6) is appropriate because even accepting plaintiffs' allegations as true, it has failed to state a basis on which the United States would be liable at the Court of Federal Claims.

B.     FASA Divests The Court Of Subject Matter Jurisdiction

The Court lacks jurisdiction to entertain Day's complaint, because of FASA's bar on challenges to the issuance of a task order.  ; *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 371 (2012).

1.     The Court's Jurisdiction Over Typical Bid Protests

Ordinarily, the Tucker Act as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320 § 12, 100 Stat. 3870, 3874-76, confers jurisdiction over post award bid protests. *Wildflower Int'l.*, 105 Fed. Cl. at  381-82

(2012) (citing 28 U.S.C. § 1491(b)(1)); *Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 722 (2009).[2]  Specifically, under the Tucker Act, the Court of Federal Claims possesses jurisdiction to "'render judgment on an action by an interested party objecting to ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Solute Consulting v. United States*, 103 Fed. Cl. 783, 790-91 (2012) (quoting 28 U.S.C. § 1491(b)(1)).  The Court of Federal claims may "'award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.'" *Id. (*quoting 28 U.S.C. § 1491(b)(2)).

2. The History and Purpose of the FASA

In 1994, the enactment of "the FASA streamlined procurements involving task or delivery order contracts." *DataMill,* 91 Fed. Cl. at 752-53 (2010).  The FASA was conceived of as a "'comprehensive overhaul of the federal acquisition laws,' S. Rep. No. 103–258, at 3 (1994), [*reprinted in*] 1994 U.S.C.C.A.N. 2561, 2563, intended to 'simplify and streamline' the often burdensome requirements for competitive acquisitions." *MED Trends, Inc. v. United States,* 102 Fed. Cl. 1, 5 (2011)(citation omitted); *see also* 140 Cong. Rec. S12369 (daily ed. Aug. 23, 1994) (statement of Senator Levin) (characterizing the FASA as "the most significant procurement reform legislation to be

---

[2]

"The FAR defines a protest, as follows:
Protest means a written objection by an interested party to any of the following:

> (1) A solicitation or other request by an agency for offers for a contract for the procurement of property or services.
> (2) The cancellation of the solicitation or other request.
> (3) An award or proposed award of the contract.
> (4) A termination or cancellation of an award of the contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract.

*Digital Techs., Inc..*, 89 Fed. Cl. at 722 & n.14 (2009) (quoting C.F.R. § 33.101 (2009)).

considered by the Senate since the [CICA]"), which were deemed to be "cumbersome" because they "reduce[d] participation," "diminish[ed] competition," and "raise[d] Government procurement costs."); 140 Cong. Rec. S12369 (daily ed. Aug. 23, 1994) (statement of Senator McCain) (Congress passed the Federal Acquisition Streamlining Act of 1994 (FASA), Pub. L. No. 103–355, 108 Stat. 3243 (1994), in an effort to reform federal procurement activities "by greatly streamlining and simplifying [the federal government's] buying practices."). *A& D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 133 (2006) (citations omitted)."In the interest of efficiency, bid protests were targeted by [the] FASA as one of the areas in need of reform[.]" *Id.* The FASA "revise[d] and simplif[ied] the bid protest process with a view towards reducing the number of protests that are filed." *DataMill, Inc.,* 91 Fed.Cl. at 752 (2010) (quoting S. Rep. No. 103–259, at 7); *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 404-05 (2009) (quoting S. Rep. No. 103–259, at 7, *reprinted in* 1994 U.S.C.C.A.N. 2598, 2604.

　　　As part of this simplification, FASA encouraged Federal agencies to use "multiple task order contracts, in lieu of single task order contracts" when possible.[3]　*Global Computer Enters., Inc.,* 88 Fed. Cl. at 405 (2009) (quoting *Digital Techs.*, 89 Fed. Cl. at 719.　A "task order contract" is defined as "a contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of

---

[3]　　　Provisions in the FASA pertaining to ID/IQ contracts are codified identically 10 U.S.C. §§ 2304a–2304d and at 41 U.S.C. §§ 253h–253k. *DataMill, Inc.,*91 Fed. Cl. at 748 n.14 (2010) citi*Seven Assocs., LLC v. United States*, 68 Fed. Cl. 28, 31 n. 5 (2005); *Global Computer Enters.,* 88 Fed.Cl. 350, 398 n.59 (2009). Title 10 represents the military procurement equivalents to the latter civilian procurement provisions in title 41. *Id.* citing *A & D Fire Prot., Inc*, 72 Fed. Cl.  at 126, 133 n. 7. Thus, the provisions contained in title 10 of the United States Code apply to the Army. *Id.* citing 10 U.S.C. § 2303(a)(2).

the contract." 10 U.S.C. § 2304d(1); 41 U.S.C. § 4101(2) "A task order is defined as 'an order for services placed against an established contract or with Government sources.' Task orders may be issued for specific jobs, as needed." *Group Seven Associates, LLC*, 68 Fed. Cl. at 31 (2005) (citing 48 C.F.R. 2.101).

"Multiple task order contracts allow an agency to use an initial competitive process to select a contractor or pool of eligible contractors, secure contract terms, and make subsequent orders within that smaller group of contractors." *MED Trends, Inc.*, 102 Fed.Cl. at 5 (2011); *Global Computer Enters.,* 88 Fed. Cl. at 413 (2009). "All otherwise applicable provisions of law would remain applicable to such acquisitions, except to the extent specifically provided in [10 U.S.C. § 2304a]. For example, the requirements of the [CICA], although they would be inapplicable to the issuance of individual orders under task and delivery order contracts, would continue to apply to the solicitation and award of the contracts themselves." *DataMill, Inc.*, 91 Fed. Cl. at 753 (2010) (quoting H. R. Rep. No. 103–712, at 178 (1994) (Conf. Rep.) *reprinted in* 1994 U.S.C.C.A.N 2607, 2608); *Global Computer Enters.*, 88 Fed. Cl. at 406 (2009) (quoting H. R. Rep. No. 103–712, at 178 (1994) (Conf. Rep.), *reprinted in* 1994 U.S.C.C.A.N 2607, 2608).

3.    The Bar on Protests of Individual Task Orders for Multiple Award IDIQ Contracts

For purposes of this case, the key element of the FASA is that the issuance of individual task orders to the pool of contractors created by a multiple award IDIQ contract would not be subject to protests, with certain limitations. Pub. L. No. 103–355, § 1054 (originally codified at 41 U.S.C. § 253j(d) (2000), and recodified at 41 U.S.C. § 4106(f) by Pub. L. No. 111–350, 124 Stat. 3677 (2011)). First, as noted above, "the task or delivery order contract itself [must have] been obtained through full and open

competition." *Savantage Fin. Servs., Inc. v. U.S.*, 81 Fed. Cl. 300, 3 (2008) (citing 41 U.S.C. § 253j(d)).  Moreover, a protest in this court "is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued."  *A & D Fire Prot.*, 72 Fed. Cl. at 133 (2006) citing 41 U.S.C. § 253j(d).  As originally written, this was the only exception to FASA's protest bar. *MED Trends, Inc.*, 102 Fed. Cl. 1, 5 (2011) citing 41 U.S.C. § 253j(d) (2006) (re-codified at 41 U.S.C. § 4106(f) by Pub. L. No. 111–350, 124 Stat. 3677 (2011)).

"In 2008, under the National Defense Authorization Act ("NDAA"), Congress added another limited exception to FASA's general bid protest preclusion: task orders valued over $10 million could be protested at GAO."  *MED Trends, Inc.,* 102 Fed. Cl. at 5 (2011) citing National Defense Authorization Act of 2008, Pub. L. No. 110–181, § 843, 122 Stat. 3, 236–37 (2008); *see also Solute Consulting*, 103 Fed. Cl. at 791 n.9 (2012). "In the place of agency protests, Government Accountability Office (GAO) protests or judicial review, Congress saw fit to offer disappointed task order bidders recourse to the agency's task and delivery order ombudsman." *A & D Fire Prot.*, 72 Fed. Cl. at 134 (2006) (citing 10 U.S.C. § 2304c(e); 41 U.S.C. § 253j(e) (2000)); 48 C.F.R. § 16.505(b)(5).  "The Court of Federal Claims has held that FASA's limitation on protests of task or delivery orders is jurisdictional."  *Wildflower Int'l, Ltd.*, 105 Fed. Cl. at 371 (collecting authority).

4.    FASA Divests The Court Of Subject Matter Jurisdiction Over Day's Complaint

The Court should dismiss Day's protest as jurisdictionally flawed.  As we established above, Day was one of several awardees on an IDIQ contract with the

Mission and Installation Contracting Command, MCO Center, Ft. Bragg.  Compl. at 4.

The bid that Day is attempting to protest was on a solicitation for award of Task Order

Proposal.  *Id.*  There is no allegation in this case that the delivery order being protested

"increases the scope, period, or maximum value of the contract under which the order

was issued."  10 U.S.C. §2304(c)(e)(A).  As a result, Day does not even attempt to argue

that it can establish jurisdiction through the first exception to FASA's jurisdictional bar.

Rather, Day's argument is based on the second exception.  Day contends that,

even though the final task order contract award is less than the $10,000,000 threshold, it

should fit within this exception because the solicitation stated that the value of the task

order was expected to exceed $10,000,000.  Compl. at 6.  Alternatively, Day contends

that the final award was only less than $10,000,000, because the awardee improperly

relied upon contractors rather than employees.  *Id.*  As an initial matter, neither of these

arguments are encompassed by the plain language of the statute -- which only refers to "a

protest of an order valued in excess of $10,000,000" – without any qualification.  *See Red

River Commc'ns, Inc. v. United States*, 109 Fed. Cl. 497, 504 (2013) (finding that "only

the first exception in FASA–that applicable to protests relating to scope, period, or

maximum value–is germane to plaintiff's complaint," where "[t]he estimated value of the

. . . contract is $9,808,904.78); *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227

(Fed.Cir.1997) ("To interpret a regulation we must look at its plain language and consider

the terms in accordance with their common meaning.").

More importantly, however, even if Day were able to somehow fit its

circumstances into this exception, it still would not be able to establish jurisdiction in this

Court.  Section 2304c(e)(2) of FASA lodges exclusive jurisdiction to hear protests

involving task orders in excess of $10 million dollars at GAO.  Specifically, the next

clause of the statute provides that "[n]otwithstanding section 3556 of title 31, the

Comptroller General of the United States shall have exclusive jurisdiction of a protest

authorized under paragraph (1)(B)" -- the paragraph containing the exception for orders

valued in excess of $10,000,000.  10 U.S.C. § 2304C (e)(1)(B)(2).  Unless a protestor can

establish that the task order exceeds the scope of the underlying IDIQ contract there is

"*no question*" that the protest "[can] be brought only before the [GAO]."  *See MED*

*Trends, Inc.*, 102 Fed. Cl. at 4 (2011) (emphasis added).  Thus, even if Day were able to

establish jurisdiction on this basis, GAO, which has already dismissed Day's protest, –

not the Court of Federal Claims -- was Day's only forum for review of its protest.  10

U.S.C. § 2304c(e)(2).  Consequently, plaintiff's complaint must be dismissed pursuant to

41 U.S.C. § 4106(f).[4]

     C.     Other Statutes Cited By The Plaintiff Do Not Confer Jurisdiction On This
            Court

     Although it is not entirely clear, Day's complaint also seems to allege that the

agency's award process violated the Procurement Integrity Act, Compl. at 7, 14, the

Trade Secrets Act, and the Economic Espionage Act of 1996.  *Id*. at 31, 33.  None of

these statutes, however, allow Day to overcome its jurisdictional hurdle.

---

[4]    To the extent that plaintiff alleges that this court has jurisdiction under the Contract Disputes Act of 1978 (CDA), Pub. L. No. 95-563, 92 Stat. 2383 (codified at 41 U.S.C. §§7101-7109), *see* Compl. 17-21, this allegation also fails.  As an initial matter, this court has read "the task order bid protest bar of 41 U.S.C. § 253j(d) to squarely deny the right of plaintiff to contest, in this court, the project's award to intervenor-defendant" and has taken issue with "the theory that actions, that are in essence bid protests of task order awards, can be re-characterized as contract disputes in order to create jurisdiction in this court or in an agency board of contract appeals." *A & D Fire Prot., Inc.*, 72 Fed. Cl. at 135 (citation omitted).  Thus, this court has found that this type of bid protest action does not fall within its CDA jurisdiction. Id.  Moreover, "[e]ven assuming CDA jurisdiction would lie for this suit, plaintiff has not alleged that a contract claim has been presented to the contracting officer. Failure to present a contract claim for a sum certain to the contracting officer prevents this court from taking jurisdiction over a CDA claim.  *Id.* (citation omitted).  "For these reasons, the CDA does not permit this suit to proceed in this court."  *Id.*

1.    The Procurement Integrity Act

The Procurement Integrity Act does not provide an independent route to jurisdiction.  Rather, suits invoking that statute have relied upon the same route used to establish jurisdiction as ordinary bid protests – the Tucker Act, 28 U.S.C. § 1491(b)(1). For instance, in *Rex Service Corp. v. United States*, 448 F.3d 1305, 1306-7 (Fed. Cir. 2006), the plaintiff filed a protest alleging that it had been prejudiced by the agency's violations of the Procurement Integrity Act.  The Court of Federal Claims dismissed the protest because plaintiff was unable to establish jurisdiction under 28 U.S.C. § 1491.  *Id.* at 1306.  The Federal Circuit evaluated the same statutory language in affirming the lower court's judgment.  *Id*. at 1307.  Likewise, in *Central Arkansas Maintenance, Inc. v. United States*, 68 F.3d 1338 (Fed. Cir. 1995), which included various allegations that the agency had violated the Procurement Integrity Act, the Federal Circuit's jurisdictional discussion relied upon 28 U.S.C. § 1491(a)(1).  *Id.* at 1341.  As the FASA limits the court's jurisdiction to entertain bid protests when the protest concerns the issuance of a task order, see 10 U.S.C. § 2304c(e), Day cannot establish jurisdiction over its claim in this manner.

2.    The Trade Secrets Act

Day also references the Trade Secrets Act in its complaint.  Compl. at 35.  This statute, however, cannot provide a route for Day to establish jurisdiction.  As this Court described in *Mobile Medical International Corp. v. United States*, 95 Fed. Cl. 706, 733 (2010), "the Trade Secrets Act in Title 18 of the United States Code is an entirely criminal statute."   Thus, "[t]his court does not have jurisdiction to enforce criminal statutes; such jurisdiction is vested in the United States District Courts."  *Id.* citing

*Joshua v. United States*, 17 F.3d 378, 379 (Fed. Cir. 1994); *Mendes v. United States*, 88 Fed. Cl. 759, 762 (2009) (finding that the court lacked jurisdiction to consider plaintiff's criminal claims), *appeal dismissed*, 375 Fed. App'x. 4 (Fed. Cir. 2009); *McCullough v. United States*, 76 Fed. Cl. 1, 4 (2006) (similarly finding that the court lacked jurisdiction to consider plaintiff's criminal claims), *appeal dismissed*, 236 Fed. App'x. 615 (Fed. Cir. 2007), *reh'g denied* (Fed. Cir. 2007), *cert. denied*, 552 U.S. 1050 (2007).

3.    The Economic Espionage Act of 1996

The Economic Espionage Act of 1996 (EEA), also referenced by Day, Compl. at 33, 35, provides for criminal penalties for certain forms of trade secret misappropriation. *See ATI Indus. Automation, Inc. v. Applied Robotics, Inc.* 801 F. Supp.2d 419, 425 n.6 (M.D.N.C. 2011) citing Pub. L. No. 104–294, § 1832, 110 Stat. 3489 (1996) (codified at 18 U.S.C. §§ 1831–1839).  However, "[t]he EEA does not create a private cause of action and *ipso facto* cannot support federal subject matter jurisdiction."  *Cooper Square Realty Inc. v. Jensen*, No. 04 Civ. 01011 2005 WL 53284, at *1 (S.D.N.Y. Jan 10, 2005).  There is simply no provision in the text of the statute permitting a private litigant to obtain relief. *Id.*; see also *Boyd v. Univ. of Ill.*, No. 96 Civ. 9327, 1999 WL 782492, at *1, *4 (S.D.N.Y. Sept. 30, 1999) (dismissing claim because EEA "is a criminal statute that affords no standing to any private citizen") and *Brown v. CitiCorp*, No. 97 CV 6337, 1998 WL 341610, at *1, *3 (N.D. Ill. June 22, 1998) ("The Economic Espionage Act of 1996 ... allows civil actions to be brought, but only by the Attorney General."). Moreover, the accompanying House Report states that the language in § 1836 "is neither intended to create a general civil cause of action nor does it authorize persons other than the Attorney General to commence a civil action to enjoin a violation [of the EEA]."

17

*Cooper Square Realty,* 2005 WL 53284, at *1 (citing H.R. Rep. 104–788, at 14 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4021, 4033).  Thus, Day cannot establish jurisdiction under this statute either.

4. The Parties Cannot Confer Jurisdiction By Agreement

Day seems to suggest that this Court has jurisdiction because the Government promised jurisdiction in its request for task order proposals.  Compl. at 17-19.  Even assuming that the Government's solicitation somehow offered jurisdiction and plaintiff accepted that offer, *see id.*, this agreement could not alter in any way the Court's jurisdiction.  "Parties cannot, by agreement, confer upon a tribunal jurisdiction that it otherwise would not have." *United Pac. Ins. Co. v. Roche*, 380 F.3d 1352, 1356-57 (Fed. Cir. 2004); *see also Gould v. Control Laser Corp*. 866 F.2d 1391, 1393 (Fed. Cir. 1989) ("This agreement by the parties cannot confer jurisdiction on this court. 'Want of jurisdiction ... may not be cured by consent of the parties....'" (citation omitted)).  Thus, plaintiff's attempt to establish jurisdiction by pointing to the parties' agreement is unavailing too. [5]

D. Day Also Fails to State Claim Under The Alternate Statutory Authorities Cited

Even assuming for the sake of argument, and we do not, that Day can establish the Court's jurisdiction under the Procurement Integrity Act, the Trade Secrets Act, or the Economic Espionage Act of 1996, Day's complaint should be dismissed under 12(b)(6) for failure to state a claim.

1. Procurement Integrity Act

[5] Because the RTOP states that jurisdiction would lie only in the GAO, even if the parties could confer jurisdiction by agreement it would not permit plaintiff to establish jurisdiction in this court.

18

With respect to the Procurement Integrity Act, for instance, Day cannot establish three of the elements required to bring a claim under that statute.  First, Day must establish that the information that it contends was disclosed improperly was proprietary information.  41 U.S.C. § 2101 (2)(C).  "'Proprietary information' is defined as "[i]nformation in which the owner has a protectable interest." *Mobile Medical Int'l Corp. v. United States*, 95 Fed. Cl. 706, 739 (2010) citing *Black's Law Dictionary* 1339 (9th ed. 2009). "Inherent in the definition is that information is not proprietary if it is not protected. Once the information is released into the public domain, the owner has lost its ability to protect its interest from others." *Id.*

Simply from a common sense standpoint, it is hard to understand how the portion of the proposal in question could be proprietary.  Day describes this element of its proposal as simply adding "extra personnel in the Train Up Period to mitigate performance risk." Compl. at 11.  Common experience tells us that this is a concept that is widely known and in broad use.  *Cf. McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 728 (2007) ("The Court very much doubts that a list of dental professionals—after all the identity and addresses of individual professionals are generally publicly available—can constitute proprietary information. But the point is not that, but that McKing has utterly failed to demonstrate what in the record made its alleged list proprietary."); *Synetics, Inc. v. United States*, 45 Fed. Cl. 1, 14 (1999) (finding no violation of the Procurement Integrity Act where proposal information appeared to have been generally available).

Moreover, the Procurement Integrity Act does not simply reference proprietary information in general, but instead specifies "[p]roprietary information about

19

manufacturing processes, operations, or techniques."  41 U.S.C. § 2101 (2)(C).  As employing extra personnel during the beginning of the program has nothing whatsoever to do with manufacturing, it is difficult to see how it can be considered proprietary information.

Second, the Procurement Integrity Act only prohibits Government representatives from "knowingly disclos[ing] contractor bid or proposal information or source selection information *before the award* of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 2102(a)(1) (emphasis added).  Day, however, contends only that the Government shared its proposal information after the award of the task order.  *See* Compl. 1, (the government "shared [its] proposal as an as an after award notification of acceptability to the Awardee"), 12 ("The government 'transferred' Plaintiff's unique, proprietary, higher priced technical approach to Awardee after it selected Awardee's lower price proposal for award and awarded it a contract.").

Finally, under the Procurement Integrity Act "A person may not file a protest against the award  . . . of a Federal agency procurement contract alleging a violation  . . . and the Comptroller General may not consider that allegation in deciding a protest, unless the person, *no later than 14 days after the person first discovered the possible violation*, reported to the Federal agency responsible for the procurement the information that the person believed constitutes evidence of the offense." 41 U.S.C. § 2106 (emphasis added). Plaintiff does not allege that it met this requirement of the Procurement Integrity Act.

In *Omega World Travel, Inc. v. United States*, 82 Fed. Cl. 452 (2008), this Court addressed deficiencies with a Procurement Integrity Act claim that were virtually identical to the second and third deficiencies here.  In that case, the Government argued

> that Omega's allegations that the government violated the PIA are
> untimely, because Omega never presented information to DOJ that
> constituted evidence of the offense, as required by 41 U.S.C. §
> 423(g), and certainly did not present information to DOJ within 14
> days of discovering the potential violation. Furthermore, the
> government contend[ed] that, because any disclosure of information
> alleged by Omega occurred after DOJ issued the protested task order
> to CWGT, Omega's allegations do not, on their face, meet the
> requirement of the PIA that information be knowingly disclosed
> before the award of the protested contract.

*Id* at 467.  For these same reasons, "[t]he court agree[d] with the government that

Omega's contention that DOJ violated the PIA and disclosed Omega's proprietary

information to CWGT [wa]s without merit."  *Id.* at 468.  Thus, it granted the

Government's motion for judgment on this claim.  *Id.*  This Court should do the same

here.

### 2.   The Trade Secrets Act

Day cannot state a claim under the Trade Secrets Act either.  "The first step in any

trade secret analysis is a determination of whether any trade secrets exist." *Mobile

Medical Intern. Corp. v. United States*, 95 Fed. Cl. 706, 733 (2010) (citing *Roton Barrier,

Inc. v. Stanley Works*, 79 F.3d 1112, 1116 (Fed. Cir. 1996), *reh'g denied* (Fed. Cir. 1996).

"Federal Courts apply the appropriate Trade Secret law of the appropriate state." *Id.*

(citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355

(Fed. Cir. 2009) ("We apply the trade secret law of the appropriate state...."), *reh'g and

reh'g en banc denied* (Fed. Cir. 2010).  "Since 1979, forty-four states and the District of

Columbia have adopted the [Uniform Trade Secrets] Act in some form." See Eric E.

Johnson, Hamline Law Rev. Vol. 33:545, 550 (2010).  Thus, the laws of the potentially

relevant states are fairly similar.  According to the codification of the USTA in Iowa,

where plaintiff is located,

> "Trade secret" means information, including but not limited
> to a formula, pattern, compilation, program, device,
> method, technique, or process that . . .[d]erives independent
> economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by
> proper means by a person able to obtain economic value
> from its disclosure or use.

*Iowa Film Production Services v. Iowa*, 818 N.W.2d 207, 219 (2012).  In South Carolina,

where the RTOP was issued, the Trade Secrets Act defines a Trade Secret as

> information, including a compilation, that: . . . derives independent
> economic value, actual or potential, from not being generally known
> to, and not being readily ascertainable by proper means by the
> public or any other person who can obtain economic value from its
> disclosure or use. . . .

*Atwood Agency v. Black*, 374 S.C. 68, 72 (2007).  And inNorth Carolina, where the

original MCoE contract was issued, the Trade Secrets Protection Act provides that

> "Trade secret" means business or technical information, including
> but not limited to a formula, pattern, program, devise, compilation
> of information, method, technique, or process that . . . Derives
> independent actual or potential commercial value from not being
> generally known or readily ascertainable through independent
> development or reverse engineering by persons who can obtain
> economic value from its disclosure or use. . . .

*Sunbelt Rentals, Inc. v. Head & Engquist Equipment*, L.L.C., 2003 WL 21017456

(2003).  Because providing "extra personnel in the Train Up Period to mitigate

performance risk," Compl. at 11, is too simple and well known a technique to constitute a

trade secret, Day cannot state a claim under the Trade Secrets Act.

    3.    The Economic Espionage Act of 1996

As discussed above, the Economic Espionage Act of 1996 does not create a

private right of action for trade secret misappropriation.  "The Economic Espionage Act

of 1996 provides for criminal penalties for such misappropriation." *Brown*, 1998 WL

341610, *3 n.3 (citing 18 U.S.C. § 1836 (1994 & Supp.1998)). Likewise "[i]t allows

civil actions to be brought, but only by the Attorney General. *Id.* at § 1836. Thus, a

private plaintiff cannot assert a federal claim with regard to misappropriation of trade

secrets. *Id.* As Day is a private entity, Day "can prove no set of facts that would warrant

the requested relief" under this statute, and thus, this element of his complaint should be

dismissed under RCFC 12(b)(6) as well. *Levine v. U.S.*, 453 F.3d 1348, 1350 (Fed. Cir.,

2006). .[6]

     E.     <u>Day's Claim Must Be Dismissed Because It Cannot Establish Standing</u>

     "Standing to sue is a threshold requirement in every federal action." *Sicom Sys.,*

*Ltd. v. Agilent Tech.*, 427 F.3d 971, 975 (Fed. Cir. 2005). The party invoking federal

jurisdiction bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife*,

504 U.S. 555, 561 (1992). "It is not altogether clear, under the law of this circuit,

whether a motion to dismiss for lack of standing should be analyzed under RCFC

12(b)(1), which concerns the absence of subject matter jurisdiction, or RCFC 12(b)(6),

which addresses failure to state a claim upon which relief can be granted." *Ironclad/EEI*

*v. United States*, 78 Fed. Cl. 351, 355-56 (2007) (citing *Boston Edison Co. v. United*

*States*, 64 Fed. Cl. 167, 174 (2005) (citing and comparing *Landmark Land Co. v. Federal*

*Deposit Ins. Corp.*, 256 F.3d 1365, 1380 (Fed. Cir. 2001); *Animal Legal Def. Fund v.*

---

[6] To the extent that Day alleges some sort of tort, see Complaint at 21-22, it should be dismissed under FRCP 12(b)(1) and 12(b)(6) as the CFC's jurisdiction is limited to cases "not sounding in tort.". See 28 U.S.C. § 1491 (a)(1). Although the CFC may adjudicate a claim for tortious conduct where the cause of action stems from the Government's breach of a contract, the claimant must identify the connection between the allegedly tortious conduct and the specific contractual obligations of the Government. *Fernandez de Iglesias v. United States*, 96 Fed. Cl. 352, 363 (2010). Simply stating that tortious conduct relates to the breach of a contract is insufficient to establish Tucker Act jurisdiction. *Id.* Moreover, the CFC "cannot award damages 'grounded in tort rather than contract,'" *id.*, which Plaintiff seems to seek. Compl. at 39. The Court's jurisdiction does not extend to awarding punitive damages. *See Bussie v. United States*, 96 Fed. Cl. 89, 96 (2011); Compl. at 39. Instead, damages may only be recovered where "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

*Quigg*, 932 F.2d 920, 925 (Fed. Cir. 1991)); *see also Dawnwood Properties/78 v. United States*, 53 Fed.Cl. 168, 171 (2002) (explaining that "[t]he lack of clarity may stem from the fact that standing issues raise both constitutional and prudential considerations"). "Regardless of which standard is used, '[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 174 (2005) (citing *Warth v. Seldin*, 422 U.S. 490, 501(1975)).

For bid protests, standing "is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009). To have standing under 28 U.S.C § 1491(b), a litigant must be an "interested party." 28 U.S.C. § 1491(b)(1). The Tucker Act refers to an "interested party," but does not define that term. *See id.* As such, "[t]he term 'interested party' in section 1491(b)(1) is construed in accordance with the Competition in Contracting Act ('CICA'), 31 U.S.C. §§ 3551-56," and therefore refers "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Rex Serv. Corp. v. United States*, 448 F.3d at 1307 (internal citation and quotation omitted). "Thus, to come within the Court of Federal Claims's § 1491(b)(1) bid protest jurisdiction, [a protester] is required to establish that it (1) is an actual or prospective bidder and (2) possesses the requisite direct economic interest." *Weeks Marine*, 575 F.3d at 1359 (quotation and modification notation omitted).

24

Protected Information to Be Disclosed Only in Accordance With the U.S. Court of
Federal Claims Protective Order

Here, the second prong of this test poses a problem for Day.  To satisfy the second

prong -- the "direct economic interest" requirement -- in a post-award protest, a plaintiff

"must show that there was a 'substantial chance' it would have received the contract

award but for the alleged error in the procurement process."  *Info. Tech. & Applications

Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citation omitted).  In other

words, the protester must show that it was prejudiced by the Government's error.  *Labatt

Food Serv. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009); see also *Myers

Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)

(explaining "[i]n fact, prejudice (or injury) is a necessary element of standing."). A bidder

lacks a "direct economic interest" if the litigation could not put it in position for an

award, e.g., if one award is contemplated and the protestor ranked below second in the

evaluations.  See *United States v. IBM Corp*., 892 F.2d 1006, 1011-12 (Fed. Cir. 1989).

Day cannot meet this test.  The task order resulting from the RTOP was to be

awarded to the lowest priced, technically acceptable offer. RTOP at 52; Compl. at 4, 5.

The Government received five task order proposals that were all determined to be

technically acceptable.  A. 131.  The evaluated prices for the five proposals were:

Anautics - $9,702,656.56, Offeror B - ███████████, Offeror C - ███████████, Day -

$10,944,642.26, and Offeror E - ███████████.  *Id.*  Thus, Day was ranked fourth – not

second – as required to establish a direct economic interest, and cannot establish

standing.

CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court grant our motion to dismiss the complaint for lack of jurisdiction.

Respectfully submitted,

STUART DELERY
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director


s/Deborah A. Bynum
DEBORAH A. BYNUM
Assistant Director


s/Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-0534

Facsimile: (202) 305-2118
Email: sonia.m.orfield@usdoj.gov

Attorneys for Defendant

# APPENDIX

Table of Contents

Ordering Guide, Maneuver Center of Excellence Training and Support
Services Multiple Award, Indefinite Delivery/Indefinite Quantity, May 9, 2012 ………1

Maneuver Center of Excellence Training & Support Services Request for
Task Order Proposal, October 2, 2012……………………………………………79

Final Task Order Decision Document  -- **Protected Information to Be Disclosed
Only In Accordance With the U.S. Court of Federal Claims Protective Order**…131

# ORDERING GUIDE



# Maneuver Center of Excellence (MCoE)
# Training and Support Services
# Multiple Award
# Indefinite Delivery/Indefinite Quantity

Implemented by:

## Mission and Installation Contracting Command (MICC)
## MCO Office – Fort Bragg
## Fort Bragg, North Carolina

## May 9, 2012

A. 001

# TABLE OF CONTENTS

**Title**                                                           **Page**

**Chapter 1:  General Information**                                    **1**

  A.   Overview                                 1
  B.   Purpose                                  1
  C.   Applicability                            1
  D.   Scope                                    1
  E.   Ordering Period                          5
  F.   Period of Performance for Task Orders     6
  G.   Program Ceiling                          6
  H.   Suites                                   6
  I.   Authority to Place Orders                6
  J.   Fee for Use                              7
  K.   Prime Contractors                        8

**Chapter 2: Roles and Responsibilities**                             **8**

  A.   Procuring Contracting Officer (PCO)       8
  B.   Mission and Installation Contracting Command
      and Principal Assistant Responsible for Contracting    8
  C.   Task Order Ombudsman                      8
  D.   Task Order Contracting Officers           9
  E.   Task Order Contracting Officer's Representative (COR)    10
  F.   Prime Contractors                        10

**Chapter 3: The Requirements Process and Placing Orders**            **11**

  A.   Acquisition Planning                     11
  B.   Performance Base Work Statement (PWS)     11
  C.   Funding                                  11
  D.   Task Order Types                         11
  E.   Security Requirements                    12
  F.   Fair Opportunity                         12
  G.   Ordering Procedures                      13
  H.   Guaranteed Minimum Order                 13
  I.   Request for Task Order Proposal (RTOP)    13
  J.   Task Order Pricing                       15
  K.   Changes in Team Members/Subcontractors    16
  L.   Government Property                      16
  M.   Organization Conflict of Interest (OCI) at the Task Level    17
  N.   Work on a Government Installation         20
  O.   Quality Control Plan                     21

**Title**                                                                                    **Page**

## Chapter 3: The Requirements Process and Placing Orders (continued)

P.   Task Order Review and Approval Procedures                                     21
Q.   Unauthorized Work                                                            21
R.   Selection of Contractor and Documentation to Support Task Order Award   21
S.   Task Order Notifications/Debriefing                                          22
T.   Contract Services/Contractor Manpower Reporting                              22
U.   Task Order Official File                                                     23
V.   Task Order Release                                                           23
W.  Contract Level and Task Order Management                                      23

## Chapter 4: Task Order Process                                                   24

A.   Task Orders covering Task Area 2 and/or Task Area 5, or a                     24
     combination thereof.

B.   Task Orders including Task Areas 1, 3, 4, 6, and 7, regardless of            25
     whether the task order also includes tasks under Task Area 2,
     Task Area 5, or a combination thereof.

## Chapter 5: Task Order Monitoring and Contract Administration                    27

A.   Task Order Review and Approval Procedures                                     27
B.   Contract Administration of Master Contracts                                   27
C.   Task Order Contracting Officer's Representative                               27
C.   Contractor Performance Assessment Report (CPAR)                               27
E.   Quality Assurance Surveillance Plan (QASP)                                    28
F.   Metrics                                                                       28
G.   Contractor Quarterly Status Report                                            29
H.   Invoices and Payments                                                         30

## Attachments                                                                     31

1.   MCoE Training & Support Services MAIDIQ Prime Contractors                     32

2.   Sample Task Order Mini Acquisition Strategy                                   34

3.   Sample Request for Task Order Proposal (RTOP) Packet                          41

4.   MCoE Training & Support Services MAIDIQ                                       76
     Delegation of Contract Authority (DCA) Request Form

A. 003

**CHAPTER 1**
**GENERAL INFORMATION**

A. **Overview**:

    1.  The objective of the Maneuver Center of Excellence (MCoE) Training & Support Service contracts is to acquire performance based services to develop and produce training strategies, doctrine, concepts, instruction and products for the current and future force. The contracts are structured for maximum flexibility in providing for an expedited ordering process in order to satisfy the needs of customers.  Approval shall be received from the assigned Contracting Officer for using these contract(s) by entities other than MCoE.  Specific requirements and standards of performance must be provided in each task order.

    2.  MCoE Training & Support Services was solicited in two Suites, Suite 1-Restricted Suite and Suite 2-Unrestricted Suite. (See paragraph G below)

    3.  The scope of the MCoE Training & Support Services contracts are separated into seven (7) broad task areas that define services that may be required by the MCoE and customers throughout the Training and Doctrine Command, U.S. Army and Department of Defense (DoD) as delineated in paragraph D below.

B. **Purpose**:  The MCoE Training & Support Services Ordering Guide contains the information needed to properly use the MCoE Training & Support Services Multiple Award Indefinite Delivery Indefinite Quantity (MAIDIQ) contracts to make Task Order awards for individual requirements that may arise during the life of the contract.  The Ordering Guide also describes the steps for preparing a requirements package, the roles and responsibilities for managing the MCoE Training & Support Service Task Orders, and guidance, oversight and review and approval procedures.

C. **Applicability:**   The MCoE Ordering Guide is applicable to all organizations delegated authority to award and administer task orders against the MCoE Support MAIDIQ contracts. (Refer to Paragraph I, Authority to Place Task Orders for delegation authority.)

D. **Scope:**

    (1) This is a non-personnel services contract to provide support services for the United States Army Maneuver Center of Excellence in its mission to develop training strategies, doctrine, capabilities, analysis, and instruction and products for current and future forces.  The MCoE Training and Support Services MAIDIQ contracts require contractor knowledge, expertise and services to support Department of the Army (DA) and Department of Defense (DoD) Agency initiatives for the Maneuver Force in the following seven (7) Task Areas:

> ➢ Task Area 1:General Technical and Analytical Support
> ➢ Task Area 2:Training Development Support
> ➢ Task Area 3:Doctrine Development Support
> ➢ Task Area 4:Capability Development Support
> ➢ Task Area 5: Training Instruction Support
> ➢ Task Area 6: Simulations and Analysis Support
> ➢ Task Area 7: Support Services

(2) <u>MCOE SUPPORT</u> provides qualified personnel, certified instructors, materials, facilities, travel and other services necessary to provide support services in the following task areas.  Services may be required in CONUS or OCONUS locations.  Specific requirements and standards of performance will be provided in each Task Order. For the purposes of this MAIDIQ, OCONUS locations includes Hawaii, Alaska, Germany, Italy, and territories of the United States. At no time shall the Contractor be required to travel to high-risk OCONUS locations.

*Task Area 1: General Technical and Analytical Support*: Task orders requiring work in this area will call for the completion of single-issue studies requiring the performance of Doctrine, Organization, Training, Material, Leadership, Personnel, and Facilities (DOTMLPF) analysis for resolution.  These studies are normally short-term, requiring completion in 1-2 years, culminating in a final report that may be the basis for issuance of a task order in one or more of the other areas of this MAIDIQ.  Task orders issued in the task area include: analysis prior to in-depth work (such as feasibility studies); research within a specific area (material field testing prior to/coincidental to deployment); surveys/analytic summaries of combat or field feedback; ad hoc studies (i.e., the conversion of PowerPoint in classroom instruction); directed surge requirements in support of the Army Learning Concept (ALC) 2015, the Integrated Training Environment (ITE), Battle Command, or Robotics technologies; and other similar support of a short-term nature.

*Task Area 2: Training Development Support:*  This effort may originate with the Directorate of Training and Doctrine Development (DOTD) when working issues in support of the MCoE.  Task orders requiring work in this area will generally require research and writing resulting in revisions to existing Maneuver Force, DoD, or DA training documents and materials (e.g., Programs of Instruction (POIs), graphic training aids, classroom reference materials, and Training Aids, Devices, Simulators, and Simulations (TADSS)).  The primary product will be a Program of Instruction (POI).  A POI is revised when:  there are significant changes projected in training strategy and course content; over 30% of the course lessons require revision and/or resources are affected; or there are changes in POI data fields and/or other course resource requirements.  In some cases, the work will result in new materials, institutional or unit training support packages, or programs of instruction developed or revised in accordance with (IAW) TRADOC Regulation 350-70, or the successor regulation.  In some cases, the work shall result in new Combined Arms Training Strategy (CATS) or related publications.  [CATS is the Army's overarching strategy for current and future training of the force. Its basis is a series of branch proponent, unit and institutional strategies describing training events, frequencies and resources required to train to standard.  These strategies describe how the Army will train the total force to standard in the institutions and unit through self-development.]  The MCoE is currently responsible for 181 POIs, each of which is scheduled for review every two years.

*Task Area 3: Doctrine Development Support:* This effort may originate with the DOTD when working issues in support of the MCoE.  Task orders requiring work in this area will require the conduct of research and analysis conducted for the purpose of revising and updating maneuver doctrine and writing revisions to existing MCoE, DOD, or DA documents and manuals concerning doctrine, based on the results of such research and analysis.  The MCoE is the proponent for 115 doctrinal publications, each of which is scheduled for review every two years. Accordingly, task orders issued in this area will potentially encompass efforts associated with the review and revision of anywhere from one to all 115 publications.  Such effort will include the collection and analysis of lessons learned from Army operations, the identification of trends, review capstone doctrinal publications to identify doctrinal disconnects, and the identification of emerging technologies that may impact on the conduct of combined arms full spectrum operations.  Task functions include, but are not limited to:  (1) Assisting TRADOC's Combined

Arms Center (CAC) in the writing, coordination, integration, and review of selected key (Joint critical) Army doctrine; (2) Reviewing capstone and keystone and other Joint critical Army doctrine to ensure proper linkages to Joint doctrine; (3) Identifying Joint critical Army manuals by publication to avoid duplication of effort with Combined Arms Doctrine Directorate (CADD), CAC and other branch proponent DOTDs; and, (4) Participating in key Army working groups, doctrine working groups and meetings, symposiums, and councils that impact Joint critical Army doctrine implications.

*Task Area 4 Capability Development Support:* This effort may originate with the Capabilities Development and Integration Directorate (CDID) when working issues in support of the MCoE and TRADOC Regulation 71-20. Task orders requiring work in this area will require: conduct of research, design, development, review, and revision of organizational design/structures, including personnel and major equipment item requirements for MCoE proponent units; equipment acquisition support (i.e., pre-Milestone A documentation) for developmental and non-developmental items; identification of materiel requirements and completion of acquisition, technical, and logistical requirements for Post-Rapid Field Initiative (RFI) items, as well as proposed resolution for engineering, manpower integration and system safety issues; support for program management functions (i.e., modifications to approved programs of record in Soldier equipment or ammunition) for programs managed by the MCoE; and the development of future operational capabilities and requirements in accordance with the Joint Capabilities Integration and Development System (JCIDS) (CJCSI 3170.01F, dated 1 May 07) with updates.  Capability Development hinges on the JCIDS process (see also TRADOC Regulation 71-20):

a) Concepts feed the JCIDS. Concepts illustrate how forces will operate, describe the capabilities required to carry out a range of military operations against adversaries in the expected joint operational environment (JOE), and how a commander, using military art and science, might employ these capabilities to achieve desired effects and objectives. They are the foundation for future requirements determination efforts.  Concepts consist of future capabilities descriptions within a proposed structure of military operations for a period of 10-20 years in the future.  Each concept describes problems to solve, the components of potential solutions, and how those components work together to solve the problems.

b) Experiments explore innovative methods of operating to assess their feasibility, evaluate their utility, or determine their limits to reduce risk in current operations and future development efforts.  Experimentation identifies and verifies acceptable solutions for required changes in DOTMLPF to achieve significant advances in force capabilities. Experiments aid in validating the feasibility and utility of future requirements determination efforts.  Concept development and prototype experiments help refine capabilities development and reduce risk to warfighters by providing credible analytical underpinnings to support decision making for force development. Experimentation applies structured assessment procedures to substantiate the effects of proposed warfighting capabilities using discovery, hypothesis-testing, and demonstration approaches as appropriate.

c) Requirements determination assesses required capabilities to identify gaps and develop DOTMLPF RIO solutions to resolve or mitigate gaps with unacceptable risk.  It consists of determining, prioritizing, and documenting changes in DOTMLPF, as well as supporting analysis. These new requirements are the result of JCIDS capabilities-based assessments (CBAs), operational needs statements (ONS), operational lessons learned, and senior leader decisions to accelerate the fielding of future capabilities to the force. Initial capabilities documents (ICDs); capability development documents (CDDs); capability production documents (CPDs); joint DOTMLPF change recommendations (DCRs); and Army DOTMLPF integrated capabilities recommendations (DICRs) formally document these new requirements.

This Task Area will normally require the Contractor to provide expertise and support to conduct a Functional Area Analysis (FAA) to identify operational tasks, conditions, and standards (T\C\S) related to the capability under consideration;  to assist the Army Study Team as they work with subject matter experts (SMEs) to identify and define T\C\S;  to provide expertise and support to conduct a Functional Needs Analysis (FNA) to assess the ability of current and programmed systems under consideration to achieve the standards defined in the FAA by providing quantitative evidence of a system's ability/inability to meet standard;  to provide expertise and support to conduct a Functional Solution Analysis (FSA) identifying and documenting DOTMLPF change recommendations, identifying and documenting materiel approaches to gaps recognized as requiring materiel solution, and documenting the Analysis of Materiel Approaches (AMA) readiness and ability to fill capability gap based on SME input. These efforts will normally result in a Capabilities-based Assessment final report.

_Task Area 5: Training Instruction Support:_ It is expected that the MCoE Schools will require contractor subject matter experts in the development and presentation of instruction for selected resident courses and Mobile Training Teams (MTT) CONUS and/or OCONUS.. Conduct of instruction shall generally be in support of the Officer Education System (OES), the Non-Commissioned Officer Education System (NCOES), Initial Entry Training (IET), and specialized training requirements or to assist in the training of new systems.  Work will require instruction in a variety of settings (classroom, laboratory, seminar, conference, discussion, lecture, demonstration, computer-assisted instruction, field/bleacher), and shall be accomplished IAW TRADOC Regulation 350-70, or its successor regulation.  Work may also require the Contractor to collect and/or analyze lessons learned, identify trends, review capstone doctrinal publications to identify doctrinal disconnects, and identify emerging technologies that may impact on the conduct of training.  The Contractor shall provide small group instruction (no more than 16 students per instructor) and large group instruction (up to 160 students), depending on the requirements of the specific POI.  Course schedules, locations, scope, target audience, class size, and special information are searchable at the Army Training Requirements and Resources System (ATRRS) website: https://www.atrrs.army.mil/atrrscc/search.aspx  Courses listed under school codes 071, 171B, 698, and 809 are potential candidates for task orders.

A typical task order issued in this area will require the Contractor to:  prepare classroom or training areas and pick-up and return training devices as needed; perform operator maintenance on training aids and/or equipment;  train to standard as it conducts classroom / laboratory / seminar / conference / discussion / lecture / demonstration / practical exercise per class training schedule;  assist in conducting and assessing student critiques to identify strengths, weaknesses, and actions to improve performance; schedule and conduct remedial training and student retests; maintain and update a class status chart and logs reflecting number of students

A. 007

in training and class progression; review and summarize student course critique, schedule remedial training as needed; conduct academic counseling, assist in grading written tests, assist in grading results performance tests, review and grade homework projects, and assist in the preparation of student written evaluation upon student graduation; for certain courses, assist in the execution during live fire exercises and course field-training exercises; review student news releases; review a student's record for progression; make entries on student record of training form; complete Training Quality Reports; complete reports on students identified as receiving deficient training; and, prepare and forward required documentation on student release prior to graduation.

   *Task Area 6: Simulations and Analysis Support:* Simulation and analysis tasks generally require contractor subject matter expertise for the MCoE and Proponent Schools in the set-up, conduct, execution, and documentation of live, constructive, and virtual (LVC) simulation exercises and analytical studies, using the Integrated Training Environment (ITE), which links a combination of:  selected training aids (LVC), devices, simulators and simulations (TADSS); infrastructure; Battle Command (BC) systems; and a training scenario framework.  The Contractor shall assist with simulation events (i.e., experiments, tests, studies, or demonstrations of equipment or concepts), and for each event, provide plans, coordination, and reports supporting the event. Depending on the complexity of the event, this includes, but is not limited to:  Model and Simulation Support Plans (including Simulation Architecture and operational views (OVs), system views (SVs), experiment Interface Control Documents, and a task organization and entity reference); Technical Modeling and Simulation Milestones and schedules; experiment Integration Plans; experiment Validation Plans; experimentation Training Plans; Communications Architecture experiment Weapon, Sensor, Munition List (WSML) Data Requests; coordination with the Army Materiel Systems Analysis Activity (AMSAA) for required data products; Experiment Directives;  Analysis Plans including Data Collection Management Plans (DCMPs); manning requirements; Event Design Documents; operational scenarios for the experiment; surveys to be administered during the conduct of the experiment; experiment schedule, milestones and event Battle Rhythm; planning conferences (Initial, Mid, and Final) and In-Process Reviews.  Simulation support involving equipment with proprietary rights and/or serviced by other contract vehicles (i.e., PEO STRI) will not be included in this requirement.

   *Task Area 7: Support Services:* Support Services tasks generally will require the performance of Support Services in administrative and clerical tasks associated with in/out-processing, student recordkeeping, file maintenance (either in hard copy or digital), and similar activities, and/or technical and graphic editing tasks.  Such work may be ordered in conjunction with and in support of task orders of this IDIQ contract, or may be ordered as a stand-alone requirement.

E. **Ordering Period:**  The MCoE Training & Support Services MAIDIQ provides for the following ordering periods:

| | |
|---|---|
| BASE YEAR: | 1 October 2011 through 30 September 2012 |
| OPTION YEAR 1: | 1 October 2012 through 30 September 2013 |
| OPTION YEAR 2: | 1 October 2013 through 30 September 2014 |
| OPTION YEAR 3: | 1 October 2014 through 30 September 2015 |
| OPTION YEAR 4: | 1 October 2015 through 30 September 2016 |

F. **Period of Performance for Task Orders:** Performance under task orders or associated options may extend beyond the ordering periods below. However, a task order **may not** have a period of performance that extends beyond 60 months from the expiration of the MAIDIQ contract vehicle.

G. **Program Ceiling:** The MCoE Training & Support Services MAIDIQ contracts have a collective ceiling of $458 million that will be measured over the contract life against all task orders awarded both, under Suite 1 and Suite 2 over the entire base plus each exercised optional ordering periods.  Prior to the initiation of a task order, ordering activities shall contact the Administrative Contracting Officer (ACO) to verify remaining ceiling capacity. (See Attachment 4)

H. **Suites**:  All Task Orders covering a single primary Task Area out of Task Area 2 and/or Task Area 5, or a combination thereof, will be solicited and awarded under Suite 1.  Any task order including Task Areas 1, 3, 4, 6, and 7 will be competed under Suite 2, Unrestricted Full and Open Competition, regardless of whether the task order also includes tasks under Task Area 2, Task Area 5, or a combination thereof.

I. **Authority to Place Task Orders:**

(1) All contracting organizations under the command of the MICC are herewith delegated authority to award and administer task orders under the MCoE Training & Support Services MAIDIQ contracts.  MICC Task Order Contracting Officers (TOCO) must request and obtain confirmed ceiling allotment from the MCoE Administrative Contracting Officer (ACO) prior to commencing procurement under this IDIQ.  This request may be done via email to the ACO.

(2) Additional DoD offices may be granted ordering authority to issue task orders if necessary to execute mission requirements to support the MCoE program.  Request for delegations will be forwarded to the ACO on the Delegation of Contract Authority (DCA) Request Form provided in Attachment 4.  Prior to delegating ordering authority to other organizations, the ACO will review the requirement to ensure:

(a) the requirement is within the scope of the MCoE Support ID/IQ;
(b) the draft strategy contemplated by the agency is commensurate with the objectives, threshold, and business rules of the contract; and
(c) the agency agrees to make its records available for review upon request.

(3) All task orders are to be awarded on a DD Form 1155 (Order for Supplies and Services).  The Task Order award number will include be the awardees' base contract number from MCoE Training & Support Services MAIDIQ.  Prior to awarding a Task Order, each TOCO that has been granted authority to use this MAIDIQ must contact the ACO to report the total dollar amount of each task order award, and request a 4 digit log number to be assigned to that award.  Task orders will be issued in accordance with the "Uniform Procurement Instrument Identification Numbers" (DFARS 204.7003 *(iv) Indefinite Delivery contracts-D).

A. 009

(4) The requiring office shall follow the policies and procedures in the Federal Acquisition Regulation (FAR) 16.505 (b), MCOE Ordering Guide, PWS, and the Terms and Conditions of the MAIDIQ Contract when soliciting, awarding, and administering TO'S under this MAIDIQ.

J. **Fee for Use**: There is no fee for the use of the contract by any activity or agency delegated authority to solicit, award and administer TOs under this contract. The TOCO shall follow the policies and procedures in the Federal Acquisition Regulation (FAR) 16.505 (b), MCoE Ordering Guide, PWS, and  the Terms and Conditions of the Multiple Award ID/IQ Contract when soliciting, awarding, and administering TOs under this contract.  This does not prohibit the negotiation of service fees by ordering offices as reimbursement for their services IAW law and regulations, when this contract is used as a means of satisfying their client's requirements.

K. **Prime Contractors:** The MCoE Training & Support Services MAIDIQprime Contractors are as follows:

| Suite 1 (100% Small Business) | Suite 2 (Full & Open) |
|---|---|
| ✓ Anautics, Inc. | ✓ Booz Allen Hamilton, Inc. |
| ✓ Charles F. Day & Associates, LLC | ✓ Cubic Applications, Inc. |
| ✓ Paramount Solutions, Inc. | ✓ L-3 Services, Inc. MPRI Division |
| ✓ Potawatomi Training, LLC. | ✓ Northrop Grumman Technical Services, Inc. |
| ✓ The Talmadge Group, Inc. | ✓ RLM Communications, Inc. |
| ✓ Totalis Consulting Group, Inc. | ✓ Science Applications International Corporation (SAIC) |
| ✓ Yorktown Systems Group, Inc. | ✓ Serco, Inc. |

All Contractors are technically qualified and have satisfied the full competitive and past performance requirements of the basic MCoE Training & Support Services MAIDIQ award process.  Additionally, at the time of award of the master contract, the MCoE Training and Support Services MAIDIQ prime Contractors listed under the Suite 1 were classified as small business concerns.

A. 010

# CHAPTER 2
# ROLES AND RESPONSIBILITIES

A. Administrative Contracting Officer (ACO): The Administrative Contracting Officer, located within the MICC, is responsible for the administration of the MCoE Training & Support Services MAIDIQ master contracts and the following:

-   Serving as point of contact for MCoE customers;

-   Providing information regarding the services available under the contracts;

-   Providing the administrative procedures for placing orders, contract administration and issuing contract modifications to the master contracts;

-   Establishing and maintaining central contract files and databases, as appropriate;

-   Monitoring the MCoE Training & Support Services MAIDIQ ceiling;

-   Reviewing and approving requests for Delegation of Contract Authority;

-   Gathering semi-annual usage data from the field and reporting to the Deputy Assistant Secretary of the Army Policy and Procurement (DASA P&P);

-   Tracking and reporting program level metrics;

-   Ensuring the task order requirements are within the MCoE SUPPORT contract scope;

B. **Mission and Installation Contracting Command (MICC), Principal Assistant Responsible for Contracting (PARC):** The MICC PARC is responsible for review and approval, overall guidance and oversight of all task orders and procedures in accordance with acquisition regulations and the designated thresholds as outlined in Chapter 5, Paragraph A, of this Ordering Guide. The PARC's Office is responsible for the following:

- Contracting authority and agency lead;

- Reviewing, processing and providing approvals and guidance for task orders in accordance with review and approval procedures;

- Simplifying, standardizing and streamlining the process;

- Analyzing the adequacy of tools and training;

- Sharing lessons learned;

- Disseminating ACC and MICC Policy;

- Ensuring competition

C. **Task Order Ombudsman:** The ombudsman is a senior agency official at the MICC PARC staff who is independent of the ACO.  The Ombudsman is delegated authority to:

A. 011

- Review concerns and complaints from contractors;

- Ensure contractors are afforded a fair opportunity to be considered;

- Render responses to concerns and complaints from contractors;

- Require the ACO to take corrective action, which may result in re-competition of the task order, if fair opportunity was not provided to all contractors;

The ombudsman represents an impartial authority outside of the task order-contracting office and has ultimate authority to review and adjudicate issues regarding task order awards under this contract.

**Note**: If the ACO does not agree with the Ombudsman, the matter will be decided by the MICC PARC.

D. **Task Order Contracting Officers:** The Task Order Contracting Officer is responsible for the following:

- Serving as the local contracting focal point for coordination and awarding task orders for their clients;

- Ensuring the task order requirements are within the MCoE Training & Support Services MAIDIQ contract scope;

- Authorize travel and overtime;

- Ensuring that the Contractor Manpower Reporting requirement is a part of the service acquisition requirements package and that the requirement is included in the PWS of the resultant task order;

- Ensuring that the requirement to monitor the Contractor's reporting of the required information obtained for the Contractor Manpower Reporting is included in the Contracting Officer's Representative appointment letter;

- Complying with the fair opportunity for consideration requirement and competing all task orders among the restricted or unrestricted suite MCoE Training & Support Services MAIDIQ Contractors;

- Ensuring that Quality Assurance Surveillance Plans and appropriate metrics are provided with each order request;

- Coordinating task order requests with the PARC or MICC points of contacts as required, and obtaining approvals prior to execution;

- Initiating a Contract Performance Assessment Report (CPAR), as required; and

- Submitting a semi-annual report to MICC regarding Contractor performance and ceiling usage.

E. **Task Order Contracting Officer's Representative (COR):** The Task Order Contracting Officer may delegate authority to a Contracting Officer's Representative. This authority is typically to:

- − Define requirements;

- − Accomplish day-to-day surveillance of Contractor performance;

- − Prepare task order performance reports (to include award fee assessments);

- − Ensure reporting under the Contractor Manpower Reports Application is loaded on the prescribed web sites in accordance with the terms of the basic contract and task order;

- − Review invoices in comparison to actual performance accomplished;

- − Interface/oversee other Task Monitors;

- − Report directly to the MAIDIQ COR concerning daily administration matters; and

- − Submit CPAR input annually.

The Task Order Contracting Officer should consider the nomination submitted by the requiring activity that identifies a Government employee who is technically qualified and trained to become COR. The COR nomination letter should outline the authority sought from the Contracting Officer and should indicate the time that will be allocated to perform COR duties. Task Order COR delegations should require CORs to ensure that the Contractor's performance is properly documented and that required reports are provided to the contracting activity for contract administration, monitoring purposes, and the official contract file.

F: **Prime Contractors:** The MCOE Support Prime Contractors are found in Attachment 1. The Prime Contractors are responsible for the following:

- - Submitting Monthly Reports to the ACO that cover task orders and contract status and quality control as specified in the master contracts (Section H.6 of MAIDIQ contract);

- - Submitting Annual Reports to the ACO that cover the assessment of the task order performance as specified in the master contracts (Section H.6 of MAIDIQ contract);

- - Ensuring that performance, deliverables, and small business goals meet the requirements set forth in the master contracts and individual task orders. Performing work and providing the services in accordance with the terms and conditions of the task order and prescribed levels of quality control;

- - Segregating cost data by task order and within each task order pursuant to the terms of the task order;

- - Submitting a proposal in accordance with the request from the Ordering Office; and

- - Collecting and reporting data for the Contractor Manpower Reporting.

A. 013

**CHAPTER 3**
**THE REQUIREMENTS PROCESS AND PLACING ORDERS**

A. **Acquisition Planning:** An Acquisition Strategy has been approved at the MAIDIQ contract level; therefore acquisition strategy documents are not required at the individual Task Order level.  However, it is highly encouraged and recommended for Task Orders reviewed at the PARC level (>$5.5 million) that an abbreviated Task Order acquisition strategy be developed.  A template of a Task Order Acquisition Strategy for Task Orders in excess of $5.5 million is provided at Attachment 2.

B. **Performance Base Work Statement (PWS):** The PWS shall be performance-based, identify the customer's entire needs and address those needs with statements describing the required services in terms of output. The requirements should not be presented in such a manner that limits fair opportunity to compete for the task order and should not impose requirements that are not specifically required to ensure successful satisfaction of the task order requirements. The requirements should be stated in clear, concise, easily understood and measurable terms. Detailed procedures should not be included that dictate how the work is to be accomplished; rather, the requirements should allow the Contractor the latitude to work in a manner suited for innovation and creativity. At a minimum, the PWS should address the work to be performed, location of the work, period of performance, delivery schedule, applicable standards, acceptable criteria, and any special requirements (i.e., security clearances, travel, reports, unique or professional qualifications, special knowledge, etc). See FAR 37.6 for additional requirements for Performance-Based Contracting.

C. **Funding:** Funding shall be authorized at the task order level and shall be the type deemed appropriate for the services to be acquired. No unfunded task orders are authorized. Specifics regarding funding streams (e.g., full funding or partial/incremental funding) will be provided with each task order.

D. **Task Order Types:** The types of TOs that are authorized for use under this MAIDIQ vehicle are Firm Fixed Price (FFP) with reimbursable line items for Other Direct Cost, Time and Material (T&M), and/or Labor Hour (LH).

   (1) The preferred TO type is FFP; however, in the event that it is not possible to accurately estimate the extent or the duration of the work to be performed with any reasonable degree of confidence, a determination may be made by the TOCO to use a T&M or LH TO type. T&M and LH TO types may be utilized at the discretion of the TOCO if properly justified, documented, and approved.  FAR 16.601(d) provides that a time and materials contract may be used only if the Contracting Officer prepares a determination and findings (D&F) that no other contract type is suitable and the D&F is approved at the appropriate level.  The same application and limitations apply to labor-hour contracts in accordance with FAR 16.602. Pursuant to FAR 16.601(d)(1)(ii), the HCA must approve the aforementioned D&F prior to the execution of the base period when the base period plus any option periods exceeds three years. Therefore, before a task order can be awarded, ordering offices shall prepare and have approved a D&F for Use of a Time and Material or Labor Hour task order.

   (2) TOs may include award/incentive fee provisions if properly justified and approved at the TO level.  TOs may be awarded as bilateral orders.  In emergency situations or when a bilateral TO cannot otherwise be issued in a timely manner, the Government has the right to

issue unilateral TOs on an undefinitized basis.  Any such undefinitized unilateral TO shall be definitized as quickly as possible in accordance with DFARS 252.217-7027 (Contract Definitization) utilizing a "not to exceed" ceiling amount provided by the Government in the TO.

Task Order Contracting Officers are encouraged to review the limitations for use of other than fixed price contract types and to ensure adequate surveillance and contract administration is available to support the contract type selected. When selecting the contract type, consider the contract administration requirements and ensure the contract administration team is capable of executing required administration requirements.

E. **Security Requirements**:

      **(1)** This MAIDIQ contract is not classified.  However, it is anticipated that some TOs will require access to or generation of classified material.  A general Contract Security Classification Specification (DD Form 254) has been included in this contract. Contractors shall conform to all security requirements as specified in each task order and as detailed in the DD Form 254 included with the task order.  If a security clearance is required, interim coverage may be obtained from the Department of Defense. Surveillance of DD 254 requirements will be executed at the task order level. Internet site http://www.classmgmt.com contains a complete booklet with instructions on how to prepare and submit a DD Form 254 to obtain security clearances of Secret or higher.  If a security clearance is required, interim coverage may be obtained from the DoD.  Surveillance of DD 254 requirements will be executed at the TO level.

F. **Fair Opportunity:** In accordance with FAR 16.505(b), Ordering, the Task Order Contracting Officer must provide each Prime Contractor a fair opportunity to be considered for each task order exceeding $3,000, except as provided for at FAR 16.505(b)(2). Pursuant to DFARS 216.505-70, Orders Under Multiple Award Contracts, each order exceeding $150,000 shall be placed on a competitive basis in accordance with paragraph DFARS 216.505-70(c), unless this requirement is waived on the basis of a justification that is prepared and approved in accordance with FAR 16.505(b)(2) and includes a written determination that—

      (1) A statute expressly authorizes or requires that the purchase be made from a specified source; or,

      (2) One of the circumstances described at FAR 16.505(b)(2)(i) through (iv) applies to the order. Follow the procedures at PGI 216.505-70 if FAR 16.505(b)(2)(ii) or (iii) is deemed to apply.

Any Request for Task Order Proposal (RTOP) issued under Suite 1 will be competed among the members of Suite 1 only.  Likewise, any RTOP under Suite 2 will be competed among the members of Suite 2 only.  In the instance that Contractor's response(s) for RTOP under Suite 1, is deemed unacceptable, the action may be cancelled under Suite 1 and re-solicited under Suite 2.  If the RTOP is re-issued under Suite 2, all Suite 1 firms who submitted an offer in response to the cancelled RTOP under Suite 1 will be provided fair opportunity for consideration for the RTOR re-competed under Suite 2.

The Task Order Contracting Officer shall:

- Provide a fair notice of the intent to make the purchase, including a description of the work the Contractor shall perform and the basis upon which the selection decision will be made to all Prime Contractors (to satisfy this requirement, the Ordering Office is allowed to provide an email to all Prime Contractors notifying them of the requirement and requesting a response if the Contractor is interested in submitting a proposal or quote);

- Afford all Prime Contractors responding to the notice a fair opportunity to submit an offer and have that offer fairly considered;

- Consider price and cost under each order as one of the factors in the selection decision;

- Keep Contractor submission requirements to a minimum;

- Use streamlined procedures, including oral presentations; and

- Consider only past performance on earlier task orders under the master contracts, if available. Past performance considerations may include the Contractor's performance regarding quality, timeliness, business relations, and cost control.

The competition requirements in FAR Part 6 and the policies in FAR Subpart 15.3 DO NOT APPLY to the ordering process.

G. **Ordering Procedures:** When ordering services over $150,000, the Task Order Contracting Officer shall follow the policies and procedures in the DFARS 216.505-70, Orders under Multiple Award Contracts. The DFARS 216.505-70 procedures take precedence over all other ordering procedures.

H. **Guaranteed Minimum Order:** If the Government requires supplies and services covered by this contract in an amount less than $5,000, the Government is not obligated to purchase, nor is the Contractor obligated to furnish those supplies or services under the contract.

I. **Request for Task Order Proposal (RTOP):** RTOPs or similar requests will be used by the Government when requesting responses to Task Order requirements.  Oral requests may be issued when the requirements are urgent.  The RTOP will include submission requirements, evaluation criteria, and other information specific to the requirement.  The Contractor shall submit a Task Order Response (TOR) in response to RTOPs.  The TOR shall include as a minimum the Contractor's approach to satisfying the Government requirements, OCI/OCI mitigation plan (*if required*), and price.

A RTOP (see sample at Attachment 2) request for quote or other communication tool should be prepared and issued for each task order requirement conveyed in writing. The RTOP and supporting documents should clearly define:

> ➢ The requirement (see Paragraph B, Performance Work Statement above);
> ➢ Anticipated task order type;
> ➢ Instructions for completing of submissions in response to the request and order placement procedures that will be employed;

  ➢ Additional clauses/provisions unique to the task order;
  ➢ Period of performance and CLIN structure instructions;
  ➢ The order placement procedures defining the method in which the task order award will be made; and
  ➢ The basis of award that will be used to select a Contractor, as well as criteria that will form the award decision.

The preferred contract type for task orders is firm-fixed price. In the event that it is not possible to accurately estimate the extent or the duration of the work to be performed with any reasonable degree of confidence, a determination may be made by the Task Order Contracting Officer to use a task order type more appropriate for the situation. Task Order Contracting Officers are encouraged to review the limitations for use of other than fixed price contract types and to ensure adequate surveillance and contract administration is available to support the contract type selected. When selecting the task order type, consider the contract administration requirements and ensure the contract administration team is capable of executing required administration requirements.

The Task Order Contracting Officers may exercise broad discretion in developing the most appropriate order placement procedures. Formal evaluation plans or scoring of quotes or offers are **NOT** appropriate for orders competed under the MCoE Training & Support Services MAIDIQ contracts.  Task Order Contracting Officers should consider the nature of the requirement, the value of the requirement, the duration of the requirement, the extent of existing information (e.g., past performance information, existing quality control plans, etc), and the extent of information requested when determining the order placement approach, submission requirements and response time. When best value tradeoff approaches are contemplated, the Task Order Contracting Officer should consider what is being traded off. For example, for requirements that are routine in nature but require considerable management emphasis to ensure effective and efficient operation under time and fiscal constraints, the Government might consider a tradeoff between price and management approach.

The Contracting Officer should keep submission requirements to a minimum. Oral task order responses may be considered. Ordering Offices should strive to minimize the Contractor's proposal costs associated with responding to requests for specific task orders. Streamlined evaluation approaches are encouraged. Information from offerors should be tailored to the evaluation criteria and should be sufficient to conduct the evaluation.

The basis of award may range from Lowest Price, to variations of best value (e.g. Lowest Price Technically Acceptable, Best Value Trade-Off, etc).  Choose the approach that best suits the requirement.  The task order evaluation factors should be developed by the customer and coordinated with the TOCO.  The evaluation factors may vary from one requirement to another and should be tailored to satisfy the unique aspects of each requirement.

Past Performance shall be limited to past performance information of previous MCoE Training & Support Services task orders where possible. See AFARS 5116.505-90(d) which states, "Past performance information, including quality, timeliness, and cost control on earlier orders placed under the same MATO contract, should be considered in the ordering process. Past performance information should already be readily available in program and technical offices. Requests for Contractor submission of past performance information with proposal submission under MATO contracts shall be eliminated."

In general, FAR Part 15 does not apply to the MCOE Training & Support Services ordering process.  However, refer to FAR 16.505 regarding postaward notices (FAR 15.503) and debriefing of awardees (FAR 15.506) for task orders exceeding $5 million dollars.

Additional clauses may be added at the TO level provided they do not conflict with clauses included in the basic ID/IQ contract.

J. **Task Order Pricing**:

The Pricing Matrix included in each Prime Contractor's contract provides the labor categories that shall be quoted and the maximum rates that may be paid/reimbursed under this contract for each year and optional ordering periods, *if exercised*. Requests to make changes to the pricing Matrices MAY be submitted to the ACO on an annual basis to reflect changes in the wage determinations used to establish CAP rate, and additions/deletions of labor categories. In isolated cases, additional labor categories **may** be added at the TO level with the express written consent of the TOCO. Requests to add additional labor categories shall be commensurate with the pricing methodology employed to establish the rates awarded with the basic contract.

 a. Labor: Labor shall be priced in accordance with the fully burdened labor rates set forth in the On-Site Price Matrix or Off-Site Price Matrix of each Contractor's MCoE Training & Support Services contract, regardless of task order type used. Rates are inclusive of prime labor, subcontract labor, overhead and other burden, and profit.

  (1) To aid in the development of prices quoted in response to TOs, the labor rates set forth in On-Site and Off-Site Price Matrices terms of CAP rates for any type of task order used (selected at the TO level).  The CAP rates represent the highest On-Site and/or Off-Site CAP rates that will be authorized to be paid/reimbursed under this contract.

  (2) Labor rates quoted at the task order level may include discounts from the "CAP" rates that consider the nature, location, size and duration of the task order.

  (3) In the event the TOCO has determined to use a T&M or L&H task order type, separate rates for each category of labor to be performed by the prime and *each* subcontractor will be required. These rates shall not exceed the pre-established CAP rates.

 b. Travel: Reimbursement for local and international travel, subsistence, and lodging shall be paid to the Contractor only to the extent that it is necessary for performance of TOs under this contract. Official travel of Contractor personnel away from their duty station that was not identified in the negotiated TO shall not be undertaken unless advance written approval has been obtained from the TO Contracting Officer or COR. See FAR 31.205-46 for additional information regarding travel costs. Invitational Travel Orders will NOT be issued by the Government for Contractor travel. Only per diem that does not exceed the maximum rates shall be considered to be reasonable. Indirect rates commensurate with the firm's disclosure statement/accounting practices are authorized for reimbursement. Fee or profit on travel expenses is not an allowable reimbursement.

 The Contractor's request for travel shall be in writing and contain the dates, locations, and estimated costs   of the travel.  The Contractor may be required to provide written

summaries of meetings/conferences content (trip report), to include cost to the government, within five (5) working days of return.

NOTE: Additional Travel requirements will be addressed specifically and in detail in each individual Task Order.

(1). Travel Regulations: The following travel regulations may be used to determine reasonableness for travel:

(a) Federal Travel Regulations (in effect at the time of travel) prescribed by the General Services Administration for travel in the contiguous 48 United States.

(b) Joint Travel Regulations Volume 2, DoD Civilian Personnel, Appendix A, prescribed by the DoD for travel in Alaska, Hawaii, The Commonwealth of Puerto Rico, and the territories and possessions of the United States.

(c) Standardized Regulations, (Government Civilians, Foreign Areas), Section 925, "Maximum Travel Per Diem Allowances in Foreign Areas" prescribed by the Department of State.

c. Other Direct Costs (ODCs): ODC's are costs not previously identified as a direct material cost, direct labor cost, or indirect cost that can be identified specifically with a final cost objective and are only authorized to the extent that it is necessary for performance of TOs under this contract. Labor is not permitted to be proposed as an ODC.  Allowable other direct costs will be determined by the Contracting Officer at the TO level and may be added to individual TOs as a separate Contract Line Item Number on a cost reimbursement basis only.

K. **Changes in Team Members/Subcontractors:** The Contractor may not add any team members to the Contractor's team without ACO's authorization to do so. When subcontractors are approved, their services shall be provided within the labor categories and at a rate no higher than the labor rates included in the On-Site Price Matrix or Off-Site Price Matrix of each Contractor's basic ID/IQ contract.  The Contractor shall advise the ACO of team member deletions as they occur.

L. **Government Property:**

It is anticipated that for some tasks Government Furnished Equipment (GFE) will be specified in the individual task order (at the discretion of the Government) with specified delivery dates and in specified condition. Such equipment shall be returned to the Government upon the conclusion of the task order.

Government Furnished Information (GFI) relevant to the tasks to be performed under this contract will be provided to the Contractor for use during the performance of the task as

A. 019

specified in the task orders (at the discretion of the Government) with specified delivery dates. These documents shall be returned to the Government upon conclusion of the task order.

When utilizing GFE/GFI at the task order level, the task order contracting officer must comply with the Deputy Assistant Secretary of the Army, Policy and Procurement Memo dated 7 July 2005, SRIM 05-35, SRIM 06-15, FAR 45.201, DFARS 245.3, and AFARS 5145.3.

M. **Organizational Conflict of Interest (OCI) at the Task Order Level**:

    a. <u>OCI</u>.  It is the intention of the parties that the Contractor will not engage in any other contractual or other activities which could create an organizational conflict of interest with its position under this contract; which might impair its ability to render unbiased advice and recommendations; or, in which it may derive an unfair competitive advantage as a result of knowledge, information, and experience gained during the performance of this contract. Therefore, the Contractor agrees that it will seek the prior written approval of the TOCO before participating in any task order that may involve such a conflict.  Ordering offices are responsible for determining and issuing specific OCI restrictions.

The Contractor agrees that it shall not release, disclose, or use in any way that would permit or result in disclosure to any party outside the Government any information provided to the Contractor by the Government during or as a result of performance of this task order.  Such information includes, but is not limited to, information submitted to the Government on a confidential basis by other persons. Further, the prohibition against release of Government provided information extends to cover such information whether or not in its original form, where the information has been included in Contractor generated work, or where it is discernible from materials incorporating or based upon such information.  This prohibition shall not expire after a given period of time.

Contractor and subcontractor employees assigned to this contract where there will be privileged, proprietary or otherwise sensitive information shall be required, prior to working, to sign a non-disclosure statement for the Government agreeing not to share any information or data with other contractor personnel not assigned to the project or, if assigned to the project, who has not signed a non-disclosure statement.  The signed nondisclosure statements shall be furnished to the COR prior to contract performance.

If after award, a Contractor discovers an actual or potential organizational conflict of interest at the contract level it shall make immediate and full disclosure in writing to the ACO or TOCO. Changes in the Contractor's relationships due to mergers, consolidations or any unanticipated circumstances may create an unacceptable organizational conflict of interest might necessitate such disclosure.

    (1) The notification shall include a description of the actual or potential organizational conflict of interest, a description of the action that the Contractor has taken or proposes to take to avoid, mitigate, or neutralize the conflict, and any other relevant information that would assist the ACO or TOCO in making a determination on this matter.

    (2) If upon RTOP receipt, the Contractor identifies a potential conflict, the Contractor shall submit a request to the TOCO to obtain written approval to participate in a RTOR.  If the Contractor is aware of multiple TOs that may create the appearance of a conflict, or be an

actual conflict, the Contractor shall notify ACO or TOCO as soon as the conflicts/apparent conflicts have been identified. This provision shall be in effect throughout the period of performance of this contract, any extensions thereto by change order or supplemental agreement, and for three years thereafter.

(3) The Contractor shall permit a Government audit of internal OCI mitigation procedures for verification purposes. The Government reserves the right to reject a mitigation plan, if in the opinion of the ACO or TOCO, such a plan is not in the best interests of the Government.

(4) The Contractor shall hold the Government harmless and will freely indemnify the Government as to any cost/loss resulting from the unauthorized use or disclosure of any third-party proprietary information by its employees, the employees of subcontractors, or by its agents.

(5) The Contractor shall include the same provisions as are expressed in this section, including this paragraph, in all subcontracts awarded for performance of any portion of this requirement. This restriction is applicable throughout the period of performance of the subcontract, and any extensions thereof by change order or supplemental agreement, and for three years thereafter. When the provisions of this section are included in a subcontract, the term "Contracting Officer" shall represent the head of the Contracts Office of the prime contract. Any deviations or less restrictive coverage deemed necessary or required by the prime Contractor for a particular subcontract must first be submitted to the ACO or TOCO for approval.

Contractors are invited to review Federal Acquisition Regulation Subpart 9.5 "Organizational and Consultant Conflicts of Interest (OCI). " Particular attention is directed to FAR 9.505, 9.505-1, 9.505-2, 9.505-3 and 9.505-4.

b. MCoE OCI Prevention. It is not the intention of the Government to exclude a Contractor from a competitive acquisition due to a perceived OCI. The Task Order Contracting Officers are fully empowered to evaluate each potential OCI scenario based upon the applicable facts and circumstances. The final determination of such action may be negotiated between the impaired Contractor and the Task Order Contracting Officer. The Task Order Contracting Officer's business judgment and sound discretion in identifying, negotiating, and eliminating OCI scenarios should not adversely affect the Government's policy for competition. The Government is committed to working with potential Contractors to eliminate or mitigate actual and perceived OCI situations, without detriment to the integrity of the competitive process, the mission of the Government, or the legitimate business interests of the vendor community.
In order to prevent a future OCI resulting from potential bias, unfair competitive advantage, or impaired objectivity, the Contractor shall be subject to the following restrictions:

(1) The Contractor may be excluded from competition for, or award of any Government contracts as to which, in the course of performance of this contract, the Contractor has received advance procurement information before such information has been made generally available to other persons or firms.

(2) The Contractor may be excluded from competition for, or award of any Government contract for which the Contractor actually assists in the development of the screening information request, specifications or statements of work.

(3) The Contractor may be excluded from competition for or award of any Government contract which calls for the evaluation of system requirements, system definitions, or other products developed by the Contractor under this contract or resulting TOs.

(4) The Contractor may be excluded from competition for, or award of any Government contract which calls for the construction or fabrication of any system, equipment, hardware, and/or software for which the Contractor participated in the development of requirements or definitions pursuant to this contract or resulting TO.

(5) This section may not exclude the Contractor from performing work under any amendment or modification to this contract or from competing for award for any future contract for work that is the same or similar to work performed under this contract.

(6) The agency may in its sole discretion, waive any provisions of this section if deemed in the best interest of the Government. The exclusions contained in this section may apply for the duration of this contract and for three (3) years after completion and acceptance of all work performed hereunder.

(7) If any stipulation of this section excludes the Contractor from competition for, or award of any contract, the Contractor may not be permitted to serve as a subcontractor, at any tier, on such contract. This section may be incorporated into any subcontracts or consultant agreements awarded under this contract unless the MCoE KO determines otherwise.

c. <u>Examples of OCI concerns</u>.  The following examples illustrate situations in which questions concerning OCI may arise. They are not all inclusive, but are intended to help the TOCO apply general guidance to individual contract and TO situations:

(1) Unequal access to information: Access to "nonpublic information" as part of the performance of a TO provided under the contract or work performed under a separate Government contract could provide the Contractor a competitive advantage in a later competition. Such an advantage could easily be perceived as unfair by a competing vendor who is not given similar access to the relevant information. If the requirements of the Government procurement anticipate the successful vendor may have access to nonpublic information, the successful vendor should be required to submit and negotiate an acceptable mitigation plan. Alternatively, the "nonpublic information" may be provided to all vendors.

(2) Biased ground rules: A Contractor in the course of performance under a TO contract has in some fashion established important "ground rules" for another requirement, where the same Contractor may be a competitor. For example, a Contractor may have drafted the statement of work, specifications, or evaluation criteria of a future procurement. The primary concern of the Government in this case is that a Contractor so situated could slant key aspects

of procurement in their own favor, to the unfair disadvantage of competing vendors. If the requirements of the Government procurement anticipate the Contractor may have been in a position to establish important ground rules, including but not limited to those described herein, the Contractor should be required to submit and negotiate an acceptable mitigation plan.

(3) Impaired objectivity: A Contractor in the course of performance of a TO or contract is placed in a situation of providing assessment and evaluation findings over itself, or another business division, or subsidiary of the same corporation, or other entity with which it has a significant financial relationship. The concern in this case is that the Contractor's ability to render impartial advice to the Government could appear to be undermined by the Contractor's financial or other business relationship to the entity whose work product is being assessed or evaluated.  In these situations, a "walling off" of lines of communication may well be insufficient to remove the perception that the objectivity of the Contractor has been tainted. If the requirements of the Government procurement indicate that the successful vendor may be in a position to provide evaluations and assessments of itself or corporate siblings, or other entity with which it has a significant financial relationship, the affected Contractor should provide a mitigation plan that includes recusal by the vendor from the affected contract work. Such recusal might include divestiture of the work to a third party vendor.

d. <u>Mitigation plans</u>.  The successful Contractor will be required to permit a Government audit of internal OCI mitigation procedures for verification purposes.  The Government reserves the right to reject a mitigation plan, if in the opinion of the Task Order Contracting Officer, such a plan is not in the best interests of the Government. Additionally, after award the Government will review and audit OCI mitigation plans as needed, in the event of changes in the vendor community due to mergers, consolidations, or any unanticipated circumstances that may create an unacceptable organizational conflict of interest.

e. <u>Compliance</u>: Compliance with this OCI requirement is a material obligation of this contract. The rights and remedies described herein shall not be exclusive and are in addition to other rights and remedies provided by law, including those set forth at FAR Part 9.5, Organizational and Consultant Conflicts of Interest, or elsewhere included in this contract. If the Contractor takes any action prohibited by this requirement or fails to take action required by this requirement, the Government may terminate this contract for default. For breach of any of the restrictions contained herein, or for nondisclosure or misrepresentation of any relevant facts required to be disclosed concerning this contract, the Government reserves the right to terminate this contract for default, disqualify the Contractor for subsequent related contractual efforts, and to pursue such other remedies as may be available under law.  If in compliance with this section, the Contractor discovers and promptly reports an organizational conflict of interest subsequent to contract award, the MCoE KO may choose to terminate this contract for convenience of the Government, when such termination is deemed to be in the best interest of the Government.

N. **Work on a Government Installation**:  In performing work under this contract or any TO on a Government installation or in a Government building, the Contractor shall fully comply with local military installation, city, state, and federal laws, regulations and/or ordinances pertinent to performance of the contractual services.  Specifically, the Contractor shall:

– Conform to the specific safety requirements established by this contract or in a TO;

– Observe all rules and regulations issued by the installation Commanding Officer pertaining to fire, safety, security, sanitation, severe weather, admission to the installation, and conduct not directly addressed in this contract;

– Take all reasonable steps and precautions to prevent accidents and preserve the life and health of the Government and Contractor personnel.

– Take such additional immediate precautions as the TOCO, COR or TO Monitor may reasonably require for safety and accident prevention purposes;

– Conform to all security requirements as specified in DD Form 254, and security requirements as specified in the TO Performance Work Statement (PWS).

Each TO request will provide additional information regarding work on government installation.

O. **Quality Control Plan:** Quality Control is the responsibility of the contractor.  The Contractor is responsible for the delivery of quality services/supplies.  All Offerors will be required to include a Quality Control Plan (QCP) with their proposal at the TO level.  The submittal of the Offerors' QCP will ensure the Offeror has an adequate and standardized procedure in place at contract start to monitor performance.  The Offerors' QCP must be detailed, containing a systematic approach to monitor daily operations of key and essential functions for providing quality service to the Government, i.e. discrepancy identification procedures, corrective action procedures, prevention procedures for occurrence/re-occurrence of discrepancies, trend analysis usage, and customer feedback utilization.  Such QCP requirements will increase the likelihood of successful contract performance.  After acceptance of the quality control plan the Contractor shall request the contracting officer's acceptance in writing of any proposed change to his QC system.

P.  **Task Order Review and Approval Procedures**:  The Principal Assistant Responsible for Contracting (PARC), MICC provides contract review, approval, and oversight for all contracts and TOs prepared and awarded by all ordering offices that fall within the MICC area of responsibility.

Q.  **Unauthorized Work**:  The Contractor is not authorized to commence TO performance without a signed TO or direction by the TOCO. Notwithstanding any of the other clauses of this contract, the TOCO shall be the only individual authorized on behalf of the Government to:

– Waive any requirement of the TO; or,

– Modify any term or condition of the TO.

NOTE: Only the ACO is authorized to waive or modify any term or condition of the MCoE ID/IQ basic contract.

R.  **Selection of Contractor and Documentation to Support Task Order Award**:

The evaluation team will evaluate the proposals submitted in accordance with the evaluation criteria set forth in the RTOP and determine the Contractor awardee in accordance with the specified evaluation criteria.  The evaluation process should be biased free. The Task Order Contracting Officer should ensure all evaluators have no conflicts of interest or preconceived outcomes.  Documentation should have clear ties back to the evaluation criteria provided in the RTOP.

Technical support to assist in the evaluation procedure must be provided by the local Garrison/customer. Technical evaluators must be capable of providing knowledge and expertise required to accurately determine adequacy of the proposals.  Technical evaluation shall be conducted of each task order response to the terms of the RTOP.  Evaluation of price should typically be based upon competition.  In-depth price analysis or cost evaluation is not typically required. The labor rates included in the MCoE Training & Support Service MAIDIQ contracts were evaluated in conjunction with the evaluation supporting the basic contract award decision. As such, an analysis of the composition of the labor rates is not required.  To support a fair and reasonable price/cost finding, the price analysis should include feedback from the technical evaluators that the skills mix and level of effort proposed appropriately represents the Contractor's proposed approach and is adequate to successfully satisfy the task order requirements. The Task Order Contracting Officer should evaluate the proposed price (and should include such in the evaluation criteria) to ensure it is fair & reasonable, balanced, and is presented in accordance with pricing instructions.

The Task Order Contracting Officer should control all communications with Contractors. A competitive range decision is not required prior to conducting communications, nor must the Contracting Officer conduct communications with each Contractor. Upon determination of the apparent task order awardee, the Task Order Contracting Officer may conduct negotiations to finalize task order terms, conditions and price/cost.

The Task Order Decision Document (TODD) should be well documented and provide the reader with a clear picture as to how the Contracting Officer arrived at the decision to select the Contractor for award.

S. **Task Order Notifications/Debriefings**: The Task Order Contracting Officer is required under FAR Part 16.505 to provide notifications to unsuccessful offerors and debriefings for task orders in accordance with FAR 15.503 and 15.506 for all task orders exceeding $5 million dollars.  The TOCO is encouraged to provide feedback to the Contractors that provide information regarding the strengths and weaknesses of the Contractor's response.  During the debriefing, the Government should discuss what was required and expected to the Contractor and how or why the Contractor did not provide what was requested.  It should not include point-by-point comparisions of the Contractor's proposal with those of other Contractors.  The debriefings are provided to assist the Contractors in preparing future proposals.  The debriefings may be provided orally, in writing or by any other method deemed appropriate to the Task Order Contracting Officer.

T. **Contract Services/Contractor Manpower Reporting**: The Contract Manpower Reporting (CMR) requirement was implemented by the Assistant Secretary of the Army, Manpower and Reserve Affairs through memorandum dated March 8, 2005. The MCoE Training & Support Services contract includes the required provisions. However, all task orders and delivery orders, regardless of dollar amount, must include a separate Contract Line Item Number for Contract Manpower Reporting in order to obtain better visibility of the Contractor service workforce from Contractors supporting the Army. The CMR was designed to collect and report data regarding

labor costs associated with the contract workforce and the organizations and missions that the contract workforce support. The Contractor Manpower Reporting will ensure that the Army is getting full value from our contract workforce. Therefore, requiring activities shall add accounting for contract services to their requirement packages that are submitted to the Contracting Officer

U. **Task Order Official File**: The official task order file will be maintained and administered at each Ordering Office.

V. **Task Order Release**: Upon release of the initial task order, a copy of that task order shall be forwarded to the ACO Contracting Officer.

W. **Contract Level and Task Order Management-**The Contractor shall manage all aspects of performance under the contract and task orders.

       (1) Contract Level Program Management- The Contractor shall provide technical and functional program management for the management of the entire MCoE Training & Support Services effort.  The Contractor shall provide the centralized administrative, clerical, and documentation and related functions.

       (2) TO Management- The Contractor shall provide all of the management and supervisory skills required to properly manage all Task Orders awarded to them.

## CHAPTER 4
## TASK ORDER PROCESS

**A. <u>Task Orders covering Task Area 2 and/or Task Area 5, or a combination thereof</u>**.

1. The Customer identifies the requirement and obtains funding and applicable approvals to submit procurement package to the applicable Ordering Office.  The customer's package shall include the funding document, PWS, QASP, PRS, IGE, COR information as submitted to COR Online Management Tool, Service Contract Approval Form (SCAF), workload data, period of performance, CLIN structure, and evaluation factors.  The TOCO formulates the Request for Task Order Proposal (RTOP) based on the procurement package submitted by the customer.

2. The TOCO determines whether the Task Order requirement is within the MCoE Training & Support Services scope.  The Ordering Office and customer conduct market research to determine whether MCoE Training & Support Services is the appropriate vehicle to satisfy the customer's requirement.

3. The TOCO determines which suite of master contracts best accommodates the Task Order requirement.  The TOCO requests and obtains confirmed ceiling allotment from the ACO/or the TOCO submits request for delegation (if not MICC).

4. The TOCO prepares Mini Acquisition Strategy for Ordering Officer approval (recommended but not mandatory).

5. The TOCO prepares RTOP to include PWS, Quality Assurance Surveillance Plan (QASP), applicable Workload Data, due date for RTOP return, period of performance and CLIN structure, discussion of Task Order type selected for Task Order, evaluation factors and basis for Task Order award, and Performance Requirements Summary (PRS).

6. The TOCO submits RTOP and attachments to local legal office for review.  For additional review requirements, please see Acquisition Instruction 00-02, Review and Approval Requirements for Contracting Actions.

7.  The TOCO submits RTOP to Suite 1 Contractors who are eligible to receive RTOP.  (Normally 10 to 30 days).

8. The RTOP solicited Contractors submit proposal response prior to TOR due date.

9. The TOCO assembles Evaluation Team to evaluate Contractor proposals in response to RTOP after due date passes.

10. The Evaluation Team evaluates proposals in response to RTOP and documents evaluation in accordance with the streamlined evaluation criteria established in the RTOP.  (Desired evaluation period is 5 to 10 days).

11. The TOCO determines whether discussions are required, if so; notifies Offerors regarding discussions, conducts discussions and request revised responses, evaluation board evaluates and documents revised responses. If discussions are not conducted, the TOCO prepares Task Order Decision Document.

12. The TOCO reviews Master Contract Price Matricies to determine whether apparent successful Task Order recipient is compliant with the price matrix CAP rates and labor categories. The TOCO shall ensure the overall price is fair and reasonable.

13. The Ordering TOCO. For additional review requirements, please see Acquisition Instruction 00-02, Review and Approval Requirements for Contracting Actions.

14.  The TOCO awards Task Order in local PD2 system.

15.  The TOCO provides notification of award decision to Task Order awardee as well as unsuccessful Task Order participants via email.

16. The TOCO conducts debriefings sessions if desired to unsuccessful participants.

17. The TOCO administers Task Order files and submits copy of awards to ACO.

B. **Task Orders including Task Areas 1, 3, 4, 6, and 7, regardless of whether the task order also includes tasks under Task Area 2, Task Area 5, or a combination thereof.**

1. The Customer identifies the requirement and obtains funding and applicable approvals to submit procurement package to the applicable Ordering Office.  The customer's package shall include the funding document, PWS, QASP, PRS, IGE, COR information as submitted to COR Online Management Tool, Service Contract Approval Form (SCAF), workload data, period of performance, CLIN structure, and evaluation factors.  The TOCO formulates the RTOP based on the procurement package submitted by the customer.

2. The TOCO determines whether the Task Order requirement is within the MCoE Training & Support Services scope.  The Ordering Office and customer conduct market research to determine whether MCoE Training & Support Services is the appropriate vehicle to satisfy the customer's requirement.

3. The TOCO determines which suite of master contracts best accommodates the Task Order requirement.  The TOCO requests and obtains confirmed ceiling allotment from the ACO/or the TOCO submits request for delegation (if not MICC).

4. The TOCO prepares Mini Acquisition Strategy for Ordering Officer approval (recommended but not mandatory). The TOCO contacts the ACO to request and ceiling amounts

5. The TOCO prepares RTOP to include PWS, Quality Assurance Surveillance Plan (QASP), applicable Workload Data, due date for RTOP return, period of performance and CLIN structure, discussion of Task Order type selected for Task Order, evaluation factors and basis for Task Order award, and Performance Requirements Summary (PRS).

6. The TOCO submits RTOP and attachments to local legal office for review.  For additional review requirements, please see Acquisition Instruction 00-02, Review and Approval Requirements for Contracting Actions.

7.  The TOCO submits RTOP to Suite 2 Contractors who are eligible to receive RTOP. (Normally 10 to 30 days).

8. The RTOP solicited Contractors submit proposal response prior to TOR due date.

9. The TOCO assembles Evaluation Team to evaluate Contractor proposals in response to RTOP after due date passes.

10. The Evaluation Team evaluates proposals in response to RTOP and documents evaluation in accordance with the streamlined evaluation criteria established in the RTOP. (Desired evaluation period is 5 to 10 days).

11. The TOCO determines whether discussions are required, if so; notifies Offerors regarding discussions, conducts discussions and request revised responses, evaluation board evaluates and documents revised responses. If discussions are not conducted, the TOCO prepares Task Order Decision Document.

12. The TOCO reviews Master Contract Price Matricies to determine whether apparent successful Task Order recipient is compliant with the price matrix CAP rates and labor categories. The TOCO shall ensure the overall price is fair and reasonable.

13. The Ordering TOCO. For additional review requirements, please see Acquisition Instruction 00-02, Review and Approval Requirements for Contracting Actions.

14.  The TOCO awards Task Order in local PD2 system.

15.  The TOCO provides notification of award decision to Task Order awardee as well as unsuccessful Task Order participants via email.

16. The TOCO conducts debriefings sessions if desired to unsuccessful participants.

17. The TOCO administers Task Order files and submits copy of awards to ACO.

A. 029

**CHAPTER 5**
**TASK ORDER MONITORING AND CONTRACT ADMINISTRATION**

A. **Task Order Review and Approval Procedures:** All Task Orders shall be reviewed in accordance with Acquisition Instruction (AI), 00-02, Review and Approval for Contracting Actions dated 26 July 2011.  Contracting Offices issuing task orders will follow the policies and ordering procedures in DFARS 216.505-70 and FAR 16.505.  Additionally, as required by FAR 16.505(b)(5), a senior agency official designated by the PARC is the Task Order Ombudsman to ensure that contractors are afforded a fair opportunity to be considered, consistent with the procedures in the contract.

B. **Contract Administration of Master Contracts**: ICO Office-Fort Benning is responsible for contract administration for the master MCoE Training & Support Services contracts. In no event shall any understanding or agreement, contract modification, change order, or other matter in deviation from the terms and conditions of the contract between the Contractor and a person other than the ACO be effective or binding upon the Government. All such actions must be formalized by proper contractual document executed by the ACO.

Notification of changes in the assigned ACO will be provided by official correspondence from ICO Office-Fort Benning. All correspondence pertaining to the MCoE Training & Support Services master contracts must be addressed to:

Department of the Army
Mission and Installation Contracting Command
ICO Office-Fort Benning
6600 Meloy Drive
Fort Benning, GA 31905

All contract administration associated with individual task orders will be performed by the ordering office issuing the task order unless otherwise designated.

C. **Task Order Contracting Officer's Representative (COR)**: A Contracting Officer's Representative shall be designated for each Task Order issued under the master contracts by the TOCO. The local Customer shall nominate a Government employee who is technically qualified and trained to become a COR and submit the nominee's name to the TOCO for approval and designation. The COR designation letter will outline the duties and authority of the COR. Local CORs will ensure that the Contractor's performance is properly documented and that required reports are provided to the local contracting office for contract administration, monitoring purposes, and the official contract file.

D. **Contractor Performance Assessment Report (CPAR)**: A Contractor Performance Assessment Report shall be completed for each task order issued under this contract that is expected to exceed $1 million (see FAR 42.15). The preparation and completion of the CPAR is the responsibility of the local Ordering Office. The CPAR will be entered into the Contractor Performance Assessment Reporting System (CPARS), located at http://cpars.navy.mil. A CPAR should also be completed for task orders over $100,000 and less than $1million, and a copy forwarded to the Contracting Officer listed in Paragraph C, above.

E. **Quality Assurance Surveillance Plan (QASP)**: A Quality Assurance Surveillance Plan will be tailored and developed for each task order to ensure the assessment of performance for critical contract elements. The QASP serves as the plan for performance surveillance and

identifies the performance indicators, standards, inspection methods, and procedures to be used in monitoring performance. Additionally, the QASP shall include specified procedures for collecting service delivery data, methods of surveillance, thresholds for acceptable and unacceptable performance, and sampling guides.

F. **Metrics**: Metrics shall be included and applied to all task orders performed. At the task order level, the Contractor's performance measurement may include (but are not limited to) metrics such as quality of service, cost effectiveness, timeliness of performance, business relations, Management of Personnel and customer satisfaction.

Program Level Metrics:  The program level metrics include the following:

- Customer Satisfaction
- Management of Service Contracts
- Timeliness of Task Order Execution in meeting Mission Requirements
- Effectiveness in supporting  Army Socio-Economic Program Goals
- Effectiveness in supporting  Army Competition Program Goals
- Opportunity Cost Savings

| Metric | Standard | Target | Data Source | Frequency |
|---|---|---|---|---|
| **Customer Satisfaction** | Contractors provided products and services which met MCoE mission requirements in terms of Quality, Timeliness, Cost Control, Business Relations, and Management of Personnel. | All Contractors received a satisfactory or higher rating for Quality, Timeliness, Cost Control , Business Relations, and Management of Personnell. | Contract Level COR Quality Assurance Surveillance | Annual |
| **Management of Service Contracts** | All MCoE contracts and task orders have a contract level QASP approved, a trained COR appointed, and an annual performance assessment report executed for task orders over $100,000.<br><br>100% – Green<br>80%- 99% - Amber<br><80% - Red | 100 % | MCoE Quality Assurance Program Files | Annual |
| **Timeliness of Task Order Execution in meeting MCoE Mission** | Task orders requirements were planned and executed to meet required services start date<br><br>100% – Green<br>80%- 99% - Amber<br><80% - Red | All task orders met agency mission requirements for required service start date. Exceptions, if any, had interim mission support provided, if required. | MCoE Task Order and Contract Level COR | Annual |

A. 031

| **Effectiveness in supporting Army Socio-Economic Program Goals** | Contractors in Suite 1 complied with FAR 52.219-14, Limitation of Subcontracting.<br><br>Contractors in Suite 2 complied with 52.219-9, Small Business Subcontracting Plan Goals. | All Contractors met small business program requirements. | Contract Level Contracting Officer Files | Annual |
|---|---|---|---|---|
| **Effectiveness in supporting Army Competition Program Goals** | Fair opportunity for consideration was provided on all task orders, unless an exception applied, promoting cost effectiveness through competition. | Average of 3-5 proposals were received in response to all request for task order response. | FPDS-NG CAR Data - Task Orders | Annual |
| **Opportunity Cost Savings** | Program to be compared using comparable in-source values and projected contractual cost to ensure cost effectiveness. | Program met agency mission requirements while continues to provide cost effectiveness. | MCoE Program Manager and COR files, and data from Fully Automated System for Classification (FASCLASS) | Annual |

G. **Contractor Quarterly Status Reports**:  The Contractor shall provide quarterly reports to the MCoE KO indicated above at the end of each quarter. The quarterly reports shall address all activity under the master IDIQ contract through the last day of the last month of each quarter. The quarterly report shall as a minimum, contain the following information:

     (1) A listing of ALL TOs issued to include:

          -- Ordering Office

          -- TO number and date of issuance;

          -- Task area – choose the task area that represents the preponderance of work

          -- Location of performance and a brief description of work covered by TO; e.g. Task Area(s) covered by the TO

          -- Total amount ordered and obligated under each individual TO, to include any modifications;

          -- Performance period of each order including options;

A. 032

-- Type of TO issued (i.e., FFP, T&M, and LH);

-- Indicate number of TOs provided fair opportunity. Number responded to, number declined to participate and rationale for not participating -- Percentage of TOs awarded under each task area;

-- Utilization of small business subcontractors;

-- Concerns or areas for improvement

(2) Cumulative summary of total dollars ordered and obligated to date on IDIQ contract;

(3) Cumulative summary of dollars ordered and obligated by task area when the TO spans more than one.

(4) OCI review to identify, certify the lack of any OCI and address any potential OCI identified.

H.  **Invoices and Payments:**  The specific WAWF will be provided at the TO level.  The information codes will be coordinated at the TO level to assure a successful flow of WAWF documents.

**ATTACHMENTS**

| | |
|---|---|
| Attachment 1 | MCoE Training and Support Services MAIDIQ Prime Contractors |
| Attachment 2 | Sample Task Order Acquisition Strategy |
| Attachment 3 | Sample Request for Task Order Proposal (RTOP) Packet |
| Attachment 4 | MCoE Training & Support Services MAIDIQ Delegation of Contract Authority (DCA) Request Form |

A. 034

**ATTACHMENT 1**

Prime Contractors – **SUITE 1** - (Restricted)

| Contractors | Contract No. | Cage Code |
|---|---|---|
| Anautics, Inc.<br>2360 NW 32nd Street<br>Newcastle, Oklahoma 73065-6589<br>(405) 392-3012 | W91247-11-D-0025 | 1V9F9 |
| Charles F. Day & Associates, LLC<br>75 Barrett Heights Road<br>STE 305<br>Stafford, Virginia 22556-8045<br>(563) 489-1872 | W91247-11-D-0026 | 1JUR5 |
| Paramount Solutions, Inc.<br>3515 S. Cherokee Lane<br>STE 1630<br>Woodstock, Georgia 30188-4795.<br>(770) 645-1155 | W91247-11-D-0027 | 303M3 |
| Potawatomi Training, LLC<br>655 Research Pkwy<br>STE 400<br>Oklahoma City, Oklahoma 73104-6266<br>(405) 996-3000 | W91247-11-D-0028 | 4RRK1 |
| The Talmadge Group, Inc.<br>1050 Crown Pointe Pkwy<br>STE 295<br>Atlanta, Georgia 30338-7701<br>(678) 325-2301 | W91247-11-D-0029 | 3NWG2 |
| Totalis Consulting Group, Inc.<br>11030 Jones Bridge Road<br>STE 200<br>Alpharetta, Georgia 30022-4560<br>(770) 753-9222 | W91247-11-D-0030 | 09KG8 |
| Yorktown Systems Group, Inc.<br>7027 Old Madison Pike NW<br>STE 108<br>Huntsville, Alabama 35806-2369<br>(256) 425-4549 | W91247-11-D-0031 | 4VJW9 |

A. 035

Prime Contractors – **SUITE 2** - (Full & Open)

| Contractors | Contract No. | Cage Code |
|---|---|---|
| Booz Allen Hamilton, Inc.<br>8283 Greensboro Drive<br>McLean, Virginia 22102-4904<br>(703)-377-7947 | W91247-11-D-0032 | 17038 |
| Cubic Applications, Inc.<br>2280 Historic Decatur Road<br>STE 200<br>San Diego, California 92106-6020<br>(706) 569-9100 | W91247-11-D-0033 | 00BW7 |
| L-3 Services, Inc.<br>DBA: MPRI Division<br>1320 Braddock PL<br>STE 200<br>Alexandria, Virginia 22314-1692<br>(703) 664-2671 | W91247-11-D-0034 | 0C9W7 |
| Northrop Grumman Technical Services, Inc.<br>2411 Dulles Corner Park<br>STE 800<br>Herndon, Virginia 20171-3431<br>(505) 998-8294 | W91247-11-D-0035 | 0JRC1 |
| RLM Communications, Inc.<br>1027 E. Manchester Road<br>Spring Lake, North Carolina 28390-9514<br>(910) 223-1350 | W91247-11-D-0036 | 3R0N3 |
| Science Applications International Corporation (SAIC)<br>1710 SAIC Drive<br>McLean, Virginia<br>(256) 971-6483 | W91247-11-D-0037 | 5UTP8 |
| Serco, Inc.<br>1818 Library St. Ste 1000<br>Reston, Virginia 20190-6276<br>(703) 939-6763 | W91247-11-D-0038 | 022Q2 |

A. 036

**ATTACHMENT 2**

**SAMPLE**

**TASK ORDER MINI ACQUISITION STRATEGY**

**Task Order Solicited under MCoE Training & Support Services MAIDIQ Contracts**

**Insert Project or Requirement Title**

**<u>MICC – FORT BENNING</u>**

| | | |
|---|---|---|
| Author: | (Signature) | |
| | NAME | DATE |
| | Contract Specialist | |

| | | |
|---|---|---|
| Reviewed ☐ Approved ≤ $150K | (Signature) | |
| | NAME | DATE |
| | Contracting Officer | |

| | | |
|---|---|---|
| Reviewed By: > *$150K* | (Signature) | |
| | NAME | DATE |
| | Contracts Attorney | |

| | | |
|---|---|---|
| Reviewed & Concur: > $150K | (Signature) | |
| | NAME | DATE |
| | Chief, Branch Name | |

| | | |
|---|---|---|
| Reviewed & Concur: > $150K | (Signature) | |
| | NAME | DATE |
| | Chief, Contracting Division | |

| | | |
|---|---|---|
| Reviewed & Approved $150K < $25M | (Signature) | |
| | NAME | DATE |
| | Director | |

☐ *Copy provided via MCC-Eustis to DASA(S) when ≥ $10M*

A. 037

*This template is a format tool to assist in documenting the acquisition strategy for services, which is to be used for all dollar levels. Instructions and guidance are in blue font. Use formal acquisition strategy signature page(s) for requirements valued in excess of $25M. The instructional language (blue font) is not to be included in the final document.*

**1.  Requirement.**  Briefly describe the requirement; what it is, what it will accomplish, who it will support, required performance period(s), estimated dollar value per year, total dollar value.

   a. Service Contract Approval. Indicate approval to initiate a contract for services has been obtained from the appropriate authority (Ref SecArmy Policy memo, 10 Jul 09, subject: Army Policy for Civilian Workforce Management and Service Contracts, and TRADOC Reg 5-14.)

   b. Taxonomy of Services.  As applicable, state "Knowledge-based Services" or "Not Knowledge-based Services."

      (1) Portfolio Group:  Insert correct group.

      (2) Portfolio:  Insert correct portfolio.

      (3) Product Service Code(s):  Insert correct code(s).

   c. Procurement History.  State if this is a new or recurring requirement.  If it's a recurring requirement discuss how the previous acquisition was accomplished, its dollar value, performance period, contract type, business size, number of offerors, source selection method, and how small business participation was achieved.

**2.  Strategy.**

   a. Enterprise Vehicle.  Provide name of enterprise vehicle (e.g., FIRST, MCoE MATOC, Federal Supply Schedules) and rationale for that selection.

      (1) Scope.  Provide basis for why this requirement is considered to be within scope of the selected enterprise vehicle.

      (2) Availability.  Discuss research conducted to conclude there are no mandatory sources, and provide amount of the MATOC's remaining ceiling.

      (3) Non-DoD Contract.  State "Not applicable" or discuss rationale for use of Federal Supply Schedules.  When requirement exceeds $150K, attach approved D&F (Ref ASA(ALT) memo, 12 Jul 05, subject: Proper Use of non-Department of Defense (Non-DoD) Contracts).

   b. Contract Type.  Discuss contract type (FFP, CPFF, etc.), and reason therefore. Preference is given to Firm Fixed Price and then Cost Plus Fixed or Incentive Fee.  Other types may require additional approvals.  T&M should be avoided.  (Ref ACC Memo, 4 Feb

11, subject: Better Buying Power Initiatives; PARC Policy Alert #12-12).  Requirement for HCA approval of contract type kicks in at $100M.

    c. Better Buying Power Initiatives.  Ref ACC memo, 4 Feb 11, subject: Better Buying Power Initiatives

    (1) Promoting Real Competition.  Discuss extent of competition anticipated and basis therefore (e.g. nature of input from MATOC holders in response to your inquiry into their level of interest prior to issuance of a Request for Task Order Proposal (RTOP), removal or rewrite of PWS sections that served as impediments to competition, leaving RTOP's on the street for 30 or more days, etc.).  Attach J&A if applicable and provide explanation how competition is planned to be stimulated with the acquisition following this one.

    (2) Improve Tradecraft in Service Acquisitions.

        (i) Quality of PWS.  Discuss quality of PWS in terms of its specificity and how it leaves no room for requirement creep.

        (ii) Contract Term. Discuss how the contract term limitation (no more than 3 years for knowledge-based services) provides for more frequent competitions, or why a longer term is critical.

        (iii) Small Business Participation.  Discuss efforts to increase small business participation via set-aside or small business subcontracting goals.  Include date the DD Form 2579 was approved by SBA's Procurement Center Representative.

    d. Basis of Award.  Discuss basis of award (price only, LPTA, Trade-Off, or some combination thereof).  Provide evaluation criteria and relative importance, if applicable.

**3.  Milestones.**  *Minimum milestone events are shown below.  If any are not applicable, remove from the table.  Other events may be added as applicable.*

| Event | Projected Completion Date |
|---|---|
| Acquisition plan approval | |
| Issue Request for Task Order Proposal (TORP) | |
| Receive Proposals | |
| Complete Evaluations | |
| Complete Pre-negotiation Objective Memorandum (POM) | |
| Complete Price Negotiation Memorandum (PNM) | |
| Contract award | |
| Commence Phase-in | |
| Commence full performance | |

A. 039

**4. <u>Attachments.</u>**

Delineate attachments or state "None."

**ATTACHMENT 3**

**SAMPLE**

**Maneuver Center of Excellence (MCoE) Training & Support Services**

**Request for Task Order Proposal (RTOP) Template**

**RTOP Number:**  *{INSERT DODAAC}*-11-RTOP-0001          **Date of Issue:**  *XX Month XXXX*
(Revision No._____)

**Description of Services:** *Enter title of the task order*

**Location of Services:** *Enter the primary place of performance-if multiple locations indicate "See Task Order PWS"*

**Closing Date/Time:** *Enter the date, time, time zone (Eastern Time) for receipt of responses*

Dear Maneuver Center of Excellence (MCoE) Training & Support Services Partners:

This is a Request for Task Order Proposal (RTOP) for services to be provided under the MCoE Training & Support Services MAIDIQ contract vehicle.  A review of the task requirements has been conducted, and it has been determined that the preponderance of the work falls within the following task area(s): *(Delete non-applicable Task Areas)*

Task Area 1:  General Technical and Analytical Support

Task Area 2:  Training Development Support

Task Area 3:  Doctrine Development Support

Task Area 4:  Capability Development Support

Task Area 5:  Training Instruction Support

Task Area 6:  Simulations and Analysis Support

Task Area 7:  Support Services

There is no incumbent contractor. *(The incumbent contractor is _____).*  Fair opportunity is herein provided to all Suite ___ prime contractors.  The Government intends to award a single task order as a result of this RTOP to the offeror that can fulfill all requirements of this RTOP

and the Performance Work Statement (PWS).  Responses that are for less than the full requirements will be rejected and will not be evaluated.

Attached are all related documents for this RTOP.  Please ensure that you have read the attached documents, to include specific response submission instructions that are included in this RTOP, and then submit your response by the date and time indicated above.

Partners choosing not to submit a proposal shall provide a detailed explanation of their decision choosing not to submit a proposal no later than seven (7) business days after receipt of the official RTOP.  The "no-bid reply" should be directed via e-mail to *{INSERT TOCO'S E-MAIL ADDRESS}*.

The Government will hold a pre-proposal conference at *{INSERT GEOGRAPHIC LOCATION}* on *{INSERT DATE}* beginning at *{INSERT TIME}* in building *{INSERT BUILDING ADDRESS}*.   A site visit will follow the pre-proposal conference.  All interested firms may attend with a limit of three (3) attendees per firm.  The names of attendees and all questions regarding this RTOP should be directed via e-mail to *{INSERT TOCO'S E-MAIL ADDRESS}* cc: *{INSERT TO CONTRACT SPECIALIST'S E-MAIL ADDRESS}* by *{INSERT DATE AND TIME}*.  Technical questions will not be addressed during the course of the site visit.  Technical questions must be submitted in writing no later than *{INSERT DATE AND TIME}* via e-mail to *{INSERT TOCO'S E-MAIL ADDRESS}* and *{INSERT TO CONTRACT SPECIALIST'S E-MAIL ADDRESS}*.  If government responses to technical questions affect the Performance Work Statement (PWS) requirements, a follow-on Amendment to the RTOP will be issued.

All items within the RTOP must be completed and returned by closing due date and time.  In addition to this letter, this RTOP includes the following exhibits:

☒ Attachment 1 - Additional Terms and Conditions
☒ Attachment 2 - Pricing Schedule (CLIN Structure)
☒ Attachment 3 - Performance Work Statement/Performance Requirements Summary
☒ Attachment 4 - Quality Assurance Surveillance Plan
☒ Attachment 5 – Submission Instructions/Evaluation Criteria
    ☒ 5 A.  Instructions
    ☒ 5 B.  Evaluation Criteria
    ☒ 5 C.  Basis for Award
☒ Attachment 6 – Attachments or Technical Exhibits *(If applicable)*

Task Order Type: The Government contemplates award of the following task order type:

    ☒  Firm-Fixed Price with reimbursable CLINs for ODCs and Travel (As applicable)

Anticipated Period of Performance:

    Phase-In:
    Base Period:
    Option Period One:
    Option Period Two:
    Option Period Three:
    Option Period Four:

The Task Ordering Contracting Officer (TOCO) reserves the right to withdraw and cancel the proposed RTOP.  In such event contractors shall be notified in writing of the TOCO's decision.  This decision is final, conclusive and shall not be subject to the "Disputes" clause or the "Contract Disputes Act."

Your response must be in full compliance with the instructions in this RTOP and your basic contract.  The response (to include price) shall be valid for sixty (60) calendar days.  If you have any questions, please contact *{INSERT ASSIGNED CONTRACT SPECIALIST'S NAME}* Contract Specialist at *{INSERT TELEPHONE NUMBER AND E-MAIL ADDRESS}* or the undersigned at *{INSERT TELEPHONE NUMBER AND E-MAIL ADDRESS OF TOCO}*.  Thank you in advance for your time and attention in this matter.

Sincerely,

*{INSERT TOCO NAME}*
Task Order Contracting Officer

**Request for Task Order Response (RTOP)**

**Attachment 1 – Additional Terms and Conditions**

**In addition to the clauses in the MCoE Training & Support Services contract, the following apply to this task order:**

☒ FAR 52.217-8, Option to Extend Services within <u>30 days</u>.
☒ FAR 52.217-9, Option to Extend the Term of the Contract
      …within____days;
      …at least___days;
      …shall not exceed___months.
☒ FAR 52.232-19, Availability of Funds for the Next Fiscal Year
      ….beyond 30 September 2012.
☒ FAR 52.232-22, Limitation of Funds is applicable at the CLIN level.
☒ FAR 52.237-3 Continuity of Services
☒ FAR 52.245-1, Government Property *(If applicable)*
☒ FAR 52.245-2, Government Property Installation Operation Services *(If applicable)*
☒ FAR 52.245-9, Use and Charges *(If applicable)*
☒ DFARS 252.211-7007, Item Unique Identification of Government Property *(If applicable)*
☒ FAR 52.233-2, Service of Protest
      <span style="color:red">…..the value of this task order is expected to exceed $10,000,000.00 and therefore the General Accountability Office (GAO) has exclusive jurisdiction of any protest (as defined in section 33.101) in accordance with Section 843 of the Fiscal Year 2008 National Defense Authorization Act (NDAA).</span>
☒ FAR 52.237-1, Site Visit *(If applicable)*
☒ FAR 52.246-6, Inspection of Services-Fixed Price)
☒ DFARS 252.232-7007, Limitation of Government's Obligation *(Only if incrementally funded)*

**The following provision is added to this RTOP:**

**AMC-LEVEL PROTEST PROGRAM (NOV 2008)**

If you have complaints about this procurement, it is preferable that you first attempt to resolve those concerns with the responsible contracting officer.  However, you can also protest to Headquarters, AMC.  The HQ, AMC-Level Protest Program is intended to encourage interested parties to seek resolution of their concerns within AMC as an Alternative Dispute Resolution forum, rather than filing a protest with the Government Accountability Office or other external forum.  Contract award or performance is suspended during the protest to the same extent, and within the same time periods, as if filed at the GAO.  The AMC protest decision goal is to resolve protests within 20 working days from filing.  To be timely, protests must be filed within the periods specified in FAR 33.10.  <u>If you want to file a protest under the AMC-Level Protest Program, the protest must request resolution under that program and be sent to the address below.  All other agency-level protests should be sent to the contracting officer for resolution.</u>

      HQ Army Material Command
      Office of Command Counsel
      4400 Martin Road
      Rm:  A6SE040.001
      Redstone Arsenal, AL 35898-5000

Facsimile number (256) 450-8840

Packages sent by FedEx or UPS should be addressed to:

HQ Army Material Command
Office of Command Counsel
4400 Martin Road
Room:  A6SE040.001
Redstone Arsenal, AL 35898-5000

The AMC-Level Protest procedures are found at:
http://www.amc.army.mil/pa/COMMANDCOUNSEL.asp.

If internet access is not available, contact the contracting officer or HQ, AMC to obtain the AMC-Level Protest Procedures.

(End of Provision)


**Contractor's additional information:**

1.  The Contractor shall provide all personnel, management, supervision, equipment, tools, supplies, materials, transportation, and any other items and services necessary to perform the functions of the Performance Work Statement (PWS).   The place of performance is *{INSERT PLACE OF PERFORMANCE}*. The period of performance is to be complete within *{INSERT MONTHS}* after contract award.

2.  Inspection and Acceptance.  Inspection and acceptance of all work, performance, reports and other deliverables under this task order will be performed at the location specified in this RTOP by the Contracting Officer's Representatives (CORs).  CORs are responsible for inspection and acceptance of services under the Task Order (TO).  The inspection and acceptance is based on the use of the Quality Assurance Surveillance Plan (QASP).  The Government will evaluate the contractor's performance under this TO using the method of surveillance to be identified in the QASP.  The Government will record all surveillance observations.  When an observation indicates defective performance, the COR will request the contractor's representative to initial the observation.

3.  Deliveries or Performance.  The anticipated Period of Performance is *{INSERT PERIOD OF PERFORMANCE}*.

4.  Task Order Administration Data.

   a. Task Ordering Contracting Officer (TOCO).  The *{INSERT ORDERING OFFICE}* is responsible for awarding this TO.  The TOCO is *{INSERT TOCO, COMMERICAL PHONE NUMBER AND E-MAIL ADDRESS}*.  The Task Ordering Contract Specialist is *{INSERT TO CONTRACT SPECIALIS, COMMERICAL PHONE NUMBER AND E-MAIL ADDRESS}*.

   b. TOCO Points of Contact.  The TOCO  will be responsible for the administration of this TO and, alone, is authorized to take actions on behalf of the Government that result in changes in the terms and conditions of the TO.   The TOCO is *{INSERT TOCO, COMMERICAL PHONE NUMBER AND E-MAIL ADDRESS}*.

A. 045

c. Contracting Officer's Representative.

(1) The TOCO will designate a representative, the COR who will provide on-the-ground administration for the Government.  The COR will be designated in writing and a copy of the designation will be furnished to the Contractor. The Contractor is cautioned to read the COR designation because certain authority under the TO is reserved solely for the Contracting Officer. The term "Contracting Officer" as used throughout the TO shall be interpreted to include the Contracting Officer's designated representative(s) acting within the limits of their delegation of authority.

(2) The COR will act in a liaison capacity to coordinate activities between the Contractor and the Government as required in the performance of the work under this TO.

(3) No oral statements of any person whosoever will in any manner or degrees modify or otherwise affect the terms of this TO.  **The TOCO is the only person authorized to approve changes in any of the requirements under this TO, and notwithstanding any provisions contained elsewhere in this TO, the said authority remains solely with the Contracting Officer.**

(4) The COR will receive, review, approve, sign and submit the invoice in WAWF to initiate contractor payment.  Additional information will be provided in the awarded TO.

d.   Electronic Submission and Processing of Payment Requests:  Electronic invoicing is mandatory in accordance with DFARS 252-232-7003, Electronic Submission of Payment Request. The contractor shall submit invoices via WAWF and the CORs will accept services performed via WAWF.  For additional information or if you have questions regarding WAWF, visit the website at https://wawf.eb.mil or contact the Customer Support section at (866) 618-5988.

5.   Special Task Order Requirements.

a. Contractor Manpower Reporting.  The Contractor is required to enter data into the Contractor Manpower Reporting (CMR) system.  Reporting period will be the period of performance not to exceed 12 months ending 30 September of each year and must be reported by 31 October of each calendar year.  Data must be accurate and complete and entered into CMR during the data gathering period of every year, or part of a year, for which the TO is in force.  As part of its submission, the contractor will also provide the estimated total cost (if any) incurred to comply with this reporting requirement. NOTE: If the reporting of Manpower Equivalents is not separately priced, insert "NSP" in the blank shown.

The Office of the Assistant Secretary of the Army (Manpower & Reserve Affairs) operates and maintains a secure Army data collection site where the contractor shall report ALL contractor manpower (including subcontractor manpower) required for performance of this Task Order.  The contractor is required to completely fill in all the information in the format using the following web address:  https://contractormanpower.army.pentagon.mil.

The required information includes:

(1) Contracting Office, Task Order Contracting Officer, Contracting Officer's Representative
(2) Contract number, including task order number
(3) Beginning and ending dates covered by reporting period

(4) Contractor name, address, phone number, e-mails address and name of contractor employee entering data

(5) Estimated direct labor hours (including sub-contractors)

(6) Estimated direct labor dollars paid this reporting period (including sub-contractors)

(7) Total payments (including subcontractors)

(8) Predominant Federal Supply Class Code (FSC) reflecting services provided by contractor (and separate predominant FSC for each sub-contractor if different)

(9) Estimated data collection price

(10) Organizational title associated with the Unit Identification Code (UIC) for the Army Requiring Activity _____ (Obtain and provide the Army Requiring Activity UIC)

(11) Locations where contractor and sub-contractors perform the work (specified by zip code in the United States and nearest city, country.  When in an overseas location, use standardized nomenclature provided on website)

(12) Presence of deployment or contingency contract language

(13) Number of contractor and sub-contractor employees deployed in theater this reporting period (by country)

b. Insurance Requirements.  The following kinds and minimum amounts of insurance are required in accordance with FAR clause 52.228-5 entitled, "Insurance—Work on a Government Installation."

| KIND: | AMOUNT: |
| --- | --- |
| Workmen's Compensation and Occupational Disease Insurance | Amount required by the State in which this TO is performed |
| Employer's Liability Insurance | $100,000 |
| Comprehensive General Liability Insurance for Bodily Injury | $500,000 per occurrence |
| Comprehensive Automobile Liability | $200,000 per person |
| | $500,000 per occurrence for Bodily Injury and |
| | $20,000 per occurrence for Property Damage |

c. Wage Determination.  *{INSERT APPLICABLE WAGE DETERMINATION}* applies to this TO and can be downloaded at www.wdol.gov.  As indicated in the Ordering Guide, Chapter 3, CAP rates are located in the basic contract.

A. 047

**Request for Task Order Response (RTOP**

**Attachment 2 - Pricing Schedule (CLIN Structure)**

| CLIN | Description | Quantity | Unit | Unit Price | Amount |
|------|-------------|----------|------|-----------|--------|
| 0001 | Environmental Compliance Services FFP<br>Contractor to provide services in accordance with the enclosed Performance Work Statement for the period of 01 October 2011 through 30 September 2012. | 12 | Month | $ _____ | $ _____ |
| 0002 | Other Direct Costs (ODC's) COST<br>Other Direct Costs shall not exceed $15,000.00. | 15,000 | Lot | $ 1.00 | $15,000.00 NTE |
| 0003 | Travel COST<br>Contractor will be authorized travel expenses consistent with the substantive provisions of the Joint Travel Regulation (JTR) and the limitation of funds specified in this contract.  Travel shall not exceed $15,000.00. | 25,0000 | Lot | $ 1.00 | $25,000.00 NTE |
| 0004 | Contractor Manpower Reporting FFP<br>Contractor shall provide a Contractor Manpower Report as described in the PWS for the period of 01 October 2011 through 30 September 2012.  If not separately price, Contractor shall input "NSP". | 1 | Each | | NSP |

**Total Based Period**                                              $_____

*(Duplicate as necessary for option periods)*

**Request for Task Order Response (RTOP**

**Attachment 3**

**PERFORMANCE WORK STATEMENT (PWS) [TEMPLATE]**
**MANUEVER CENTER OF EXCELLENCE (MCoE) TRAINING & SUPPORT SERVICES**

*[Insert Title and Activity]*

---

**NOTE TO OUR CUSTOMERS:  THIS TEMPLATE <u>MUST BE TAILORED</u> FOR YOUR AGENCY BY INCLUDING YOUR UNIQUE REQUIREMENTS, QUANTITIES FOR WORKLOAD, SPECIFIC SURVEILLANCE TECHNIQUES,  … ETC.  ANY QUESTIONS REGARDING THIS TEMPLATE SHOULD BE ADDRESSED WITH YOUR ASSIGNED ACQUISITION TEAM.**

**GENERAL INFORMATION IS PRESENTED IN BLUE ITALICS WITH PARENTHESIS BORDERS, WHILE FILL-IN GUIDANCE IS PRESENTED IN BLUE ITALICS WITH BRACKET BORDERS. PLEASE DELETE ALL BLUE ITALICS WHEN FINALIZING THE PWS.**

---

Part 1

General Information

*(General information will include background information, a brief description of the scope of work, personnel related matters such as safety requirements, security requirements, security clearances, quality control requirements, …etc.)*

1.  **<u>GENERAL:</u>**  This is a non-personnel services task order to provide [*Insert title of service to be provided*]. The Government shall not exercise any supervision or control over the contract service providers performing the services herein.  Such task order service providers shall be accountable solely to the Contractor who, in turn is responsible to the Government.

1.1  <u>Description of Services/Introduction</u>:  The Contractor shall provide all personnel, equipment, supplies, facilities, transportation, tools, materials, supervision, and  other items and non-personal services necessary to perform  [*Insert title of service to be provided*] as defined in this Performance Work Statement  except for those items specified as government furnished property and services. The Contractor shall perform to the standards in this task order and the terms and conditions set forth in the master ID/IQ contract.

1.2  <u>Background</u>:   [*Insert history and/or background information on the services that are to be provided.*]

1.3  <u>Objectives</u>:  [*Insert a few bullets stating what the basic service objective is.*]

1.4  <u>Scope</u>:  [*Insert the type of services that are to be performed*].  *Services include* [*Insert what is included in the services to be provided*].  *The Contractor shall accomplish* [*Insert what should be accomplished, if applicable*].

1.5  <u>Period of Performance</u>:  [*State period of performance and option years, if applicable.*]   *For example:* The period of performance shall be for one (1) Base Year of 12 months and two (2) 12-month option years.  The Period of Performance reads as follows:

A. 049

Base Year

Option Year I

Option Year II      *(If applicable)*

## 1.6 General Information

1.6.1 Quality Control *(If applicable)*:  The Contractor shall develop and maintain an effective quality control plan to ensure services are performed in accordance with this PWS.  The Contractor shall develop and implement procedures to identify, prevent, and ensure non-recurrence of defective services.  The Contractor's quality control program is the means by which he assures himself that his work complies with the requirement of the contract.  [*Insert when and how the QCP is to be delivered, i.e., within 30 days after contract award or with the Contractors proposal if it is an evaluation  factor, three copies of a comprehensive written QCP shall be submitted to the KO and COR  within 5 working days when changes are made thereafter.*]  The Offerors' QCP must be detailed, containing a systematic approach to monitor daily operations of key and essential functions for providing quality service to the Government, i.e. discrepancy identification procedures, corrective action procedures, prevention procedures for occurrence/re-occurrence of discrepancies, trend analysis usage, and customer feedback utilization.  Such QCP requirements will increase the likelihood of successful contract performance.  After acceptance of the quality control plan the Contractor shall request the contracting officer's acceptance in writing of any proposed change to his QC system.

1.6.2 Quality Assurance:  The Government shall evaluate the Contractor's performance under this contract in accordance with the Quality Assurance Surveillance Plan.  This plan is primarily focused on what the Government must do to ensure that the Contractor has performed in accordance with the performance standards.  It defines how the performance standards will be applied, the frequency of surveillance, and the minimum acceptable defect rate(s).

1.6.3 Recognized Holidays:  [*State if the Contractor is or is not required to perform services on holidays.*]

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Jr.'s Birthday | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

1.6.4 Hours of Operation:  The Contractor is responsible for conducting business, between the hours of [*Insert the appropriate hours for your organization*] Monday thru Friday except Federal holidays or when the Government facility is closed due to local or national emergencies, administrative closings, or similar Government directed facility closings.  For other than firm fixed price contracts, the Contractor will not be reimbursed when the government facility is closed for the above reasons.  The Contractor must at all times maintain an adequate workforce for the uninterrupted performance of all tasks defined within this PWS when the Government facility is not closed for the above reasons.  When hiring personnel, the Contractor shall keep in mind that the stability and continuity of the workforce are essential.

1.6.5 Place of Performance:  The work to be performed under this task order will be performed at [*Insert the place of performance, i.e., Contractor facility or government facilities*].

1.6.6   Type of Contract:  The Government will award a (Type of task order to be determined by TOCO and the customer).

1.6.7   Security Requirements:  Contractor personnel performing work under this task order must have a [Insert the level of security required, if applicable] at time of the proposal submission, and must maintain the level of security required for the life of the contract.  The security requirements are in accordance with the attached DD254 (The unit security monitor is responsible for initiating this form).

1.6.7.1  Physical Security:  The Contractor shall be responsible for safeguarding all Government equipment, information and property provided for Contractor use.  (Insert the following sentence, if performing in a government facility.)  At the close of each work period, government facilities, equipment, and materials shall be secured.

1.6.7.2  Key Control  (If applicable).  The Contractor shall establish and implement methods of making sure all keys/key cards issued to the Contractor by the Government are not lost or misplaced and are not used by unauthorized persons.  NOTE: All references to keys include key cards.  No keys issued to the Contractor by the Government shall be duplicated.  The Contractor shall develop procedures covering key control that shall be included in the Quality Control Plan.  Such procedures shall include turn-in of any issued keys by personnel who no longer require access to locked areas.  The Contractor shall immediately report any occurrences of lost or duplicate keys/key cards to the Contracting Officer.

1.6.7.2.1. In the event keys, other than master keys, are lost or duplicated, the Contractor shall, upon direction of the Contracting Officer, re-key or replace the affected lock or locks; however, the Government, at its option, may replace the affected lock or locks or perform re-keying.  When the replacement of locks or re-keying is performed by the Government, the total cost of re-keying or the replacement of the lock or locks shall be deducted from the monthly payment due the Contractor.  In the event a master key is lost or duplicated, all locks and keys for that system shall be replaced by the Government and the total cost deducted from the monthly payment due the Contractor.

1.6.7.2.2. The Contractor shall prohibit the use of Government issued keys/key cards by any persons other than the Contractor's employees.  The Contractor shall prohibit the opening of locked areas by Contractor employees to permit entrance of persons other than Contractor employees engaged in the performance of assigned work in those areas, or personnel authorized entrance by the Contracting Officer.

1.6.7.3 Lock Combinations  (If applicable).   The Contractor shall establish and implement methods of ensuring that all lock combinations are not revealed to unauthorized persons.  The Contractor shall ensure that lock combinations are changed when personnel having access to the combinations no longer have a need to know such combinations.   These procedures shall be included in the Contractor's Quality Control Plan.

1.6.8  Special Qualifications:  [Insert any special certification requirements for employees if deemed appropriate i.e. The Contractor is responsible for ensuring all employees possess and maintain current Information Assurance Technician (IAT) Level I professional certification during the execution of this task order.]

1.6.9  Post Award Conference/Periodic Progress Meetings:  The Contractor agrees to attend any post award conference convened by the contracting activity or contract administration office in

accordance with Federal Acquisition Regulation Subpart 42.5. The Contracting Officer, Contracting Officers Representative (COR), and other Government personnel, as appropriate, may meet periodically with the Contractor to review the Contractor's performance.  At these meetings the Contracting Officer will apprise the Contractor of how the government views the Contractor's performance and the Contractor will apprise the Government of problems, if any, being experienced.  Appropriate action shall be taken to resolve outstanding issues.  These meetings shall be at no additional cost to the government.

1.6.10  <u>Task Order Contracting Officer Representative (COR)</u>:  The (COR) will be identified by separate letter.  The COR monitors all technical aspects of the task order and assists in task order administration The COR is authorized to perform the following functions: assure that the Contractor performs the technical requirements of the task order: perform inspections necessary in connection with task order performance: maintain written and oral communications with the Contractor concerning technical aspects of the task order: issue written interpretations of technical requirements, including Government drawings, designs, specifications: monitor Contractor's performance and notifies both the Contracting Officer and Contractor of any deficiencies; coordinate availability of government furnished property, and provide site entry of Contractor personnel.  A letter of designation issued to the COR, a copy of which is sent to the Contractor, states the responsibilities and limitations of the COR, especially with regard to changes in cost or price, estimates or changes in delivery dates.  The COR is not authorized to change any of the terms and conditions of the resulting order.

1.6.11  <u>Key Personnel</u>:  The follow personnel are considered key personnel by the government:  [*Insert the titles of the key personnel i.e., task order manager/Alternate task order manager, Systems Engineer, etc.*]   The Contractor shall provide a task order manager who shall be responsible for the performance of the work.  The name of this person and an alternate who shall act for the Contractor when the manager is absent shall be designated in writing to the contracting officer.  The task order manager or alternate shall have full authority to act for the Contractor on all task order matters relating to daily operation of this task order.  The task order manager or alternate shall be available between [*Insert the hours, i.e., 8:00 a.m. to 4:30p.m.*], Monday thru Friday except Federal holidays or when the government facility is closed for administrative reasons.  Qualifications for all key personnel are listed below:  [*Insert the qualifications for all key personnel, i.e., 1.6.12.1 Task order Manager and Alternate, 1.6.12.1.1 The Task order Manager and Alternate must have 24 semester hours in mathematical, engineering, and/or quanititative analysis courses; 15 or more years cost analysis experience; and familiarity with Defense Department Data Sources (e.g. cost and software data reporting, EVM), 1.6.12.2 Systems Administrator, 1.6.12.2.1 The Systems Administrator must have a high degree of expertise with the following systems/protocols:  Microsoft Server 2000 and XP operation and administration, and Network Administration.*]

1.6.12  <u>Identification of Contractor Employees</u>:  All task order personnel attending meetings, answering Government telephones, and working in other situations where their Contractor status is not obvious to third parties are required to identify themselves as such to avoid creating an impression in the minds of members of the public that they are Government officials.  They must also ensure that all documents or reports produced by Contractors are suitably marked as Contractor products or that Contractor participation is appropriately disclosed.  [*Indicate if Contractor personnel will be required to obtain and wear badges in the performance of this service.*]

1.6.13  <u>Contractor Travel</u> *(If applicable)*:   [*Insert any travel requirements.*].  *For example:*  Contractor will be required to travel CONUS and within the NCR during the performance of this task order to attend meetings, conferences, and training.  The Contractor may be required to travel to off-site

training locations and to ship training aids to these locations in support of this PWS.  *Required language should travel be needed:*  Contractor will be authorized travel expenses consistent with the substantive provisions of the Joint Travel Regulation (JTR) and the limitation of funds specified in this task order.  All travel requires Government approval/authorization and notification to the COR. *For proposal purposes, a Not to exceed amount  for travel can be established or you can include in your IGCE and the  workload summary , a projected listing of travel locations to include frequency and number of persons required to travel so the offerors can provide pricing.*

1.6.14  <u>Other Direct Costs</u>  *(If applicable)*:  [*Insert what the other direct costs requirements will be. These costs must be preapproved by the contracting officer*]  *For example:*  This category includes travel (outlined in 1.6.13), reproduction, and shipping expenses associated with training activities and visits to Contractor facilities.  It could also entail the renting of suitable training venues.

1.6.15  <u>Data Rights</u>  *(If applicable)*:  The Government has unlimited rights to all documents/material produced under this task order.  All documents and materials, to include the source codes of any software, produced under this task order shall be Government owned and are the property of the Government with all rights and privileges of ownership/copyright belonging exclusively to the Government.  These documents and materials may not be used or sold by the Contractor without written permission from the Contracting Officer.  All materials supplied to the Government shall be the sole property of the Government and may not be used for any other purpose.  This right does not abrogate any other Government rights.

1.6.16  <u>Phase In/Phase Out Period</u>  *(If applicable)*:  To minimize any decreases in productivity and to prevent possible negative impacts on additional services, the Contractor shall have personnel on board,  during the [*Insert the time period, i.e., sixty (60) day, thirty (30) day, etc.*] phase in/ phase out periods.  During the phase in period, the Contractor shall become familiar with performance requirements in order to commence full performance of services on the task order start date.

A. 053

PART 2

DEFINITIONS & ACRONYMS

(This section includes all appropriate terms and phrases for this PWS.   The definition must be clear and concise, not ambiguous.  Carefully consider each definition because they will be binding for the duration of this task order, unless modified.  In addition, include a complete listing of all acronyms and words or phrases they represent.)

2.  **DEFINITIONS AND ACRONYMS:**

2.1.  DEFINITIONS:  [*List any terms used within the PWS that require further definition.  At a minimum, insert the definitions provided below*].

2.1.1.  CONTRACTOR.  A supplier or vendor having a task order to provide specific supplies or service to the government.  The term used in this task order refers to the prime.

2.1.2.  CONTRACTING OFFICER.   A person with authority to enter into, administer, and or terminate contracts, and make related determinations and findings on behalf of the government.  Note: The only individual who can legally bind the government.

2.1.3.  CONTRACTING OFFICER'S REPRESENTATIVE (COR).   An employee of the U.S. Government appointed by the contracting officer to administer the task order.  Such appointment shall be in writing and shall state the scope of authority and limitations.  This individual has authority to provide technical direction to the Contractor as long as that direction is within the scope of the task order, does not constitute a change, and has no funding implications.  This individual does NOT have authority to change the terms and conditions of the task order.

2.1.4.  DEFECTIVE SERVICE.  A service output that does not meet the standard of performance associated with the Performance Work Statement.

2.1.5.  DELIVERABLE.  Anything that can be physically delivered but may include non-physical things such as meeting minutes.

2.1.6.  KEY PERSONNEL.  Contractor personnel that are evaluated in a source selection process and that may be required to be used in the performance of a task order by the Key Personnel listed in the PWS.  When key personnel are used as an evaluation factor in best value procurement, an offer can be rejected if it does not  have a firm commitment from the persons that are listed in the proposal.

2.1.7.  PHYSICAL SECURITY.  Actions that prevent the loss or damage of Government property.

2.1.8.  QUALITY ASSURANCE.  The government procedures to verify that services being performed by the Contractor are performed according to acceptable standards.

2.1.9.  QUALITY ASSURANCE Surveillance Plan (QASP).  An organized written document specifying the surveillance methodology to be used for surveillance of Contractor performance.

2.1.10.  QUALITY CONTROL.  All necessary measures taken by the Contractor to assure that the quality of an end product or service shall meet task order requirements.

2.1.11.  SUBCONTRACTOR.  One that enters into a contract with a prime Contractor.  The Government does not have privity of contract with the subcontractor.

A. 054

2.1.12.  WORK DAY.  The number of hours per day the provides services in accordance with the task order.

2.1.12.  WORK WEEK.  Is defined as Monday through Friday, unless specified otherwise.

2.2.  ACRONYMS:  [*List all acronyms used in the PWS and what they represent.  At a minimum, insert the  acronyms provided below*].

| | |
|---|---|
| ACOR | Alternate Contracting Officer's Representative |
| AFARS | Army Federal Acquisition Regulation Supplement |
| AR | Army Regulation |
| CCE | Contracting Center of Excellence |
| CFR | Code of Federal Regulations |
| CONUS | Continental United States (excludes Alaska and Hawaii) |
| COR | Contracting Officer Representative |
| COTS | Commercial Off the Shelf |
| DA | Department of the Army |
| DD250 | Department of Defense Form 250 (Receiving Report) |
| DD254 | Department of Defense Contract Security Requirement List |
| DFARS | Defense Federal Acquisition Regulation Supplement |
| DMDC | Defense Manpower Data Center |
| DOD | Department of Defense |
| FAR | Federal Acquisition Regulation |
| HIPAA | Health Insurance Portability and Accountability Act of 1996 |
| MAIDIQ | Multiple Award Indefinite Delivery/Indefinite Quanity |
| MCoE | Maneuver Center of Excellence |
| OCI | Organizational Conflict of Interest |
| OCONUS | Outside Continental United States (includes Alaska and Hawaii) |
| ODC | Other Direct Costs |
| PIPO | Phase In/Phase Out |
| POC | Point of Contact |
| PRS | Performance Requirements Summary |
| PWS | Performance Work Statement |
| QA | Quality Assurance |
| QAP | Quality Assurance Program |
| QASP | Quality Assurance Surveillance Plan |
| QC | Quality Control |
| QCP | Quality Control Plan |
| TE | Technical Exhibit |
| TO | Task Order |
| TOCO | Task Order Contracting Officer |

A. 055

PART 3

GOVERNMENT FURNISHED PROPERTY, EQUIPMENT, AND SERVICES

*(This section should identify those items such as property, information and/or services that will be provided for the Contractor's use (without cost to the Contractor) to allow them to provide the required services, such as materials, facilities, training, etc.  Examples provided below.)*

**3. <u>GOVERNMENT FURNISHED ITEMS AND SERVICES</u>:**

3.1. Services  *(If applicable)*:  The Government will provide [*Insert the services that will be provided, i.e., may include personnel to assist with production set-up*].

3.2  Facilities  *(If applicable)*:  The Government will provide [*Insert what facilities will be provided, i.e., the necessary workspace for the Contractor staff to provide the support outlined in the PWS to include desk space, telephones, computers, and other items necessary to maintain an office environment*].

3.3  Utilities  *(If applicable)*:  The Government will provide [*Insert what utilities will be provided, i.e., all utilities in the facility will be available for the Contractor's use in performance of tasks outlined in this PWS.*]  *If utilities are furnished, the following is required:*  The Contractor shall instruct employees in utilities conservation practices.  The Contractor shall be responsible for operating under conditions that preclude the waste of utilities, which include turning off the water faucets or valves after using the required amount to accomplish cleaning vehicles and equipment.

3.4  Equipment  *(If applicable)*:  The Government will provide [*Insert what equipment will be provided and/or what the Contractor will have access to, i.e., scanners  fax machines, printers, shipping crates, lighting and sound, etc.*]

3.5  Materials  *(If applicable)*:  The Government will provide [*Insert what materials will be provided, i.e., Standard Operating Procedures and Policies.*]

A. 056

PART 4

CONTRACTOR FURNISHED ITEMS AND SERVICES

*(This section is used to identify the materials and equipment that the Contractor must provide. Examples provided below.)*

**4.  CONTRACTOR FURNISHED ITEMS AND RESPONSIBILITIES:**

4.1  General  *(If applicable)*:  The Contractor shall furnish all supplies, equipment, facilities and services required to perform work under this task order that are not listed under Section 3 of this PWS.

4.2  Secret Facility Clearance  *(If applicable)*:  The Contractor shall possess and maintain a SECRET facility clearance from the Defense Security Service.  The Contractor's employees, performing work in support of this task order shall have been granted a SECRET security clearance from the Defense Industrial Security Clearance Office.  The DD 254 is provided as Attachment [*Insert the attachment number*].

4.3.  Materials  *(If applicable)*.  The Contractor shall [*Insert what materials will be provided, i.e., furnish materials, supplies, and equipment necessary to meet the requirements under this PWS*].

4.4.  Equipment  *(If applicable)*.  The Contractor shall [*Insert what equipment will be provided, i.e., furnish tractors, lighting and sound, containers, etc. to meet the requirements under this PWS*].

PART 5

SPECIFIC TASKS

*(This section is the heart of the PWS.  All of the services to be performed under the task order should be described in sufficient detail here.  This includes all general tasks required by the Government.)*

## 5.  Specific Tasks:

5.1.  Basic Services.  The Contractor shall provide services for [*Insert the services and/or tasks to be provided by the Contractor*].

5.2.  Task Heading.  (*If applicable) [Insert the specific task to be provided in sequential order, i.e.,5.2, 5.3, etc. by the Contractor]*

5.3.  <u>CONTRACTOR MANAGEMENT REPORTING (CMR)</u> (Only applies to Army Customers): The Office of the Assistant Secretary of the Army (Manpower & Reserve Affairs) operates and maintains a secure Army data collection site where the Contractor shall report ALL Contractor manpower (including subcontractor manpower) required for performance of this contract.   The Contractor shall completely fill in all the information in the format using the following web address https://Contractormanpower.army.pentagon.mil.  The required information includes:  (1) Contracting Office, Contracting Officer, Contracting Officer's Technical Representative (COTR) or also know as the Contracting Officer's Representative (COR); (2)  Contract number, including task and delivery order number; (3)  Beginning and ending dates covered by reporting period; (4)  Contractor's name, address, phone number, e-mail address, identity of Contractor employee entering data; (5)  Estimated direct labor hours (including sub-Contractors); (6)  Estimated direct labor dollars paid this reporting period (including sub-Contractors); (7)  Total payments (including sub-Contractors); (8)  Predominant Federal Service Code (FSC) reflecting services provided by Contractor (and separate predominant FSC for each sub-Contractor if different); (9)  Estimated data collection cost; (10)  Organizational title associated with the Unit Identification Code (UIC) for the Army Requiring Activity (the Army Requiring Activity is responsible for providing the Contractor with its UIC for the purposes of reporting this information); (11)  Locations where Contractor and sub-Contractors perform the work (specified by zip code in the United States and nearest city, country, when in an overseas location, using standardized nomenclature provided on website); (12)  Presence of deployment or contingency contract language; and (13)  Number of Contractor and sub-Contractor employees deployed in theater this reporting period (by country).  As part of its submission, the Contractor shall provide the estimated total cost (if any) incurred to comply with this reporting requirement.  Reporting period shall be the period of performance not to exceed 12 months ending September 30 of each government fiscal year and must be reported by 31 October of each calendar year.  Contractors may use a direct XML data transfer to the database server or fill in the fields on the website.  The XML direct transfer is a format for transferring files from a Contractor's system to the secure website without the need for separate data entries for each required data element at the website.  The specific formats for the XML direct transfer may be downloaded from the website.

PART 6

APPLICABLE PUBLICATIONS

*(In this section list any publications, manuals, and/or regulations that the contractor must abide by. See example provided below.)*

**6**. **APPLICABLE PUBLICATIONS (CURRENT EDITIONS)** *(If applicable)*:  *(In this section list any publications, manuals, and/or regulations that the contractor must abide by.  See example provided below.)*

6.1. The Contractor must abide by all applicable regulations, publications, manuals, and local policies and procedures.  *(For example, insert AR 25-2, AR 530-1.)*

A. 059

PART 7

ATTACHMENT/TECHNICAL EXHIBIT LISTING

*(Under this section list all attachments and technical exhibits that will be useful for the contractor to submit an appropriate proposal.)*

**7.   Attachment/Technical Exhibit List:**


7.1. Attachment 1/Technical Exhibit 1 – Performance Requirements Summary *(This document is required for every PWS.  See attached example for format.)*

7.2.  Attachment 2/Technical Exhibit 2 – Deliverables Schedule *(This document is required for every PWS.  See attached example for format.)*

7.3  Attachment 3/Technical Exhibit 3 – Estimated Workload Data *(This document should be made available if historical data exists.  See attached example for format.)*

## Technical Exhibit 1

### Performance Requirements Summary

The contractor service requirements are summarized into performance objectives that relate directly to mission essential items.  The performance threshold briefly describes the minimum acceptable levels of service required for each requirement.  These thresholds are critical to mission success.

| Performance Objective<br><br>*(The Service required—usually a shall statement)* | Standard | Performance Threshold<br><br>**(This is the Maximum Error Rate.  It could possibly be "zero deviation from standard)** | Method of Surveillance | Frequency |
|---|---|---|---|---|
| **Timeliness of Performance** | The Contractor adhered to all schedule timelines, milestones, delivery schedules and administrative requirements that contribute to, or effected schedule variance, to include scheduled on-time delivery of reports, data products, billing invoices, staffing of personnel, and action items. | All deliverables were complete, accurate, and delivered on time with no more than one discrepancy during the surveillance period with effective corrective action taken on the discrepancy to prevent reoccurrence.  Services are unacceptable if more than one discrepancy was identified or if the discrepancy was for a previously identified performance issue whereby corrective action failed to prevent reoccurrence. | Contractor Quality Control Records, Contractor Monthly Status Report,  and Government Quality Assurance Surveillance Records | Monthly |
| **Cost Control (Task Orders with Cost, T&M, and/or LH CLINs)** | Contractor was effective in forecasting, managing, and controlling cost, including reporting and analyzing variances in accordance with the contract terms and conditions. Contractor complies with Limitation of Cost, invoicing, and availability of funding contract terms and conditions. | No more than one discrepancy in maintaining cost, whereby cost increases occurred without a commensurate increase in performance level. Corrective action prevents reoccurrence. Services are unacceptable if more than one discrepancy was identified or if the discrepancy was for a | Contract terms and conditions, Contractor Monthly Status Report, Contractor monthly invoices, Government Quality Assurance Surveillance Records, WAWF | Monthly |

A. 061

| | | previously identified performance issue whereby corrective action failed to prevent reoccurrence. | | |
|---|---|---|---|---|
| **Quality of Product/ Services** | The Contractor provided quality services/products and management oversight in all functional areas and acquisition processes. The Contractor provided accurate data/reports, met task order objectives, with emphasis on overall success and positive impact to the acquisition program and organizational mission. | No more than one deficiency during the surveillance period. Corrective action prevents reoccurrence. Services are unacceptable if more than one deficiency is identified or if the discrepancy was for a previously identified performance issue whereby corrective action failed to prevent reoccurrence. | Contractor Quality Control Records, Contractor Monthly Status Report,  and Government Quality Assurance Surveillance Records | Monthly |
| **Management of Personnel** | The contactor provided qualified personnel, with appropriate skills and experience.  The Contractor provided effective management of all personnel, to include the selection, retention, training, support, and replacement, when necessary (e.g., employee is not qualified to perform assigned tasks, or if disruptive personality conflicts and/or behavioral problems arise.) | No more than one validated customer complaint during the surveillance period with corrective action to prevent reoccurrence. Services are unacceptable if more than one validated customer complaint was received or if the complaint was for a previously identified performance issue whereby corrective action failed to prevent reoccurrence. | Contractor Quality Control Records, Contractor Monthly Status Report,  and Government Quality Assurance Surveillance Records | Monthly |

*The following listing provides various types of Surveillance as examples to select from and should not be included on the final document:*

*<u>Random Sampling</u>:  Appropriate for frequently recurring tasks.  Evaluate randomly selected samples of the lot to determine the acceptability of the entire lot.*

*Random Inspection Guide, Method of surveillance, Lot size, Sample size, Performance requirement, Sampling procedure, Inspection procedure*

*100 Percent Inspection:  Appropriate for tasks that occur infrequently.  Inspect and evaluate performance each time task is performed*

*Periodic Surveillance:  Evaluation of samples selected on other than 100% or statistically random basis.  (i.e. monthly, quarterly, semi-annually etc.)*

*Validated Customer Complaint:  Complaints must be validated.*

**NOTE:  YOU MAY ALSO IDENTIFY  ANY SURVEILLANCE METHOD USED IN THE COMMERCIAL MARKET TO SURVEY THE REQUIRED SERVICE.  (THIS WILL BE DISCOVERED WHEN MARKET RESEARCH IS CONDUCTED).**

**TECHNICAL EXHIBIT 2**

**DELIVERABLES SCHEDULE**

*(This technical exhibit lists any reports or documentation that is required as a deliverable to include the frequency, # of copies, medium/format and who/where it is to be submitted.  A deliverable is anything that can be physically delivered but may include non-physical things such as meeting minutes.  Note:  All PWS deliverables should be included in this exhibit.)*

| Deliverable | Frequency | # of Copies | Medium/Format | Submit To |
|---|---|---|---|---|
| [*Insert the deliverable, i.e., the DoD Business Process and Agency Operating Models Report and the PWS paragraph number, i.e., PWS paragraph 5.5.*] | [*Insert how often it is to be provided, i.e., by the 5th of every month, within 30 days of task order award, etc.*] | [*Insert the number of copies, i.e., 1 original and 2 copies, how often it is to be provided, i.e., by the 5th of every month, within 30 days of task order award, etc.*] | [*Insert the medium/format that the deliverable is to be provided in, i.e., paper (hard copy), CD in MS Word, DVD, Briefing Slides on CD, Excel Spreadsheet, etc.*] | [*Insert where the deliverable is to be delivered, i.e., Name of Activity,*<br><br>*ATTN: POC, and Address.*] |
| [*Continue to insert the deliverables in accordance with the example provided above.*] | [*Same as above.*] | [*Same as above.*] | [*Same as above.*] | [*Same as above.*] |
| [*Same as above.*] | [*Same as above.*] | [*Same as above.*] | [*Same as above.*] | [*Same as above.*] |
| [*Same as above.*] | [*Same as above.*] | [*Same as above.*] | [*Same as above.*] | [*Same as above.*] |

A. 064

**TECHNICAL EXHIBIT 3**

**ESTIMATED WORKLOAD DATA**

*(This technical exhibit lists the historical workload data, i.e., the hours previously performed under the PWS by labor category.  This workload data should be used to prepare the Independent Government Cost Estimate (IGCE), if available.  Note:  Based on the PWS, historical workload data can be provided in other formats, i.e., the volume of tasks order issued over a five year period, the number of users by locations requiring support, etc.)*

| ITEM | NAME | ESTIMATED FTEs* | ESTIMATED HOURS |
|------|------|-----------------|------------------|
| 1 | [*Insert the Labor Category, i.e, Task order Manager, etc.*] | _____ | [*Insert the number of hours, i.e., 200 HRs, etc.*] |
| 2 | [*Continue to insert the Labor Categories, using example provided above.*] | _____ | [*Same as above.*] |
| 3 | [*Same as above.*] | _____ | [*Same as above.*] |
| 4 | [*Same as above.*] | _____ | [*Same as above.*] |
| 5 | [*Same as above.*] | _____ | [*Same as above.*] |

* Full Time Equivalents

A. 065

**Request for Task Order Response (RTOP)**

**Attachment 4 - Quality Assurance Surveillance Plan**

**FOR**

**Task order:** _____

**Contractor:** _____

**1. PURPOSE.** This QASP is a Government developed document used to ensure that the Government receives quality services, and pays only for services actually provided. The QASP provides a systematic method to evaluate the services the Contractor is required to furnish.

**2. SCOPE.** The role of Government Quality Assurance is to ensure task order standards are achieved. The QASP provides guidelines and methods for the Government's oversight of the Contractor's quality control efforts to assure timely, effective services are provided IAW the contract/order. The Contractor, and not the Government, is responsible for management and quality control actions to meet the terms of the task order.

**3. ROLES AND RESPONSIBILITIES.**

**Task Order Contracting Officer (TOCO)** - A person duly appointed with the authority to enter into, administer and terminate contracts/task orders on behalf of the Government. The TOCO is the only person who can legally commit the Government and only the TOCO, as the Government's agent, can modify the contract/order. The KO is the final authority for determining the adequacy of the Contractor's performance. TOCO decisions arising under or relating to the contact are final.

**Contracting Officer's Representative (COR)** – An individual designated in writing by the TOCO to perform specific technical and administrative functions within the scope and limitations of their written appointment (e.g., surveillance of Contractor's performance, accept services). The COR is not empowered to make any contractual commitments or authorize any changes to the order/contract or in any way obligate additional funds by the Government; such authority rests solely with the KO.

**Quality Assurance Evaluator (QAE)** – An individual designated by the requiring activity to assist the COR and provide technical oversight of the Contractor's performance. The QAE's primary duty is to monitor the Contractor's performance by physically checking to see that tasks are completed, reports are submitted, and desired outcomes are achieved. When a surveillance observation results in an unacceptable evaluation, the QAE will report the unacceptable performance to the COR. The QAE is not authorized to direct work, offer advice on how the work should be performed, change the task order, or in any way obligate payment of funds by the Government.

**4. METHODS OF SURVEILLANCE.** Surveillance is performed by the Government to provide objective quality evidence that there is a reasonable level of confidence that the services provided by the Contractor have met all the requirements of the task order before authorizing payment. The primary methods of surveillance are periodic inspections and customer feedback.

A. 066

Periodic Inspection:    Inspections are planned at specific intervals or dates as determined by the surveillance schedule.  Periodic inspections will be performed regularly, yet randomly, during all hours of the Contractor's training.  Periodic inspections may be performed more frequently if the COR/QAE discovers the quality of the Contractor's performance is less than acceptable.

Customer Feedback: Customer feedback is firsthand information from the actual users of the service and is typically obtained via telephone or email.  Customer complaints obtained via telephone must be followed up in writing/email.  The customer complaint must clearly articulate the nature of the complaint, time, date, etc.   The COR/QAE will validate the complaint within 24 hours of receipt, complete the validation section on DA Form 5477-R, Customer Complaint Record, and forward a copy to the KO for resolution with the Contractor.  The TOCO will return a copy of the completed and signed DA Form 5477-R to the COR for inclusion in the contract/order file.  If the COR/QAE determines a complaint is invalid, rationale will be cited in the validation section and retained for future reference.  Customer feedback will be used to supplement other forms of performance evaluation, but will not be a primary method of evaluating the Contractor's performance.

## 5.  SURVEILLANCE PROCEDURES.

**a.** The COR will develop a monthly schedule of surveillance activities based on the Performance Standards as outlined in the  contract/order and Performance Requirements Summary, as applicable, as well as any other critical contractual requirements the COR determines to be higher risk requiring oversight.  The surveillance outlined in the monthly schedule will be as detailed and in-depth as necessary to provide the Government with the objective quality evidence required to support acceptance of a monthly task order invoice.  The schedule should provide periodic surveillance during all required hours of the Contractor's operation including nights and weekends.  The schedule is "FOR OFFICIAL USE ONLY" and is not releasable to anyone other than authorized Government personnel.  The schedule will identify the date of inspection, activity to be monitored, and who will conduct the surveillance (dates and times can be altered without a formal change to the schedule as long as all inspections are performed).  The DA Form 5475-R, COR/QAE Surveillance Schedule, may be used for this purpose.  The monthly schedule will be completed no later than seven calendar days prior to the beginning of the period it covers and a copy forwarded to the TOCO for information and review.

b. The COR/QAE will monitor performance in accordance with the schedule and will ensure all services required by the order/contract are successfully performed.  All inspections will be documented and include as a minimum date and time, who performed the inspection, what was inspected, to what standard and the results.   Successful or exceptional performance will be documented as well as deficiencies in Contractor performance.   Documentation will be maintained for future reference, audit, and proof of inspection.  Any uncorrected unacceptable observation will result in an unacceptable rating, a corrective action request to the Contractor and notification to the KO.

c. The COR will notify the Contractor, in person, each time an unacceptable observation has been recorded and ask the Contractor to correct the problem. The COR/QAE will record the task order requirement , the specific deficiency to the requirement, the date and time it was discovered, and have the Contractor initial the entry. The Contractor will be given two working days after notification to correct the deficiency in accordance with requirements of the task order.  Deficiencies that cannot be corrected within two working days will be reported to the Contracting Officer.

d. The COR will report more serious (systemic in nature) deficiencies or recurring deficiencies in the same area that could indicate a trend by using DA Form 5479-R, Contract Discrepancy Report

(CDR).  The CDR will state the Contract Requirement, the specific contract reference and the specific nonconformance to the requirement.  The COR will forward copies of CDRs to the TOCO within one working day.   The KO will notify the Contractor and request corrective action.  The KO may require the Contractor to re-perform any services that do not meet task order requirements at no additional cost to the Government. The Contractor will return a copy of the completed and signed CDR to the TOCO for inclusion in the contract/order file.

e.  The COR/QAE will re-inspect services that were found deficient to ensure corrections were made within the timeframe outlined in the task order or other agreed upon time.  The COR/QAE will not consider the services complete until all deficiencies have been corrected.  Contractor's failure to complete corrective actions will be reported immediately to the TOCO for further action.

f. The COR/QAE will accept the services provided and authorize payment, typically on a monthly basis or upon satisfactory completion of the work.  This is done by approving the Contractor's invoice in Wide Area Workflow.

g. The COR/QAE will submit a brief monthly activity report to the TOCO which will include the next months surveillance schedule,  summary of inspections performed and results, summary of customer feedback, summary of task order discrepancies and corrections, recommendations, invoices accepted and any other pertinent activities.

**6.  PERFORMANCE STANDARD.**  The performance standard, as set forth in the PWS/PRS, is the standard the Contractor must meet for a particular Performance Objective to be deemed acceptable. The maximum degree of deviation from the requirement is the percent defective or the maximum number of defects per month that can be reached without the performance being considered overall unsatisfactory for a particular Performance Objective.  Exceeding the number of defects or percent will cause the service to be deemed unsatisfactory.

**7.  QUALITY ASSURANCE SURVEILLANCE FILE:**  The COR/QAE file shall contain:
a) Copy of the COR appointment letter from the KO, any changes to that letter, and any termination letters; b) Training Certifications for COR; c) Copy of the task order and all contract modifications; d) Copy of the applicable Quality Assurance Surveillance Plan (QASP); e) Copy of the contractor's Quality Control Plan (QCP); f) All correspondence initiated by authorized representatives (Contractor or Government) concerning performance of the task order; g) Names, position titles and contact information of all key personnel assigned to this task order both Government and Contractor; h) Monthly surveillance schedules & Surveillance Checklists; i) Records of all inspections performed and the results; j) Customer Feedback; k) Memoranda for record of minutes of any meeting, telephone conversations and discussions with the contractor or others pertaining to the task order or task order performance; l) Documentation pertaining to acceptance of services, reports or data.

**8. RECORDS:** All records will be retained for the life of this task order. The COR/QAE will forward these records to the KO upon completion of the contract/order.

**9. CHANGES:**  The QASP is a living document and, as such, may be changed as needed. However, the KO must approve changes.  The COR will submit recommended changes to the TOCO for approval.

**Request for Task Order Response (RTOP)**

**Attachment 5 – Submission Instructions/Evaluation Criteria**

## 5-A  Instructions

1.   The submission instructions are designed to provide general guidance for preparing responses as well as providing specific instructions on response organization, format, and content. Offerors shall include all documents and information requested and should be submitted in accordance with the instructions. The Offeror is cautioned to follow the instructions carefully, as the Government reserves the right to make an award based on initial responses received without discussion of such response.

2.   Offerors shall submit a response that is self-sufficient and responds directly to the requirements of the Request for Task Order Proposal (RTOP).  The response should be clear, concise, and include adequate detail for effective evaluation.  The response should not simply rephrase or restate the Government's requirements, but rather provide convincing rationale to address how the Offeror intends to meet the requirements of the RTOP.  The response should contain sufficient information to enable the Government to fully evaluate and determine the Offeror's capability to comply with the requirements identified in the RTOP. Responses that are overly verbose or include marketing material may distract from the evaluators ability to ascertain compliance with the RTOP.

3.   Offerors shall submit a response that describes the procedures, processes, controls, etc. that are established for this RTOP.  The Offeror shall provide any assumptions upon which your approach/solution is based, and the rationale supporting the assumption (i.e., why do you believe the assumptions are valid).  Express your best understanding of the ramification inherent in the TO. Discuss alternatives considered, risks involved, impact to the missions (both detriment, as well as efficiency), impacts from external sources, etc.   Provide any other explanations or supporting data (matrix, charts, or other graphics) determined necessary for the Government to fully understand the Offeror's methodology and approach.

4.   In the event that travel is authorized in support of this task order, all travel charges shall be authorized in advance.  Contractor travel charges will be invoiced in accordance with the current volume of the Government Joint Travel Regulations (JTR).  Fee/profit on travel is not allowed.

5.   Wage Determination No.____, Revision____, dated XX Month, XXXX applies to this task order.

6.   The Offeror shall provide its response with a cover sheet that contains the company's name, address and telephone number, name and title of the person authorized to sign and negotiate the TO, offer validation period of sixty (60) days, RTOP number *{INSERT RTOP NUMBER}*, and the original date of response.  The original date of response shall be located in the upper right hand corner of the cover sheet.

7.   Response Organization and Format:  The response should consist of two (2) volumes. The volumes are:  Volume I – Technical Submission and Volume II – Price Submission.  All required copies are due by XX Month year, no later than X:XX p.m. EDT.  Responses should be submitted to the following address:

A. 069

**Regular Mail:**                                          **Via Express Carrier:**

*{INSERT APPROPRIATE MAILING ADDRESSES}*

8.  Responses must comply with the page limitations and format specified for each volume. Information submitted beyond limitations identified could negatively impact the evaluation during the rating process.  The follow-on paragraphs provide the specific information required for each volume.

| Volume | Format | Page Limitation | Number of Copies |
|--------|--------|-----------------|------------------|
| Volume I – Technical Submission | MS Word or PDF | 20 (Excluding the table of contents)<br><br>(8.5 x 11 inch paper; 12 Font or larger)<br><br>Fold-outs used for charts, tables (May not exceed 11" x 17"; 12 Font or larger) | 1 Original, 3 Copies 1 CD ROM |
| Volume  II – Price Submission | Price Data in Excel | None (8.5 x 11 inch paper or 11x17 fold outs; 12 Font or larger) | 1 Original, 1 Copy 1 CD ROM |

9.  Format for responses to Volumes I and II must be as follows:

- A page is defined as one face of a sheet of paper containing information.  Foldouts will be counted as two pages.

- Typing must not be less than 12 font.

- The table of contents does not count against the 20 page limitation.

- Documents supporting Relevant Experience do not count against the 20 page limitation.

- Elaborate formats, bindings or color presentations are not desired or required.

10.  **Volume I - Technical Submission.**  Volume I should be clearly marked **"Volume I - Technical Submission,** *{INSERT RTOP NUMBER}*, and shall include the Offeror's technical submission.  Volume I shall consist of a written narrative that is the Offeror's proposed solution to the requirement contained in the Performance Work Statement (PWS) and Performance Requirements Summary (PRS) for this TO.  The technical discussion should be practical, straightforward, specific, concise, and complete.  **Volume I should not include price information.**  Technical submission should be segregated and partitioned into three separate sections, as described below.  Each section should include a table of contents.  A list of attachments, exhibits, tables, and figures, as required, may be provided.  ***The table of contents will not count against the 20 page limitation.***

***However any attachments, exhibits, tables, and figures will count against the 20 page limitation.***

Technical Response:  Offerors shall demonstrate an understanding of the tasks required through a comprehensive discussion of each of the following:

a. <u>Technical/Staffing Approach.</u>  Offeror shall demonstrate a thorough knowledge and understanding of how to fulfill and staff the Government's requirement.  Each response should include sufficient information to describe the offeror's procedures, processes, controls, etc. that are established at the contract level and employed at the TO level.  The Offeror shall specifically identify and explain their process to achieve full capability of performance (offeror shall ensure process and description at a minimum includes a timeline of events and describe how the offeror will support the PWS); identify and explain how they will be staffed to include identifying necessary skill sets and specific qualifications (to include security clearances) to complete each task;  how work will be scheduled (including use of any automated systems or workloading procedures); and/or assumptions of Government support.  For depicting staffing, offerors shall provide the following information:

i. Provide manpower matrices showing the proposed list of labor categories and total overall manning by functional area and supervisory level for each performance period.  Separate sets of matrices are required for the base task order period of performance and each of the option years.  This list of labor categories must be a subset of the labor categories that have been incorporated into basic ID/IQ contract.

ii. Clearly depict the total number of productive man-hours and associated Full Time Equivalents (FTE's) for each proposed labor category.  All cross utilization of the labor force shall be clearly explained and depicted.  Offeror shall also describe approach for backfilling positions identified for cross training/cross utilization.

*{INSERT ANY OTHER SPECIFIC TECHNICAL APPROACH REQUIREMENTS}*

b. <u>Program Management Approach.</u>  The Offeror shall demonstrate the program management methods to be employed to accomplish the technical requirements of the PWS and PRS.  In the event that subcontractors are proposed, discuss your communications and internal control plans that will ensure successful satisfaction of the requirements.  Discuss how you will update the Government and bring matters to the attention of the Government.  Discuss your performance, schedule, and cost/price control plans.  Discuss the need for, and your approach to, adding team members at the task order level to satisfy the unique requirements of this task order (if applicable)

*{INSERT ANY OTHER PROGRAM MANAGEMENT APPROACH REQUIREMENTS}*

11. **Volume II – Price Submission**. The price submission should be clearly marked "**Volume II, Price Submission,** *{INSERT RTOP NUMBER}*.

a. The Offeror shall include a price response per the Contract Line Item Number (CLIN) Structure shown in Attachment 2.  The Offeror shall submit a completed CLIN Structure (Attachment 2) which includes a firm-fixed price for each CLIN.

b. The response shall include the labor/pricing matrix(ces) for the phase-in, base period, and the option periods.  The labor/pricing matrix (ces) should include labor categories as identified in the basic contract, ON/OFF Site CAP rates as identified in the basic contract, the Discount rate (if applicable) the number of full time equivalents (FTEs), the number of total hours per labor category, and the total dollar value.   The Offeror shall include a comparison between the labor categories/hourly rates proposed in this task order to your Labor/Pricing Matrix(ces) in the basic ID/IQ contract.  Offerors shall also annotate any discounts.

**BASE YEAR:**

| LABOR CATEGORY AS PROPOSED IN MASTER CONTRACT | CAP RATE (ON/OFF SITE) AS PROPOSED IN MASTER CONTRACT | DISCOUNTED RATE | NO. of FTE's | HOURS | TOTALS |
|---|---|---|---|---|---|
|  |  |  |  |  | $ |
|  |  |  |  |  | $ |
|  |  |  |  |  | $ |
|  |  |  | | TOTAL DOLLAR VALUE | $ |

c. All information relating to the proposed price must be included in both hard copy and electronic format.  Electronic versions of the price response should be submitted on a CD in MS Office Excel format, and shall not be read only or password protected.  All formulas, lookup tables, and links should be intact, and no links should exist to files not included with the response.  Spreadsheets shall not contain hidden worksheets.  PDF or flat files will not be considered adequate.  The hard copy version will take precedence for any differences noted between the hard and electronic versions of a response.  Failure to comply with these formatting requirements may result in rejection of your response.

A. 072

**2-B  Evaluation Criteria** *(Trade-off)*

        The evaluation factors for this TO are Technical Approach, Program Management Approach, and Price.  For evaluation purposes, the Technical Approach is the most important factor and is significantly more important than the Program Management Approach.  When combined the Technical Approach and Program Management Approach are significantly more important than price.  The Technical Approach and Program Management will be assigned an adjectival rating based on the definitions in the table below.  The Price factor will be evaluated as discussed in paragraph D - Price Factor of this section.

Combined Technical/Risk Adjectival Ratings

| COLOR | ADJECTIVAL RATING | Description |
|---|---|---|
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

A. 073

**2-B  Evaluation Criteria** *(Lowest Price Technically Acceptable - LPTA)*

**The Government will use the criteria set forth below to evaluate and select the TO awardee.**

a. Technical/Staffing Approach Factor.  The Offeror must demonstrate the capability to provide a technical approach as required by the RTOP.  The technical /staffing approach response shall contain sufficient quantitative details (without reference to cost or price) to permit a complete and accurate evaluation of the approach from strictly a technical viewpoint.  Higher consideration will be given to the Offeror's proposed approach that demonstrates:

*{INSERT TECHNICAL APPROACH EVALUATION CRITERIA}*

b. Program Management Approach Factor.  The Offeror shall demonstrate the capability to provide program management as required by the PWS and PRS.  The Offeror's approach shall demonstrate:

*{INSERT PROGRAM MANAGEMENT APPROACH EVALUATION CRITERIA}*

c. Price Factors.   The responder's price submission will be evaluated considering the response to the task order and the pricing matrix of the TO.  The techniques and procedures described under FAR Part 15.404 will be the primary means of assessing price submission reasonableness.  To be viable for award, responder's price must be determined fair and reasonable.  The Government price team will evaluate responder's price submission for reasonableness based on the following:

(1) Reasonableness will be determined by comparing the responder's total cost proposed to the total costs proposed by the other responders.  Additionally, total proposed prices may be compared to the Independent Government Estimate (IGE) to determine the reasonableness of price.

(2)  The responder's price submission shall represent the responder's best efforts to respond to the RTOP.  Any inconsistency between promised performance and price shall be explained in the submission.  For example, if unique, innovative approaches are the basis for an unusually low price, the nature of these approaches and their impact on price shall be explained.  If a responder proposes to absorb a portion of price, the responder must also explain the impact on the estimated price.  Any significant inconsistency, left unexplained, may raise a fundamental question of the responder's understanding of the nature and scope of the work required in the task order, and of the responder's ability to perform the tasks within the fiscal constraints thereof, and may be cause for rejection of the submission.  The burden of proof for price credibility rests with the responder.

(3) As part of price evaluation, the Government will evaluate its option to extend services (see FAR clause 52.217-8) by adding one-half of the offeror's final option period to the offeror's total price .

A. 074

**5-C  Basis of Award**

     a. The response evaluation and discussion procedures in Federal Acquisition Regulation (FAR) Part 15, Contracting by Negotiation, does not apply to this acquisition.  TO evaluation procedures will be conducted in accordance with FAR Part 16, and supplements thereto.  The Government will not establish a competitive range; conduct "discussions" with all responders within a competitive range, or request final revision response from responders.  Therefore, initial responses should include the responder's best terms from a price and technical standpoint.  Although the Government does not anticipate conducting discussions; the Government does reserve the right to make clarifications or request revised responses if later determined by the Contacting Officer to be necessary.  Additional oral or written information from one or more responder's may be requested, but not necessarily from all.

     b. The Government intends to award a single task order to the responder whose response, conforming to the RTOP and the PWS, provides the overall best benefit to the Government.  The Government will assign an adjectival rating to the Technical/Staffing Approach and Program Management Approach and will use a tradeoff process between non-price factors and price factors to determine the task order awardee.  The Government may select other than the lowest evaluated price response for award.  The response selected for award will be the response that is determined more advantageous to the Government, and if other than the lowest price, the adjectival rating justifies awarding to the higher priced response.

**ATTACHMENT 4**

**MCoE TRAINING & SUPPORT SERVICES MAIDIQ DELEGATION OF CONTRACT AUTHORITY (DCA) REQUEST FORM**

---

**Part I – Requestor Information:**

**Customer POC:** _____

**Phone:** _____ **Fax:** _____ **Email:** _____

**Alternate POC:** _____

**Phone:** _____ **Fax:** _____ **Email:** _____

**Organization and Mailing Address:**

_____

_____

_____

**Delegated Contracting Official (DCA/KO):** _____

**Phone:** _____ **Fax:** _____ **Email:** _____

**Organization and Mailing Address:**

_____

_____

_____

**DCA/KO Warrant Authority Amount:** _____

---

**Part II – Type of Delegation Requested:**

**Scope of task order:** (*Provide a brief description of the services that are required.*)_____
_____
_____
_____
_____
_____
_____

A. 076

**Requested Total Amount (including options):** _____

**TO Period of Performance:**

                                   **From:** _____ **To:** _____
                                   **From:** _____ **To:** _____
                                   **From:** _____ **To:** _____
                                   **From:** _____ **To:** _____
                                   **From:** _____ **To:** _____

**Special Conditions/Waivers Sought:** _____
_____
_____
_____

---

**Part III – KO Duties and Responsibilities:**

---

1. The DCA is subject to the task order ceiling set by the MCoE Training & Support Services MAIDIQ Administrative Contracting Officer.

2. Task orders must be signed by the warranted United States Contracting Officer servicing the Requiring Activity's Command, hereinafter designated as the DCA KO, and subject to the monetary limitations contained in your Contracting Officer Warrant Task order funds obligated by DCA KO are limited to funds of the KO's organization and Command.

3. The DCA KO may appoint a qualified Contracting Officer's Representative (COR), and delegate certain administrative responsibilities to the COR to assist in the administration of the task order. However, the DCA KO must personally sign the task order (and modifications thereto) issued under this MAIDIQ. The DCA KO remains, at all times, accountable for ensuring compliance with the contract, applicable regulations and procedures, and the Ordering Guide.

4. To the extent applicable, the DCA KO will adopt the Office of Federal Procurement Policy's (OFPP) guidance that emphasizes the use of performance-based requirements and quality standards in defining contract requirements, source selection, and quality-assurance.

5. The Mission & Installation Contracting Command's Ombudsman shall be the primary point of contact for reviewing concerns and complaints from contractors regarding competition issues, ensuring that contractors are afforded a fair opportunity to be considered; rendering responses to concerns and complaints from contractors; and may require the contracting officer to take corrective action. If fair opportunity is not provided to all offerors, the result may be task order re-competition.

6. A copy of all Request for Task Orders Proposal (RTOP)/Solicitations/Amendments) and Task Order awards must be forwarded via email to the ACO/Admin Office. The DCA KO files will be made available to the Contracting Officer for a contractual compliance review upon request or as required. Failure to comply with any or all the conditions set for this delegation may result in the termination of a DCA KO appointment.

A. 077

**Part IV – Certification:**

**By signing this DCA Request form, I certify that I am a fully warranted, Federal Contracting Officer, and that I have read and accept the above conditions of the MCoE Training & Support Services MAIDIQ Delegation of Contract Authority.**

**Name:** _____

**Signature:** _____

**Date:** _____

A. 078



## Mission & Installation Contracting Command

### Fort Jackson

# Maneuver Center of Excellence (MCoE) Training & Support Services Request for Task Order Proposal (RTOP)

**RTOP Number:** W9124C-13-R-TOR1          **Date of Issue:** 02 October 2012

**Description of Services:** Master Fitness Trainer Course (MFTC)

**Location of Services:** Various CONUS and OCONUS locations

**Closing Date/Time:** 19 October 2012 at 2:00 p.m. Eastern Daylight Time

Dear Maneuver Center of Excellence (MCoE) Training & Support Services Partners:

This is a Request for Task Order Proposal (RTOP) for services to be provided under the MCoE Training & Support Services MAIDIQ contract vehicle.  A review of the task requirements has been conducted, and it has been determined that the preponderance of the work falls within the following task area(s):

☒ Task Area 5: Training Instruction Support

This RTOP is 100% small business set aside.  There is no incumbent Contractor.  Fair opportunity is herein provided to all Suite 1 small business prime Contractors.  The Government intends to award a single task order as a result of this RTOP to the responder that can fulfill all requirements of this RTOP and the Performance Work Statement (PWS).  Responses that are for less than the full requirements will be rejected and will not be evaluated.

Attached are all related documents for this RTOP.  Please ensure that you have read the attached documents, to include specific response submission instructions that are included in this RTOP, and then submit your response by the date and time indicated above.

Partners choosing not to submit a proposal shall provide a detailed explanation of their decision choosing not to submit a proposal no later than seven (7) business days after receipt of the official RTOP.  The "no-bid reply" should be directed via e-mail to terry.l.trent.mil@mail.mil and cc nicole.b.harris4.civ@mail.mil.

The Government will not be holding a pre-proposal conference.  Technical questions must be submitted in writing no later than 10 October 2012 at 2:00 p.m. Eastern Daylight Time via e-mail to terry.l.trent.mil@mail.mil and cc nicole.b.harris4.civ@mail.mil.  If Government

responses to technical questions affect the Performance Work Statement (PWS) requirements, a follow-on Amendment to the RTOP will be issued.

All items within the RTOP must be completed and returned by closing due date and time. In addition to this letter, this RTOP includes the following Attachments:

☒ Attachment 1 – Additional Terms and Conditions
☒ Attachment 2 – Pricing Schedule (CLIN Structure)
☒ Attachment 3 – Performance Work Statement (PWS) and Technical Exhibits (TE)
   ☒ TE1 – Projected Course Schedule
   ☒ TE2 – Course Management Plan (CMP)
   ☒ TE3 – Individual Student Assessment Plan (ISAP)
   ☒ TE4 – Performance Requirements Summary (PRS)
   ☒ TE5 – FM 7-22, Army Physical Readiness Training
   ☒ TE6 – Deliverables Schedule
   ☒ TE7 – Estimated Workload Data
☒ Attachment 4 – Submission Instructions/Evaluation Criteria

Task Order Type: The Government contemplates award of the following task order type:

☒ Firm-Fixed Price with reimbursable CLINs for ODC's

Anticipated Period of Performance:
Phase-In:  10 December 2012 through 09 January 2013
Train-up Period:  10 January 2013 through 31 March 2013
Base Period:  1 April 2013 through 09 December 2013
Option Period One:  10 December 2013 through 09 December 2014
Option Period Two:  10 December 2014 through 09 December 2015

The Task Order Contracting Officer (TOCO) reserves the right to withdraw and cancel the proposed RTOP.  In such event Contractors shall be notified in writing of the TOCO's decision.  This decision is final, conclusive and shall not be subject to the "Disputes" clause or the "Contract Disputes Act."

Your response must be in full compliance with the instructions in this RTOP and your basic contract.  The response (to include price) shall be valid for sixty (60) calendar days.  If you have any questions, please contact SFC Terry Trent, Contract Specialist at 803-751-2593 or terry.l.trent.mil@mail.mil or the undersigned at Nicole B. Harris, Contracting Officer at 803-751-6713 or nicole.b.harris4.civ@mail.mil.  Thank you in advance for your time and attention in this matter.

Sincerely,

Nicole B. Harris
Task Order Contracting Officer

# Table of Contents

Maneuver Center of Excellence (MCoE) Training & Support Services Request for Task Order Proposal (RTOP) ................................................................................................................. 1
Attachment 1 – Additional Terms and Conditions ...................................................... 4
Attachment 2 - Pricing Schedule (CLIN Structure) ................................................... 10
Attachment 3 – Performance Work Statement ............................................................ 17
   Part 1 General Information .......................................................................................... 17
   Part 2 Part 2 Denifitions, Abbreviations, and Acronyms .......................................... 28
   Part 3 Government-Furnished Property and Services.................................................. 31
   Part 4 Contractor Furnished Items and Services ........................................................ 33
   Part 5 Specific Tasks................................................................................................... 34
   Part 6 Applicable Publications and Forms.................................................................. 38
   Part 7 Technical Exhibits............................................................................................ 41
Attachment 4 – Submission Instructions/Evaluation Criteria..................................... 42
   5-A Instructions .......................................................................................................... 42
   5-B Evaluation Criteria............................................................................................... 49
   5-C Basis of Award..................................................................................................... 52

Request for Task Order Response (RTOP)

# Attachment 1 – Additional Terms and Conditions

**In addition to the clauses in the MCoE Training & Support Services contract, the following clauses and provisions apply to this task order:**

☒  FAR 52.204-10, Reporting Executive Compensation and First Tier Subcontract Awards

☒  FAR 52.204-99, System for Award Management Registration

☒ FAR 52.209-5, Certification Regarding Responsibility Matters

☒ FAR 52.209-7, Information Regarding Responsibility Matters

☒FAR 52.209-9, Updates of Publicly Available Information Regarding Responsibility Matters

☒  FAR 52.216-1, Type of Contract

The Government contemplates award of a firm fixed price Task Order with one (1) cost reimbursable CLIN resulting from this Request for Task Order Proposal (RTOP).

☒ FAR 52.217-5, Evaluation of Options

☒ FAR 52.217-7, Option for Increased Quantity—Separately Priced Line Item.

The Government may require the delivery of the numbered line item, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor within 30 days of contract/option expiration.  Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.

☒  FAR 52.217-8, Option to Extend Services

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within 15 days of contract expiration.

☒  FAR 52.217-9, Option to Extend the Term of the Contract

The Government may extend the term of this contract by written notice to the Contractor within 30 days of contract expiration; provided that the Government gives the Contractor a

preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

If the Government exercises this option, the extended contract shall be considered to include this option clause.

The total duration of this contract, including the exercise of any options under this clause, shall not exceed 42 months.

☒  FAR 52.222-40, Notification of Employee Rights Under the National Labor Relations Act

☒  FAR 52.232-20, Limitation of Cost

☒  FAR 52.232-99, Providing Accelerated Payment to Small Business Subcontractors

☒  FAR 52.233-2, Service of Protest

The value of this task order is expected to exceed $10,000,000.00 and therefore the General Accountability Office (GAO) has exclusive jurisdiction of any protest (as defined in section 33.101) in accordance with Section 843 of the Fiscal Year 2008 National Defense Authorization Act (NDAA).

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the Government Accountability Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from Nicole B. Harris at Nicole.B.Harris4.civ@mail.mil

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

☒  DFARS 252.203-7005, Representation Relating to Compensation of Former DoD Officials

☒  DFARS 252.225-7043, Antiterrorism/Force Protection for Defense Contractors Outside the United States

☒  DFARS 252.245-7003, Contractor Property Management System Administration

☒  DFARS 252.245-7004, Reporting, Reutilization, and Disposal

☒  MICC Local Clause, 5152.233-4000, AMC-Level Protest Program
If you have complaints about this procurement, it is preferable that you first attempt to resolve those concerns with the responsible contracting officer.  However, you can also protest to Headquarters (HQ), Army Materiel Command (AMC).  The HQ AMC-Level Protest Program is intended to encourage interested parties to seek resolution of their concerns within AMC as an Alternative Dispute Resolution forum, rather than filing a protest with the Government Accountability Office (GAO) or other external forum.  Contract award or performance is suspended during the protest to the same extent, and within the same time periods, as if filed at the GAO.  The AMC protest decision goal is to resolve protests within 20 working days from filing.  To be timely, protests must be filed within the periods specified in FAR 33.103. <u>If you want to file a protest under the HQ AMC-Level Protest Program, the protest must request resolution under that program and be sent to the address below.  All other agency-level protests should be sent to the contracting officer for resolution.</u>

Headquarters U.S. Army Materiel Command
Office of Command Counsel
4400 Martin Road
Room: A6SE040.001
Redstone Arsenal, AL 35898-5000
Fax: (256) 450-8840

Packages sent by FedEx or UPS should be addressed to:
Headquarters U.S. Army Materiel Command
Office of Command Counsel
4400 Martin Road
Rm: A6SE040.001
Redstone Arsenal, AL 35898-5000
Fax: (256) 450-8840

The AMC-Level Protest procedures are found at:
http://www.amc.army.mil/pa/COMMANDCOUNSEL.asp.

If internet access is not available, contact the contracting officer or HQ, AMC to obtain the HQ AMC-Level Protest Procedures.
 (End Clause)

## Contractor's additional information:

    1.  The Contractor shall provide all personnel, management, supervision, equipment, tools, supplies, materials, transportation, and any other items and services necessary to perform the functions of the Performance Work Statement (PWS).   The place of performance is various CONUS and OCONUS locations.

    2.  Inspection and Acceptance.  Inspection and acceptance of all work, performance, reports and other deliverables under this task order will be performed at the location specified in

this RTOP by the Contracting Officer's Representatives (CORs).  CORs are responsible for inspection and acceptance of services under the Task Order (TO).  The inspection and acceptance is based on the use of the Quality Assurance Surveillance Plan (QASP).  The Government will evaluate the Contractor's performance under this TO using the method of surveillance to be identified in the QASP.  The Government will record all surveillance observations.  When an observation indicates defective performance, the COR will request the Contractor's representative to initial the observation.

3.  Deliveries or Performance.  The anticipated Period of Performance is 10 December 2012 through 9 December 2015.

4.  Task Order Administration Data.
a.  Task Order Contracting Officer (TOCO).  The Mission and Installation Contracting Command – Fort Jackson is responsible for awarding this TO.  The TOCO is Nicole B. Harris, 803-751-6713, nicole.b.harris4.civ@mail.mil.  The TO Contract Specialist is SFC Terry Trent, 803-751-1511, terry.l.trent.mil@mail.mil.

b. The TOCO  will be responsible for the administration of this TO and, alone, is authorized to take actions on behalf of the Government that result in changes in the terms and conditions of the TO.

c. Contracting Officer's Representative.

(i) The TOCO will designate a representative, a COR and Alternate Contracting Officer Representatives (ACORs) who will provide on-the-ground administration for the Government.  The COR and ACORs will be designated in writing and a copy of the designation will be furnished to the Contractor. The Contractor is cautioned to read the COR/ACOR designation because certain authority under the TO is reserved solely for the Contracting Officer. The term "Contracting Officer" as used throughout the TO shall be interpreted to include the Contracting Officer's designated representative(s) acting within the limits of their delegation of authority.

(ii) The COR/ACOR will act in a liaison capacity to coordinate activities between the Contractor and the Government as required in the performance of the work under this TO.

(iii) **All changes and modifications to this Task Order SHALL be in writing. Oral authorizations are strictly prohibited.  The TOCO is the only person authorized to approve changes in any of the requirements under this TO, and notwithstanding any provisions contained elsewhere in this TO, the said authority remains solely with the Contracting Officer.**

(iv) The COR and/or ACORs will verify that the services billed for in the WAWF invoice match those listed in the contract and the actual services were performed and either reject or accept the invoice to initiate Contractor payment.  Additional information will be provided in the awarded TO.

    d.   Electronic Submission and Processing of Payment Requests:  Electronic invoicing is mandatory in accordance with DFARS 252.232-7003, Electronic Submission of Payment Request.  The Contractor shall submit invoices via WAWF and the CORs will accept services performed via WAWF.  For additional information or if you have questions regarding WAWF, visit the website at https://wawf.eb.mil or contact the Customer Support section at (866) 618-5988.

    5.  Special Task Order Requirements.

    a. Insurance Requirements.  The following kinds and minimum amounts of insurance are required in accordance with FAR clause 52.228-5 entitled, "Insurance—Work on a Government Installation."

| KIND | AMOUNT |
|---|---|
| Workmen's Compensation and Occupational Disease Insurance | Amount required by the state in which the TO is performed |
| Employer's Liability Insurance | $100,000 |
| Comprehensive General Liability Insurance for Bodily Injury | $500,000 per occurrence |
| Comprehensive Automobile Liability and Damage | $200,000 per person<br>$500,000 per occurrence for Bodily Injury and $200,000 per person<br>$20,000 per occurrence for Property Damage |

b. Wage Determination.  The following wage determinations apply applies to this task order and can be downloaded at www.wdol.gov.  As indicated in the Ordering Guide, Chapter 3, CAP rates are located in the basic contract.

| Location | County | State | Wage Determination Number | Revision Number | Date of Revision |
|---|---|---|---|---|---|
| Fort Riley | Riley | KS | 2005-2213 | 13 | 6/13/2012 |
| Fort Jackson | Richland | SC | 2005-2475 | 14 | 6/13/2012 |
| Fort Irwin | San Bernardino | CA | 2005-2053 | 15 | 6/13/2012 |
| Fort Huachuca | Cochise | AZ | 2005-2025 | 14 | 6/12/2012 |
| Fort Benning | Chattahoochee | GA | 2005-2137 | 13 | 6/13/2012 |
| Fort Lee | Prince George | VA | 2005-2545 | 16 | 6/13/2012 |
| Fort Lewis | Pierce | WA | 2005-2567 | 16 | 6/13/2012 |
| Fort Campbell | Christian | KY | 2005-2187 | 12 | 6/13/2012 |
| Fort Still | Comanche | OK | 2005-2525 | 14 | 6/13/2012 |
| Fort Hood | Bell and Coryell | TX | 2005-2523 | 12 | 6/13/2012 |
| Fort Polk | Vernon Parish | LA | 2005-2229 | 12 | 6/13/2012 |
| Fort Bragg | Cumberland | KY | 2005-2497 | 15 | 6/13/2012 |
| Fort Carson | El Paso | CO | 2005-2079 | 13 | 6/13/2012 |
| Fort Knox | Hardin | KY | 2005-2223 | 14 | 6/13/2012 |
| Fort Drum | Jefferson | NY | 2005-2377 | 11 | 6/13/2012 |
| Fort Sam Houston | Bexar and Comal | TX | 2005-2521 | 13 | 6/13/2012 |
| Fort Bilss | El Paso | TX | 2005-2511 | 16 | 6/13/2012 |
| Fort Leonard Wood | Pulaski | MO | 2005-2311 | 13 | 6/13/2012 |
| Fort Stewart | Liberty | GA | 2005-2141 | 13 | 6/13/2012 |
| Alaska | Statewide | AK | 2005-2017 | 16 | 6/13/2012 |
| Hawaii | Statewide | Hi | 2005-2153 | 16 | 6/13/2012 |

NOTE:  The Service Contract Act (SCA) applies to all work performed within the United States. For purposes of the SCA, the term "United States" includes any State, the District of Columbia, Puerto Rico, the Virgin Islands, Outer Continental Shelf lands as defined in the Outer Continental Shelf Lands Act, American Samoa, Guam, Wake Island, Johnston Island, and the Commonwealth of the Northern Mariana Islands. The SCA does not apply to work performed in any other territory under the jurisdiction of the United States or any United States base or possession within a foreign country.

**Request for Task Order Response (RTOP)**

# Attachment 2 - Pricing Schedule (CLIN Structure)

**BASE PERIOD:**

| CLIN | Description | Quantity | Unit | Unit Price | Total Amount |
|------|-------------|----------|------|------------|--------------|
| 0001 | Phase-in Period<br>FFP<br>Contractor to provide services in accordance with the Performance Work Statement (PWS) for the period of 10 December 2012 through 09 January 2013. | 1 | Each | $ _____ | $ _____ |
| 0002 | Initial Train-up Period<br>FFP<br>Contractor to provide services in accordance with the PWS for the period of 10 January 2013 through 31 March 2013. | 1 | Each | $ _____ | $ _____ |
| 0100 | Master Fitness Trainer Course Support Services Iteration<br>FFP<br>Contractor to provide services in accordance with the Performance Work Statement for the period of 1 April 2013 through 09 December 2013. | 42 | Each | $ _____ | $ _____ |
| 0200 | Project Management<br>FFP<br>Contractor to provide services in accordance with the PWS for the period of 10 January 2013 through 09 December 2013. | 11 | Months | $ _____ | $_____ |

| | | | | | |
|---|---|---|---|---|---|
| 0300 | Travel<br>COST<br>Contractor will be authorized travel expenses consistent with the substantive provisions of the Joint Travel Regulation (JTR) and the limitation of funds specified in this contract 10 January 2013 through 09 December 2013.  Travel shall not exceed $729,590.<br><br>Travel must be approved by the Government prior to incurring costs<br><br>NTE – Not to Exceed | 1 | Job | $1.00 | NTE $729,590 |
| 0400 | Contractor Manpower Reporting<br>FFP<br>Contractor shall provide a Contractor Manpower Report as described in the PWS for the period of 10 December 2012 through 09 December 2013.<br><br>NSP - Not Separately Priced | 1 | Each | NSP | NSP |
| **Total Base Period** | | | | | $_____ |

| Labor Category As Proposed In Master Contract | Cap Rate (On/Off Site) As Proposed In Master Contract | Discounted Rate | Number of FTE's | Hours | Totals |
|---|---|---|---|---|---|
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| **Total Base Period** | | | | | $ |

**OPTION PERIOD 1:**

| CLIN | Description | Quantity | Unit | Unit Price | Total Amount |
|---|---|---|---|---|---|
| 1100 | Master Fitness Trainer Course Support Services Iteration<br>FFP<br>Contractor to provide services in accordance with the PWS for the period of 10 December 2013 through 09 December 2014. | 54 | Each | $ _____ | $ _____ |
| 1200 | Project Management<br>FFP<br>Contractor to provide services in accordance with the PWS for the period of 10 December 2013 through 09 December 2014. | 12 | Months | $ _____ | $_____ |
| 1300 | Travel<br>COST<br>Contractor will be authorized travel expenses consistent with the substantive provisions of the Joint Travel Regulation (JTR) and the limitation of funds specified in this contract 10 December 2013 through 09 December 2014.  Travel shall not exceed $1,019,045.<br><br>Travel must be approved by the Government prior to incurring costs<br><br>NTE – Not to Exceed | 1 | Job | $1.00 | NTE<br>$1,019,045 |
| 1400 | Contractor Manpower Reporting<br>FFP<br>Contractor shall provide a Contractor Manpower Report as described in the PWS for the period of 10 December 2013 through 09 December 2014.<br><br>NSP - Not Separately Priced | 1 | Each | NSP | NSP |
| **Total Option Period 1** | | | | | $_____ |

| Labor Category As Proposed In Master Contract | Cap Rate (On/Off Site) As Proposed In Master Contract | Discounted Rate | Number of FTE's | Hours | Totals |
|---|---|---|---|---|---|
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| **Total Option Period 1** | | | | | $ |

**OPTION PERIOD 2:**

| CLIN | Description | Quantity | Unit | Unit Price | Total Amount |
|------|-------------|----------|------|-----------|--------------|
| 2100 | Master Fitness Trainer Course Support Services Iteration<br>FFP<br>Contractor to provide services in accordance with the enclosed Performance Work Statement for the period of 10 December 2014 through 09 December 2015. | 48 | Each | $ _____ | $ _____ |
| 2200 | Project Management<br>FFP<br>Contractor to provide services in accordance with the enclosed Performance Work Statement for the period of 10 December 2014 through 09 December 2015. | 12 | Months | $ _____ | $_____ |
| 2300 | Travel<br>COST<br>Contractor will be authorized travel expenses consistent with the substantive provisions of the Joint Travel Regulation (JTR) and the limitation of funds specified in this contract 10 December 2014 through 09 December 2015.  Travel shall not exceed $905,818.<br><br>Travel must be approved by the Government prior to incurring costs<br><br>NTE – Not to Exceed | 1 | Job | $1.00 | NTE $905,818 |
| 2400 | Contractor Manpower Reporting<br>FFP<br>Contractor shall provide a Contractor Manpower Report as described in the PWS for the period of 10 December 2014 through 09 December 2015.<br><br>NSP - Not Separately Priced | 1 | Each | NSP | NSP |
| **Total Option Period 2** | | | | | $_____ |

| Labor Category As Proposed In Master Contract | Cap Rate (On/Off Site) As Proposed In Master Contract | Discounted Rate | Number of FTE's | Hours | Totals |
|---|---|---|---|---|---|
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| **Total Option Period 2** | | | | | $ |

Request for Task Order Response (RTOP)

# Attachment 3 – Performance Work Statement

## PERFORMANCE WORK STATEMENT (PWS)
## MANUEVER CENTER OF EXCELLENCE (MCoE) TRAINING & SUPPORT SERVICES

## MASTER FITNESS TRAINER COURSE
## FORT JACKSON, SOUTH CAROLINA

## Part 1

1. General Information

1. General.  This is a non-personnel services task order to provide Master Fitness Trainer Course services Army wide. The Government shall not exercise any supervision or control over the task order (TO) service providers performing the services herein.  Such TO service providers shall be accountable solely to the Contractor who, in turn is responsible to the Government.

1.1. Description of Services/Introduction.  The Contractor shall provide all personnel, equipment, supplies, facilities, transportation, tools, materials, supervision, and other items and non-personal services necessary to perform Master Fitness Trainer Course services as defined in this Performance Work Statement except for those items specified as Government furnished property and services. The Contractor shall perform to the standards in this task order and the terms and conditions set forth in the master ID/IQ contract.

1.2. Background.  PRD has developed the MFTC to train and certify small unit leaders in exercises, drills, and activities in accordance with Field Manual (FM) 7-22, Army Physical Readiness.  The purpose of this effort is to support Army Force Generation (ARFORGEN) and enhance expeditionary forces' abilities to conduct operations.  This will be accomplished through the training of selected generating and operating force non-commissioned officers, warrant officers, and commissioned officers in all aspects of the Army's Physical Readiness Training (PRT) doctrine to perform as the unit commander's PRT advisor.

1.3. Objective.  The objective of this Performance Work Statement (PWS) is to obtain performance-based academic and physical instruction to support the Physical Readiness Division (PRD) in the execution of the Master Fitness Trainer Course (MFTC).  The Contractor shall provide a professionally trained staff to conduct and execute the MFTC Army wide in accordance with the MFTC Course Management Plan (CMP) listed as TE2.  The MFTC consists of classroom (academic) instruction, hands-on (exercise) instruction, hands-on (performance) assessments, testing, re-training, re-testing, MFTC administration, and end-of-course reporting. The objective of training is to provide professional instruction that inspires and motivates

students to improve their units, themselves, and the Army in the realm of physical readiness and unit performance.

1.4. Scope of Work.

1.4.1. The MFTC is a 20-day course delivered in a resident setting locally at Fort Jackson, SC and via Mobile Training Team (MTT) at both Continental United States (CONUS) and Outside the Continental United States (OCONUS) host sites not located within an identified combat zone. OCONUS locations include, but are not limited to, USAREUR (Germany) and USARPAC (Korea, Hawaii, Alaska, Japan) zones as specified in TE1 - Projected Course Schedule. The projected student load is a maximum of 50 Soldiers, minimum of 30 Soldiers, and optimum of 40 Soldiers per class. The Course Schedule requires the Contractor to provide a minimum of six training teams as defined in paragraph 1.7.3 to meet the concurrency requirements.

1.4.1.1. This course teaches the practical application of Army physical readiness training doctrine, policy, and procedures. Graduates will be expected to assist in the development of unit and individual physical readiness training programs based on exercise science to include instruction in: human anatomy, physiology and kinesiology; body composition, diet, performance nutrition and weight control; stress management, behavior modification, substance abuse, cardiovascular disease risk, environmental considerations, Army Physical Readiness Program policy and regulations, exercise prescription, physical readiness training techniques, reconditioning, equipment and facilities; and functional screening and physical readiness testing. This includes the conduct of PRT exercises, activities, and drills within Basic Combat Training, Advanced Individual Training, One Station Unit Training, Basic Officer Leadership Courses A and B, as well as Active and Reserve component units operating within ARFORGEN. Specific course details may change over the period of contract performance, such as the number of hours for specific lessons, but the overall program length will be maintained. These changes would be negotiated in accordance with FAR 52.243-1 Alt I, Changes – Firm Fixed Price, Alternate I. Instructors will be expected to remain current with changes to lesson plans during the performance of this contract.

1.4.1.2. Tasks included in this PWS are designated as non-emergency, non-essential. Contractor employees performing under this contract shall not be required to work under hazardous conditions or within any active theater of operations or combat zone, and shall not be required to work in the event of a site closure as defined in paragraph 1.4.2.

1.4.1.3. MFTC Lead Instructors and Instructors shall wear appropriate civilian attire. At a minimum, MFTC instructors shall wear a collar shirt and long trousers during classroom instruction and shirt with collar and mid-thigh to knee length shorts for exercise instruction. Civilian outer garments (jacket and pants) may be worn during cold weather activities. The Contractor may elect to make such outfits uniform for Contractor personnel or provide uniform name tags for personnel. If Contractor elects to use name tags, they must be suitable for wear during all activities (e.g. no badges worn around the neck that introduce a choking hazard during physical demonstration activities).

1.4.1.4. At the conclusion of the last exercised option period under this TO, the Government anticipates the need for Contractor support described in this PWS during a phase-out period that would be concurrent with the final option period exercised under this TO. Due to this phase-out, the Government reserves the right to increase or decrease support requirements during option years and negotiate workload changes in accordance with FAR 52.243-1 Alt I, Changes – Firm Fixed Price, Alternate I.

1.4.2. Duty Hours: The Contractor shall be responsible for providing MFTC instruction services as scheduled except for facility closings due to local or national emergencies, administrative closings, or similar Government directed facility closings. Inclement weather or other reasons may result in the temporary closing of the facility. Notification of closure will be in accordance with the host installation's standing operating procedure. Travel to the host site typically occurs on Saturday and/or Sunday. Return travel from the host site typically occurs on Saturday. However, due to alternative schedules around holidays, these travel days may be effected. The course will generally be taught using the following base schedule:

> Week 1 - Monday through Friday
> Week 2 - Monday through Friday (re-test Saturday)
> Week 3 - Monday through Friday
> Week 4 - Monday through Friday

1.4.2.1. Normal Duty Hours: The normal training day hours of operation are 8:00 a.m. to 5:15 p.m., Monday through Friday (Weeks 1 -4). The hours of operation for Saturday (Week 2) are 8:00 a.m to 12:00 p.m. Instructors shall be responsible for all daily travel, instructional space setup and clean up outside the normal training day hours. Remedial instruction to students may be executed either outside of these hours or during these hours, if time is available, and shall not impact instruction on other course subjects.

1.4.2.2. Irregular Duty Hours: The COR may adjust class time and schedules to accommodate varying schedules including national holidays or training holidays. Adjusted hours shall begin no earlier than 6:30 a.m. and end no later than 6:00 p.m. The Government will attempt to notify the Contractor approximately one week in advance of any changes to the normal instructional duty hours. Reasonable efforts will be made so that each team will receive a minimum of five (5) days between course executions. However, conditions may require the execution of back-to-back courses if in the best interest of the Government (i.e. two courses may be scheduled back-to-back at an OCONUS installation to reduce travel time).

1.4.2.3. Recognized Holidays: The following are recognized federal holidays. Instructors will not be expected to work under the requirements of this contract but may be required to travel on federal holidays.

| | |
|---|---|
| New Year's Day | Labor Day |
| Martin Luther King Jr. Birthday | Columbus Day |
| President's Day | Veteran's Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

1.4.3. Travel:  The Contractor shall be required to travel to CONUS and OCONUS locations to perform duties outlined in this PWS.  Contractor will be authorized travel expenses consistent with the substantive provisions of the Joint Travel Regulation (JTR) and the limitation of funds specified in this task order. All travel requires Government approval/authorization and notification to the COR.  The Contractor shall be responsible for making all travel arrangements to include airfare, car rental, lodging, subsistence, etc., required for contracted personnel.  The Government will be responsible for arranging travel of Government personnel and equipment. Travel reimbursement costs shall be no more than the costs of travel from Fort Jackson, SC using the most efficient means.  In the event that a Contractor instructor must be replaced during a training iteration due to unforeseen circumstances, additional travel costs for the replacement instructor will not be reimbursed by the Government.

1.4.4. All Contractor employees shall obtain passports for OCONUS travel no later than 1 April 2013.

1.5. Type of Contract.  The Government will award a firm fixed price task order with one (1) cost reimbursable CLIN as a result of this RTOP.

1.6. Contract Performance.

1.6.1. Phase-in Period.  A mobilization period of not more than 30 calendar days is provided to the Contractor for the purpose of verifying certifications and hiring personnel.  The Contractor shall prepare to assume full responsibility for all areas of operation in accordance with the terms and conditions of this contract in order to meet the course schedule outlined in TE1 - Projected Course Schedule. There will be 48 MFTC iterations conducted in Fiscal Year 2015.  The specific dates and location are to be determined. The Contractor shall take all actions necessary for a smooth start-up of the contracted operations.  During the phase-in period, the Contractor shall at a minimum establish the project management office, recruit and hire necessary personnel, and attend post-award meetings as required.  Day 31 completes phase-in period and begins the start of the initial train-up period.  Contractor performance outlined in this PWS.

1.6.2. Training-Up Period.  This initial train-up period will immediately follow the phase-in period (see paragraph 1.7.3.2.2).  During this period, all Contractor instructor employees associated with the performance of this TO shall attend and successfully complete the PRD instructor review and certification requirements prior to executing course instruction

1.6.3. Period of Performance:  The period of performance shall consist of a thirty day phase-in period, an eighty-one day train-up period, and an eight-month base period, plus two one-year option periods.

1.6.4. Place of Performance:   All tasks under this contract shall be performed at Government furnished facilities both CONUS and OCONUS.  See Technical Exhibit 1 for a listing of all the places of performance for Fiscal Year 2013 through Fiscal Year 2014. The specific places of performance for Fiscal Year 2015 are to be determined.

1.7. Contractor Personnel.

1.7.1. General:  The Contractor must maintain an adequate work force for the uninterrupted performance of all services defined within this PWS during the life of this contract.

1.7.2. Program Manager (PM).  The Contractor shall designate a Program Manager and his/her alternate for this TO within five days of contract award.  The Program Manager shall be responsible for the performance of the work.  The PM and his/her alternate will act as the single primary point of contact between the Contractor, Contracting Officer and the Government COR and shall have the authority to commit the Contractor for matters pertaining to administration of this contract.  The PM or alternate shall be available between 8:00 a.m. to 4:30 p.m. Monday through Friday except federal holidays, as specified in paragraph 1.4.2.3, or national emergencies.

1.7.2.1. PM Meetings.  The PM shall meet with the COR and leadership of the PRD to schedule timelines in accordance with this contract and instructor certification needs as identified in paragraph 1.7.3.  A similar meeting will be scheduled whenever any of the following conditions occur:

1.7.2.1.1. A personnel change of any Lead Instructor or Instructor (hiring or termination in support of this contract).

1.7.2.1.2. A Lead Instructor or Instructor re-certification is required.

1.7.2.1.3. Change of PM.

1.7.2.1.4. A negotiated and Contracting Officer's approved change to this contract.

1.7.2.2. The Contractor shall not employ any persons to work on this contract if such employee is a potential threat to the health, safety, security, general well being, or operational mission of the installation and its population.

1.7.2.3. Key Personnel.  The follow personnel are considered key personnel by the Government: Program Manager/Alternate Program Manager and Lead Instructors.  Qualifications for all personnel are listed in paragraph 1.7.3.

1.7.2.4. Identification of Contractor Employees.  All Contractor personnel attending meetings, answering Government telephones, and working in other situations where their Contractor status is not obvious to third parties shall identify themselves as such to avoid creating an impression in the minds of members of the public that they are Government officials.  They must also ensure that all documents or reports produced by Contractors are suitably marked as Contractor products or that Contractor participation is appropriately disclosed.

1.7.2.5. List of Contractor Employees:  Within ten calendar days of the train-up period of performance, the Contractor shall furnish, in writing, to the COR an alphabetical staff roster.  At a minimum, the staff roster shall include of the complete name, duty phone, and badge identification number of each employee (including potential substitutes or temporary employees) engaged in the performance of this contract.  This roster shall be updated within two calendar days as personnel changes occur.

1.7.3. Minimum Requirement:  Contractor personnel shall possess at least the minimum education/experience requirements to perform the tasks listed herein.  A team is considered to be a combination of three instructors, a lead instructor, and a Government-provided team leader who provides liaison and support requirements with the Government.  Contractor personnel shall possess good working knowledge of computer operations and associated software applications in order to accomplish all tasks associated with this TO.  General working knowledge of Microsoft Windows and Microsoft Office products is required.  All specific tasks shall be performed independent of Government supervision, direction, or control.  The following criteria are minimum requirements for Contractor employees:

1.7.3.1. Physical Fitness.  Contractor personnel shall maintain an adequate level of physical fitness with no physical disability or handicap that precludes the ability to teach, lead, and demonstrate exercises, drills, and activities in accordance with FM 7-22.  Contractor personnel shall maintain body composition standards as specified in Army Regulation (AR) 600-9, The Army Weight Control Program.

1.7.3.2. Certifications/Training.

1.7.3.2.1. All Contractor personnel shall possess a current National Strength and Conditioning Association certification.

1.7.3.2.1.1. Instructors shall be Certified Physical Trainers (NSCA-CPT).

1.7.3.2.1.2. One out of every four (25%) of instructors will, at a minimum, have a Bachelor's Degree in physical education or exercise science from an accredited college or university which is not able to be waivered and a minimum of one year of experience in teaching and leading exercise.  Alternative acceptable degrees include Kinesiology, Biomechanics, Exercise Physiology, Athletic Training, and Physical Therapy.  These instructors will be Certified Strength and Conditioning Specialists (NSCA-CSCS) in lieu of the NSCA-CPT certification requirement.  These instructors are referred to as "Lead Instructors" throughout this PWS.

1.7.3.2.2. Upon completion of the phase-in, an initial Contractor train-up period shall begin. During this train-up period, all Contractor instructor employees under this TO shall attend and successfully complete the PRD instructor review and certification requirements prior to executing course instruction.  During the life of this TO as replacement Contractor instructor employees are hired by the Contractor to perform duties under this requirement, all new employees must also attend and successfully complete the PRD instructor review and certification course prior to commencement of work.  These duties will be considered part of the work requirement of this PWS and not separately billed.  All costs associated with travel and training of replacement personnel are the responsibility of the Contractor and will not be reimbursed.  If initial Contractor employees are required to travel to attend training at Fort Jackson, such travel expenses for certification of those employees will be billed as per the travel requirements outlined in paragraph 1.4.3.  Certification requires the following actions:

1.7.3.2.2.1. Attend and pass the MFTC taught by a PRD-Certified instructor (4-weeks).  First iteration of instructor training is scheduled to start 14 January 2013.

1.7.3.2.2.2. Certify as an Army Instructor/ABIC-Certified (2-weeks).

1.7.3.2.2.3. Complete PRD MFTC Instructor Certification (4-6 weeks).

1.7.3.2.3. Government provided courses and training will be located at Fort Jackson, South Carolina.

1.7.4. Security Requirements.

1.7.4.1. Personnel Security:  Contractor employees shall be required to submit to a Government background check in order to be issued a DOD Common Access Card (CAC).  These background checks will be performed by the Government at no additional expense to the Contractor.  Contractor and all associated subcontractor employees shall comply with applicable installation, facility and area commander installation/facility access and local security policies and procedures (provided by Government representative).  The Contractor shall also provide all information required for background checks to meet installation access requirements to be accomplished by installation Provost Marshal Office, Director of Emergency Services, or Security Office.  Contractor workforce must comply with all personal identity verification requirements as directed by DOD, HQDA and/or local policy.  In addition to the changes otherwise authorized by the changes clause of this TO, should the Force Protection Condition (FPCON) at any individual facility or installation change, the Government may require changes in Contractor security matters or processes.  Contractor employees must also be able to obtain a valid U.S. passport for OCONUS travel.

1.7.4.2. Installation Security:  The Contractor shall be responsible for obtaining the proper temporary vehicle registration and proper valid identification for entrance onto the host installation, and following all installation access requirements.  Host installations require proof of a valid state driver's license, vehicle insurance and/or a DOD CAC for entry on to the installation.

1.7.4.3. Physical Security:  The Contractor shall be responsible for safeguarding all Government equipment, information and property provided for Contractor use.  At the close of each work period, Government facilities, equipment, and materials shall be secured.

1.7.4.3.1. Key Control:  The Contractor shall establish and implement methods of making sure all keys/key cards issued to the Contractor by the Government are not lost or misplaced and are not used by unauthorized persons. NOTE: All references to keys include key cards.  No keys issued to the Contractor by the Government shall be duplicated.  The Contractor shall develop procedures covering key control that shall be included in the Contractor's Quality Control Plan (QCP).  Such procedures shall include turn-in of any issued keys by personnel who no longer require access to locked areas.  The Contractor shall immediately report any occurrences of lost or duplicate keys/key cards to the Contracting Officer.

1.7.4.3.1.1. In the event keys are lost or duplicated, the total cost of re-keying or the replacement of the lock or locks shall be deducted from the monthly payment due the Contractor.

1.7.4.3.1.2. The Contractor shall prohibit the use of Government issued keys/key cards by any persons other than the Contractor's employees performing wok under this TO.  The Contractor

shall prohibit the opening of locked areas by Contractor employees to permit entrance of persons other than Contractor employees engaged in the performance of assigned work in those areas, or personnel authorized entrance by the Contracting Officer.

1.7.4.3.2. Lock Combinations.  When required, the Contractor shall establish and implement methods of ensuring that all lock combinations are not revealed to unauthorized persons.  The Contractor shall ensure that lock combinations are changed when personnel having access to the combinations no longer have a need to know such combinations.  These procedures shall be included in the QCP.

1.7.5. Post Award Conference/Periodic Progress Meetings.

1.7.5.1. The Contractor shall attend any post award conference convened by the contracting activity or contract administration office in accordance with FAR Subpart 42.5, Post-award Orientation.  The Contracting Officer, COR, and other Government personnel, as appropriate, may meet periodically with the Contractor to review the Contractor's performance.  At these meetings, the Contracting Officer or COR will apprise the Contractor of how the Government views the Contractor's performance and the Contractor will apprise the Government of problems, if any, being experienced.  Appropriate action shall be taken to resolve outstanding issues.  These meetings shall be at no additional cost to the Government.  The aforementioned meetings do not take the place of the Contractor Performance Assessment Report (CPARS) that will be completed for each task order.

1.7.5.2. The Contractor shall attend and participate in meetings when requested by the COR. The COR will provide notification to the Contractor of the date, time and location of meetings at least 48 hours prior to commencement.  Estimated frequency of meetings is one per month and may be conducted either face-to-face or through alternative meeting systems as indicated in paragraph 4.5.2.  Purpose of these meetings will be to review upcoming training events scheduled, verify changes in personnel assignments for training, review training progress for any new Contractor personnel, and notify Contractor of any changes to curriculum, TE3 - Individual Student Assessment Plan (ISAP), or CMP.

1.8. Quality Assurance.

1.8.1. The Government will evaluate the Contractor's performance under this TO in accordance with the Quality Assurance Surveillance Plan (QASP).  This plan primarily focuses on what the Government must do to ensure that the Contractor has performed in accordance with the performance standards.  It defines how the performance standards will be applied, the frequency of surveillance, and the minimum acceptable defect rate(s).  The Contracting Officer will follow FAR Clause 52.246-4 Inspection of Services – Fixed-Price in the event of the Contractor's failure to perform satisfactory services or failure to correct non-conforming services.

1.8.2. The Government will monitor the Contractor's performance under this TO.  The COR will conduct evaluations to assess proficiency and proper MFTC execution.  If any aspect of performance is not in conformity with the requirements of this TO, the Government will have the right to issue to the Contractor a Contract Discrepancy Report (CDR).  The Contractor shall explain in writing why performance was not in conformity, how performance will be returned to

conformity, and how the Contractor will prevent any recurrence of the discrepancy.  The Contractor shall complete and return the CDR within five (5) workdays after receipt.

1.8.3.  Quality Control:  The Contractor shall develop and maintain an effective Quality Control Plan (QCP) to ensure services are performed in accordance with this PWS.  The Contractor shall develop and implement procedures to identify, prevent, and ensure non-recurrence of defective services.  The Contractor's quality control program is the means by which assurance of work complies with the requirement of the contract.  At a minimum, the Contractor QCP shall include procedures that address the areas identified in TE4 – Performance Requirements Summary (PRS) and the QCP shall develop and implement written management procedures to ensure timely delivery and service continuity.  The responder's QCP must be detailed, containing a systematic approach to monitor daily operations of key and essential functions for providing quality service to the Government, i.e. discrepancy identification procedures, corrective action procedures, prevention procedures for occurrence/re-occurrence of discrepancies, trend analysis usage, and student and customer feedback utilization.  Such QCP requirements will increase the likelihood of successful contract performance.  The Contractor shall submit in writing to the Contracting Officer and COR a draft copy of the QCP within five (5) calendar days after TO award for review.  The final QCP shall be submitted to and approved by the Contracting Officer and COR within thirty (30) calendar days after TO award.  Any changes to the QCP shall be provided to the Contracting officer and COR for approval in writing prior to implementation.

1.8.4.  Task Order Contracting Officer's Representative (COR).

1.8.4.1.  The COR monitors all technical aspects of the TO and assists in day-to-day TO administration.  ACORs will be appointed to each Mobile Training Team (MTT) to assist the COR in monitoring contract performance:  All CORs are authorized to perform the following functions:  assures that the Contractor performs the technical requirements of the TO; performs inspections necessary in connection with TO performance; maintains written and oral communications with the Contractor concerning technical aspects of the TO; issues written interpretations of technical requirements, including Government drawings, designs, specifications; monitors Contractor's performance and notifies both the Contracting Officer and Contractor of any deficiencies; coordinates availability of Government furnished property.  The COR may also direct the Contractor to attend meetings to resolve issues or meet objectives as outlined in this PWS.

1.8.4.2.  A letter of designation issued to the COR, a copy of which is sent to the Contractor, states the responsibilities and limitations of the COR, especially with regard to changes in cost or price, estimates or changes in delivery dates.  The COR is not authorized to change any of the terms and conditions of this TO.

1.9.  Deliverables.  The Contractor shall alter the format and data elements of reports in order to meet mission requirements.  Reports shall be prepared using Microsoft Office 2007 or compatible software.  All reports shall be submitted electronically via an email attachment in a format that allows for manipulation of data.  Acceptable report formats include Excel 2007, Word 2007, PowerPoint 2007, and equivalent software.  Non-editable or non-machine-readable files such as Portable Document Format (PDF) or scanned images formats such as TIFF will not be accepted. See Technical Exhibit 6 for a listing of required deliverables.

1.9.1. Monthly Reports:  The Contractor shall prepare and submit a report of invoicing to the COR within the first seven (7) working days of each calendar month.

1.9.2. Quarterly Reports:  The Contractor shall prepare and submit a report of service delivery and Contractor performance to the Government on a fiscal quarterly basis.  At a minimum, the Contractor performance report shall include all data required for quarterly reporting that applies to services or courses delivered by the Contractor.  At the end of each fiscal quarter, one copy of this report shall be submitted to the COR.  Submittals are due no later than the 20th day of the following month.  Fiscal quarters under this paragraph are defined in relationship to the start of performance under this PWS.  At a minimum, this data shall include:

1.9.2.1. Number of classes conducted.

1.9.2.2. Number of tests administered.

1.9.2.3. Number of certificates of training awarded.

1.9.2.4. Number of students failing course standards.

1.10. Data Rights.  The Government has unlimited rights to all documents/material produced under this TO.  All documents and materials, to include the source codes of any software, produced under this TO shall be Government owned and are the property of the Government with all rights and privileges of ownership/copyright belonging exclusively to the Government. These documents and materials may not be used or sold by the Contractor without written permission from the Contracting Officer.  All materials supplied to the Government shall be the sole property of the Government and may not be used for any other purpose.  This right does not abrogate any other Government rights.

1.11. Contract Manpower Report.

1.11.1. General.  The Office of the Assistant Secretary of the Army (Manpower & Reserve Affairs) operates and maintains a secure Army data collection site where the Contractor will report ALL Contractor manpower (including subcontractor manpower) required for performance of this TO.  The Contractor is required to completely fill in all the information in the format using the following web address https://cmra.army.mil.  The required information includes:

1.11.1.1. Contracting Office, Contracting Officer, and Contracting Officers Technical Representative;

1.11.1.2. Contract number, including task and delivery order number;

1.11.1.3. Beginning and ending dates covered by reporting period;

1.11.1.4. Contractor name, address, phone number E-mail address, identity of Contractor employee entering data;

1.11.1.5. Estimated direct labor hours (including subcontractors);

1.11.1.6. Estimated direct labor dollars paid this reporting period (including subcontractors);

1.11.1.7. Total payments (including subcontractors);

1.11.1.8. Predominant Federal Service Code (FSC) reflecting services provided by Contractor (and separate predominant FSC for each subcontractor if different);

1.11.1.9. Estimated data collection cost;

1.11.1.10. Organizational title associated with the Unit Identification (UIC) for the Army Requiring Activity (the Army Requiring Activity is responsible for providing the Contractor with its UIC for the purposes of reporting this information;

1.11.1.11. Locations where Contractor and subcontractors perform the work (specified by zip code in the United States and nearest city, country, when in an overseas location, using standardized nomenclature provided on web site);

1.11.1.12. Presence of deployment or contingency contract language;

1.11.1.13. Number of Contractor and subcontractor employees deployed in theater this reporting period (by country).

1.11.2. As part of its submission, the Contractor will also provide the estimated total cost (if any) incurred to comply with this reporting requirement. Reporting period will be the period of performance not to exceed 12 months ending 30 September of each Government fiscal year and must be reported by 31 October of each calendar year. Contractors may use a direct extensible Markup Language (XML) data transfer to the database server or fill in the Fields on the website. The XML direct transfer is a format for transferring files from a Contractor's systems to the secure web site without the need for separate data entries for each required data element at the web site. The specific formats for the XML direct transfer may be downloaded from the web site.

# Part 2

2. Definitions, Abbreviations, and Acronyms.

2.1. Definitions.

2.1.1. Alternate Contracting Officer Representative (ACOR): A representative from the requiring activity appointed by the Contracting Officer to provide technical advice and guidance regarding specific implementation of tasks outlined in the PWS.  The ACOR assists the COR and Contracting Officer in performing the contract's inspections, acceptance, and quality assurance functions.

2.1.2. Contracting Officer:  An employee of the Government with overall responsibility for the conduct of and integrity of the contract process to include administration after award.  The ONLY individual authorized to issue changes to this contract.

2.1.3. Contracting Officer's Representative (COR):  A representative from the requiring activity appointed by the Contracting Officer to provide technical advice and guidance regarding the contract's specifications and statement of work.  The COR assists the Contracting Officer in ensuring the contract proceeds in accordance with the terms and conditions of the contract as well as performing the contract's inspections, acceptance, and quality assurance functions.

2.1.4. Contractor:  The provider of services described in this performance work statement.

2.1.5. Defective Service:  A service output that does not meet the performance standards in accordance with the Performance Work Statement.

2.1.6. Performance Standards:  Performance standards establish the performance level required by the Government to meet the contract requirements.  The standards shall be measurable and structured to permit an assessment of the Contractor's performance.

2.1.7. Performance Requirements Summary (PRS):  Gives the Contractor a breakdown of the most important tasking which will be inspected by the Government and the method of inspection.  It also states the acceptable quality levels/standards which the Contractor must meet to have an acceptable performance of the requirements.

2.1.8. Performance Work Statement (PWS):  A statement of the technical, functional and performance characteristics of the work to be performed, identifies essential functions to be performed, determines performance factors, including the location of the work, the units of work, the quantity of work units, and the quality and timeliness of the work units.

2.1.9. Quality Assurance (QA):  A planned and systematic pattern of all actions necessary to provide confidence that adequate technical requirements are established and that products and services conform to established technical requirements, and satisfactory performance.  Quality assurance refers to actions taken by the Government.

2.1.10. Quality Assurance Surveillance Plan (QASP):  An organized written document specifying all work requiring surveillance and the methodology used for surveillance of Contractor performance.

2.1.11. Quality Control (QC):  Those actions taken by a Contractor to control the performance of services so that they meet the requirements of the PWS.

2.2. Mobile Training Team (MTT):  MTTs are defined under this PWS as any course that is conducted away from the host location at Fort Jackson.  MTTs use equipment shipped from Fort Jackson for the duration of the course and shipped back at the conclusion of the course.

2.3. Instructor: A Contractor employee who performs instruction under the performance requirements of this TO with certifications outlined in paragraph 1.7.3.2.1.1.

2.4. Lead Instructor:  A Contractor employee who performs instruction under the performance requirements of this TO with certification outlined in paragraph 1.7.3.2.1.2.

2.5. Abbreviations and Acronyms:  The following acronyms are used in this PWS.  Some acronyms are not listed in the PWS, but may be helpful to the Contractor.  Acronyms related to the conduct of the MFTC are found in FM 7-22, Army Physical Readiness Training dated AUG 2010.

| | |
|---|---|
| AAR | After Action Review |
| ABIC | Army Basic Instructor Course |
| AFARS | Army Federal Acquisition Regulation Supplement |
| AI | Assistant Instructor |
| AKO | Army Knowledge Online |
| APT | Army Personnel Testing |
| AR | Army Regulation |
| ARFORGEN | Army Force Generation |
| AT | Anti-Terrorism |
| CAC | Common Access Card |
| CDR | Contract Discrepancy Report |
| CFR | Code of Federal Regulations |
| CMP | Course Management Plan |
| CONUS | Continental United States |
| COR | Contracting Officer Representative |
| CPT | Certified Personal Trainer |
| CSCS | Certified Strength and Conditioning Specialist |
| DA | Department of the Army |
| DCG | Deputy Commanding General |
| DCO | Defense Connect Online |
| DFARS | Defense Acquisition Regulation Supplement |
| DOD | Department of Defense |
| FAR | Federal Acquisition Regulation |
| FM | Field Manual |
| FPCON | Force Protection Condition |

| | |
|---|---|
| FSC | Federal Service Code |
| FTE | Full Time Equivalent |
| HQDA | Headquarters, Department of the Army |
| IA | Information Assurance |
| IA/IT | Information Assurance/Information Technology |
| IAW | In accordance with |
| IMT | Initial Military Training |
| ISAP | Individual Student Assessment Plan |
| IT | Information Technology |
| ITR | Individual Training Record |
| KO | Contracting Officer |
| MFTC | Master Fitness Trainer Leader Course |
| NSCA | National Strength and Conditioning Association |
| OCONUS | Outside Continental United States |
| ODC | Other Direct Costs |
| OSHA | Occupational Safety and Health Administration |
| OT | Overtime |
| PDF | Portable Document Format |
| PI | Primary Instructor |
| PII | Personally Identifiable Information |
| PM | Program Manager |
| POI | Program of Instruction |
| POP | Period of Performance |
| PRD | Physical Readiness Division |
| PRT | Physical Readiness Training |
| PWS | Performance Work Statement |
| QA | Quality Assurance |
| QASP | Quality Assurance Surveillance Plan |
| QC | Quality Control |
| QCP | Quality Control Plan |
| OPSEC | Operational Security |
| SGITC | Small Group Instructor Training Course |
| SOP | Standard Operating Procedures |
| TC | Training Circular |
| TCO | Test Control  Officer |
| TIF | Tagged Image File |
| TO | Task Order |
| TOCO | Task Order Contracting Officer |
| UIC | Unit Identification Code |
| U.S. | United States |
| USABCTCOE | United States Army Basic Combat Training Center of Excellence |
| USAREUR | United States Army Europe |
| USARPAC | United States Army Pacific |
| USMEPCOM | United States Military Entrance Processing Command |
| XML | Extensible Markup Language |

# Part 3

3. Government-Furnished Property and Services.

3.1. Facilities: Suitable Government facilities, to include classrooms, gymnasiums, fields, and running tracks, will be provided at the training location for the duration of each course plus sufficient time to setup and recover facilities from course execution. Each training location may establish facility control requirements in accordance with local operation procedures. For example, some installations may provide the Contractor with keys and complete access to training facilities during course execution while other installations will require that the building or facility owner unlock/lock the building.

3.1.1. The Contractor shall neither construct any new building facilities or structures on Government property nor make any structural changes to existing facilities without prior written approval by the Government. The Contractor shall reimburse the Government for repairs to property under control of the Contractor not attributable to normal wear and tear. The Contractor shall replace or pay for any lost property or equipment for which the Contractor was responsible.

3.1.2. The Government, at the COR's discretion as to need, will provide structural building maintenance (i.e. repair of roofs, walls, windows, etc.).

3.1.3. Workspace: The Government will provide the necessary workspace required for the execution of the MFTC plus sufficient time for setup and recovery for all course iterations. In addition, the Government will provide workspace for Contractor employees performing initial instructor certification requirements.

3.2. Utilities: All utilities (i.e., heat, electrical power, sewer service, and water) in the facility will be available for the Contractor's use in performance of duties outlined in this PWS. The Contractor shall instruct employees in utilities conservation practices. The Contractor shall be responsible for operating under conditions that preclude the waste of utilities.

3.3. Trash Disposal: The Government will furnish trash pickup and disposal at training locations. The Contractor shall be responsible for the placement of trash in the nearest garbage can or dumpster.

3.4. Janitorial Service: The Government may provide limited cleaning services through an installation-wide janitorial contract or by some other means. The availability of installation-wide janitorial services varies from installation to installation. The Contractor shall be required to perform some cleaning such that the areas under the Contractor's control remain in a neat and orderly condition. No janitorial services will be provided outside of a host installation's facility.

3.5. Equipment: The Government will provide projection equipment for use in classrooms (computer, projector, screen) to facilitate mission accomplishment. The vendor may augment or elect to use contractor equipment as long as such automation equipment is not attached to any government network. Use of equipment is for accomplishing official business related to TO requirements only. Fitness equipment for use during training will be provided by the Government.

3.6. Materials:  FM 7-22, Army Physical Readiness Training, shall be used for the MFTC curriculum.  The Government will furnish FM 7-22, supplies and other consumable material required under this TO in the conduct of the MFTC.  The Contractor will notify the Government when available consumable materials are identified to be insufficient to execute schooled training over the next quarter.

# Part 4

4. Contractor Furnished Items and Services.

4.1. Master Fitness Trainer Course (MFTC) Services:  The Contractor shall provide all personnel to conduct and execute the MFTC in accordance with the MFTC CMP.  This includes training and certifying small unit leaders in exercises, drill, and activities in accordance with FM 7-22, Army Physical Readiness Training, as defined in this PWS.  The time and location of training are identified in TE1.  If TE1 and TE2 are in conflict regarding specific course iteration dates and times, TE1 supersedes.

4.2. Equipment:  Contractor is responsible for providing any equipment for use by the instructors while the Government will provide equipment for students (i.e. Contractor will provide own paper, clipboards, pens, and other general administrative and office equipment).

4.3. Curriculum Recommendations:  The contactor shall not be responsible for MFTC curriculum development.  However, they are encouraged to make curriculum recommendations based on conduct of the course, course conduct experience, and lessons learned. Recommendations shall be made to the COR as part of MFTC End-of-Course-Reporting.

4.4. While the Contractor will not be required to manage transportation of shipping equipment, Contractor personnel will be expected to assist with the loading and unloading of shipping containers as part of training preparation and cleanup under guidelines outlined in paragraph 1.4.2.1.

4.5. Except for those items specifically stated to be Government furnished in Part 3 above, the Contractor shall furnish all other services, equipment, facilities, supplies (to include office/copier supplies), and other items required to perform this PWS, to include items listed below:

4.5.1. Telephone Service:  The Government will not provide telephone support to the Contractor. The Contractor shall be required to maintain at least one cell phone per training team in order to maintain contact with the COR while conducting training.  A cell phone shall also be required in order to maintain contact with installation emergency services should a serious incident occur during the conduct of the course.

4.5.2. Automation Connectivity:  The Government will not provide automation connectivity or support.  The Contractor shall be required to maintain the capability to communicate using online systems, specifically Defense Connect Online (DCO).  DCO requires a computer with an internet connection, speakers and microphone or headset, and a webcam.  The Government will provide necessary automation equipment for the conduct of the course (i.e. computers and mobile projectors) but this equipment will not meet the requirements for connectivity outlined in this paragraph and will typically be under the control of Government personnel.

# Part 5

5. Specific Tasks.

5.1. Classroom (Academic) Instruction.  The Contractor's trained instructors shall be required to follow the approved academic program/curriculum and meet the objectives through prepared lessons plans.  Academic instruction will be conducted in a large group setting using a primary and assistant instructor.  Small-group, hands-on sessions will be expected to re-enforce academic lessons.

5.2. Hands-on (Performance) Instruction.  Hands-on instruction of exercises, drills, and activities shall be conducted en mass or by small group (squad-sized elements, 6-12 students) in accordance with TE2 - Course Management Plan (CMP).

5.3. Testing.  The Contractor shall not be responsible for MFTC test construction.  However, the Contractor shall be responsible for the following regarding tests:

5.3.1. Procurement and inventory of the MFTC written examinations prior to the start of each class from the PRD MFTC manager in accordance with applicable regulations, policies and other guidance such as the Army Personnel Testing (APT) Test Control Officer (TCO) Handbook, AR 619-5, AR 619-6, AR 601-210, and AR 601-222.  Specifically, Contractors will sign for and maintain accountability of testing materials to ensure tests are not compromised or made accessible to students prior to proctored examinations.

5.3.2. Maintain positive control (security) of all test items.  There shall be zero discrepancies in inventory, reporting or comprised exams.  There shall be 100 percent inventory at all times.  Security of the tests shall be the Contractor's highest priority.  For TCO, Test Examiner and Test Proctor services, destruction of test material will be in accordance with local testing Standard Operating Procedures.  At no time shall test material be placed in a trash can, garbage can, or dumpster.

5.3.3. Contractor shall meet all suspenses in accordance with current testing policy.  The suspenses include written examination scoring, reports, submission of inventories, returning tests to the PRD MFTC manager and providing test results to the PRD MFTC manager  (NOTE: The Government TCO/Alternate TCO (PRD) is responsible for the overall testing program and will not relinquish TCO/PRD responsibility to test examiners.)

5.3.4. The Contractor shall administer the written examination in accordance with the MFTC CMP.  An acceptable performance of duties will be determined by a 90 percent pass rate of students enrolled in the MFTC.  During the conduct of MFTC written examinations, the Lead Instructors and Instructors will be present to act as examination proctors.

5.3.5. Re-testing.  The CMP provides guidance for re-testing for those students who fail tests on first attempt.  In the event of hands-on or written examination failure, instructors shall conduct re-training in accordance with the ISAP.

5.3.6. Exercise performance assessments and evaluations shall be conducted in small group (squad) in accordance with the ISAP.

5.4. Re-training.  The Lead Instructors may conduct remedial training during or outside of normal hours.  However, re-training will not be conducted in a place or manner that detracts from a student learning other course material or interferes with other students' learning.

5.5. MFTC Administration.

5.5.1. Start-of-Course.  At the start of each course, the Contractor shall take an initial attendance of arrived students.  Any late-arriving students will be referred to the COR for determination if to allow the student to enter the class.  The Government will permit walk-ons (students not previously scheduled but who meet entrance requirements) as long as the course seats are not fully allocated; the Contractor will forward information concerning walk-ons for enrollment into the course.

5.5.2. Daily attendance.  The Contractor shall take daily student attendance and make note of any students who fail to arrive for training.  The Contractor shall notify the COR of students not attending training for the Government to determine appropriate actions regarding students.

5.5.3. Accident/Injury reporting.  The Contractor shall verbally report any student injury immediately to the COR.  In the event of a severe injury, the Contractor shall notify medical personnel using installation procedures (in most cases, dialing 911 from an installation phone); advance notification of the COR is not required before contacting medical personnel. When applicable, DA Form 285 reporting of accidents or injuries to the Army Safety Center will be a requirement of the hosting installation.

5.5.4. End-of-Course-Reporting.  After each class, the Contractor shall submit academic administrative data to the COR as specified in the MFTC CMP. The Contractor shall submit the end-of-course reporting within 2 working days after course completion.  The instructors shall distribute graduation certificates for all students meeting MFTC standards.  The Government will administer student evaluations of the Lead Instructor and Instructors during course out-processing.  Student evaluation will be used by the COR to assist in evaluating performance of Contractor.

5.6. Additional Tasks.

5.6.1. All Contractor employees, to include subcontractor employees, requiring access to Army installations, facilities, and controlled access areas shall complete AT Level I awareness training within 30 days of award of TO.  The Contractor shall submit certificates of completion for each affected Contractor employee and subcontractor employee to the COR at the completion of the phase-in period or within 2 days of completion of training by all employees and subcontractor personnel who begin performance following phase-in.  AT level I awareness training is available at https://atlevel1.dtic.mil/at.

5.6.2. Contractor and all associated subcontractor employees shall comply with applicable installation, facility and area commander installation/facility access and local security policies

and procedures (provided by Government representative).   The Contractor shall also provide all information required for background checks to meet installation access requirements to be accomplished by installation Provost Marshal Office, Director of Emergency Services or Security Office.  Contractor workforce must comply with all personal identity verification requirements as directed by DOD, HQDA and/or local policy.  In addition to the changes otherwise authorized by the changes clause of this TO, should the Force Protection Condition (FPCON) at any individual facility or installation change, the Government may require changes in Contractor security matters or processes.

5.6.3. AT Awareness Training for Contractor Personnel Traveling Overseas.  U.S.-based Contractor employees and associated subcontractor employees must receive Government provided area of responsibility (AOR) specific AT awareness training as directed by AR 525-13. Specific AOR training content is directed by the combatant commander with the unit ATO being the local point of contact.  This shall be accomplished before any Contractor employee travels oversees under the provisions of this PWS.

5.6.4. All Contractor employees and associated subcontractor employees must complete the DOD IA awareness training before issuance of network access and annually thereafter.  All Contractor employees working IA/IT functions must comply with DOD and Army  training requirements in DODD 8570.01, DOD 8570.01-M and AR 25-2 within six months of employment.

5.6.5. The Contractor and all associated subcontractor shall brief all employees on the local iWATCH program (training standards provided by the requiring activity ATO).  This local developed training will be used to inform employees of the types of behavior to watch for and instruct employees to report suspicious activity to the COR.  This training shall be completed within 120 calendar days of TO award and within 30 calendar days of new employees commencing performance with the results reported to the COR within quarterly performance reports.

5.6.6. Operations Security (OPSEC) Plan. Contractor employees shall follow the OPSEC policies and regulations.

5.6.7. OPSEC Training.  New Contractor employees shall complete Level I OPSEC Training within 30 calendar days of their reporting for duty. All Contractors shall complete annual OPSEC Awareness training (IAW AR 530-1).  Deputy Commanding General (DCG) Initial Military Training (IMT) OPSEC Officer will provide training.

5.6.8. For Contract Requiring Performance or Delivery in a Foreign Country, DFARS Clause 252.225-7043, Antiterrorism/Force Protection for Defense Contractors outside the U.S.  The clause shall be used in solicitations and contracts that require performance or delivery in a foreign country.  This clause applies to both contingencies and non-contingency support.  The key AT requirement is for non-local national Contractor personnel to comply with theater clearance requirements and allows the combatant commander to exercise oversight to ensure the Contractor's compliance with combatant commander and subordinate task force commander policies and directives.

5.6.9. Contractor will comply with requirements of DOD Directive (DODD) 5400.11 regarding control of privacy act information.  Specifically, the Contractor will take steps to ensure that any personally identifiable information (PII) such as, but not limited to, student names, contact information, or social security numbers are restricted to access required for administration of the course and is not disclosed or stored on any unsecure systems.

# Part 6

6. Applicable Publications and Forms.

6.1. Publications and forms that apply to the PWS are listed below.  Publications and forms have been coded as mandatory or advisory.  The Contractor shall be obligated to follow those publications and use those forms coded as mandatory to the extent specified in other sections of this PWS.  The Contractor shall be guided by those publications or use those forms coded advisory to the extent necessary to accomplish requirements in this PWS.  All publications and forms listed will be made available by the Government at the start of the TO.  It is the responsibility of the Contractor to establish follow-on requirements with the publications distribution office.  Supplements or amendments to listed publications from any organizational level may be issued during the life of the TO.  All regulations, manuals, and pamphlets (PAMs) can be accessed at http://www.army.mil/usapa/.

6.2. Unless otherwise specified by the Contracting Officer, the Contractor shall be required to perform in accordance with the most current editions of the following regulatory and procedural guidelines:

6.2.1. Regulations, Manuals, PAMs and Other Publications.

| Number | Regulations, Manuals, PAMS and Other Publications | Mandatory/ Advisory |
|---|---|---|
| AR 25-1 | Army Knowledge Management and Information Technology, dated 12/04/2008 | Advisory |
| AR 25-400-2 | The Army Records Information Management System (ARIMS), dated 10/02/2007 | Advisory |
| AR 40-501 | Standards of Medical Fitness, dated 12/14/2007 | Advisory |
| AR 190-13 | The Army Physical Security Program, dated 02/25/2011 | Advisory |
| AR 190-51 | Security of Unclassified Army Property (Sensitive and Nonsensitive), dated 09/30/1993 | Mandatory |
| AR 200-1 | Environmental Protection and Enhancement, dated 12/13/2007 | Advisory |
| AR 210-7 | Commercial Solicitation on Army Installations, dated 10/18/2007 | Mandatory |
| FJ Supplement 1 to AR 210-7 | Commercial Solicitation on Army Installations, dated 06/01/2005 | Mandatory |
| AR 340-21 | The Army Privacy Program, dated 07/05/1985 | Mandatory |
| AR 350-1 | Army Training and Leader Development, dated 12/18/2009 | Mandatory |
| AR 380 SERIES | Army Information Security Program Regulations | Mandatory |
| AR 380-5 | Department of the Army Information Security Program dated 09/29/2000 | Mandatory |

| AR 380-67 | Personnel Security Program, dated 9/09/1988 (RAR 01, 8/4/2011) | Mandatory |
|---|---|---|
| AR 385-10 | The Army Safety Program, dated 8/23/2007 (RAR 004, 2/25/2010) | Mandatory |
| DA PAM 385-40 | Accident Reporting and Records, dated 03/06/2009 (RAR dated 02/25/2010) | Mandatory |
| AR 420-1 | Army Facilities Management, dated 02/12/2008 (RAR 002, 8/24/2012) | Mandatory |
| FJ Reg.420-90 | Fire Protection and Protection Services, dated 06/01/2005 | Mandatory |
| AR 600-8-1 | Army Casualty Program, dated 4/30/2007 | Mandatory |
| AR 600-63 | Army Health Promotion, dated 05/07/2007 (RAR 002, 09/07/2010) | Advisory |
| AR 600-9 | The Army Weight Control Program, dated 11/27/2006 | Mandatory |
| AR 619-5 | Personnel and Classification Testing, dated 02/05/2008 | Mandatory |
| AR 670-1 | Wear and Appearance of Army Uniforms and Insignia, dated 02/03/2005 | Advisory |
| AR 735-5 | Policies And Procedures For Property Accountability, dated 02/28/2005 | Advisory |
| DA PAM 25-30 | Consolidated Index of Army Publications & Blank Forms (online) | Advisory |
| DA PAM 200-1 | Environmental Protection and Enhancement, dated 01/17/2002 | Mandatory |
| DA PAM 385-10 | Army Safety Program, dated 05/23/2008 (RAR 003, 01/19/2010) | Mandatory |
| DOD 4500.9-R | Defense Transportation Regulation (DTR) | Mandatory |
| DOD 5500.7-R | Joint Ethics Regulation (JER), Ch 2, dated 03/25/1996 http://www.dod.gov/dodgc/defense_ethics/ethics_regulation/ | Mandatory |
| DODI 4715.4 | Pollution Prevention, dated 06/28/1996 | Mandatory |
| EM 385-1-1 | Safety And Health Requirement Manual, dated 11/3/2003 | Mandatory |
| EO 12873 | Federal Acquisition, Recycling, and Waste Prevention | Mandatory |
| FAR PART 45 | Government Property | Mandatory |
| FM 3.0 | Operations, dated 6/14/2001 | Mandatory |
| FM 7.0 | Training The Force, dated 02/23/2011 | Advisory |
| FM 7-22 | Army Physical Readiness Training dated TBD replaces | Mandatory |
| FM 22-100 | Army Leadership, dated 01/1/2007 | Advisory |
| OSHA 3071 | Job Hazard Analysis 2001 http://www.osha.gov/Publications/osha3071.pdf | Mandatory |

| TRADOC PAM 350-70-5 | Systems Approach to Training:  Testing, dated 08/20/2004 | Mandatory |
|---|---|---|
| TRADOC Regulation 350-70 | Army Learning Policy and Systems, dated 12/06/2011 | Advisory |
| 29 CFR 1910 | OSHA General Industry Standards | Mandatory |
| 40 CFR 1910 | Occupational Safety and Health Administration, Department of Labor | Mandatory |

6.2.2. Reference Material:

| Reference Title | Mandatory / Advisory |
|---|---|
| Army Personnel Testing (APT) Handbook, June 2004 | Mandatory |
| Ft. Jackson Policy Letter 6-1, Sexual Harassment and Misconduct | Mandatory |

6.2.3. Forms:

| Form Number | Form Description | Mandatory /Advisory |
|---|---|---|
| DA Form 17 | Requisition for Publications and Blank Forms, dated OCT 1979 | Advisory |
| DA 285 | Technical Report of U.S. Army Ground Accident, dated FEB 2009 | Mandatory |
| DA Form 705 | Army Physical Fitness Test (APFT) Scorecard, dated MAY 2010 | Mandatory |
| DA 1687 | Notice of Delegation of Authority- Receipt for Supplies, dated MAY 2009 | Advisory |
| DD 200 | Financial Liability Investigation of Property Loss, dated JUL 2009 | Advisory |
| DD 1662 | DOD Property in the Custody of Contractors, dated JUN 2003 | Advisory |

# Part 7

7. Technical Exhibits:

7.1. TE1 – Projected Course Schedule

7.2. TE2 – Course Management Plan (CMP)

7.3. TE3 – Individual Student Assessment Plan (ISAP)

7.4. TE4 – Performance Requirements Summary (PRS)

7.5. TE5 – FM 7-22, Army Physical Readiness Training

7.6. TE6 – Deliverables Schedule

7.7. TE7 – Estimated Workload Data

**Request for Task Order Response (RTOP)**

# Attachment 4 – Submission Instructions/Evaluation Criteria

## 5-A Instructions

1.  The submission instructions are designed to provide general guidance for preparing responses as well as providing specific instructions on response organization, format, and content.  Responders should include all documents and information requested and should be submitted in accordance with the instructions. The responder is cautioned to follow the instructions carefully, as the Government reserves the right to make an award based on initial responses received without discussion of such response.

2.  Responders should submit a response that is self-sufficient and responds directly to the requirements of the RTOP.  The response should be clear, concise, and include adequate detail for effective evaluation.  The response should not simply rephrase or restate the Government's requirements, but rather provide convincing rationale to address how the responder intends to meet the requirements of the RTOP.  The response should contain sufficient information to enable the Government to fully evaluate and determine the responder's capability to comply with the requirements identified in the RTOP. Responses that are overly verbose or include marketing material may distract from the evaluators ability to ascertain compliance with the RTOP.

3.  Responders shall submit a response that describes the procedures, processes, controls, etc. that are established for this RTOP.  The responder should provide any assumptions upon which your approach/solution is based, and the rationale supporting the assumption (i.e., why do you believe the assumptions are valid).  Express your best understanding of the ramification inherent in the TO.  Discuss alternatives considered, risks involved, impact to the missions (both detriment, as well as efficiency), impacts from external sources, etc.   Provide any other explanations or supporting data (matrix, charts, or other graphics) determined necessary for the Government to fully understand the responder's methodology and approach.

4.  All travel charges shall be authorized in advance.  Contractor travel charges will be invoiced in accordance with the current volume of the Government Joint Travel Regulations (JTR).  Fee/profit on travel is not allowed.

5.  The following wage determinations numbers apply to this TO:

| Location | County | State | Wage Determination Number | Revision Number | Date of Revision |
|---|---|---|---|---|---|
| Fort Riley | Riley | KS | 2005-2213 | 13 | 6/13/2012 |
| Fort Jackson | Richland | SC | 2005-2475 | 14 | 6/13/2012 |
| Fort Irwin | San Bernardino | CA | 2005-2053 | 15 | 6/13/2012 |
| Fort Huachuca | Cochise | AZ | 2005-2025 | 14 | 6/12/2012 |
| Fort Benning | Chattahoochee | GA | 2005-2137 | 13 | 6/13/2012 |
| Fort Lee | Prince George | VA | 2005-2545 | 16 | 6/13/2012 |
| Fort Lewis | Pierce | WA | 2005-2567 | 16 | 6/13/2012 |
| Fort Campbell | Christian | KY | 2005-2187 | 12 | 6/13/2012 |
| Fort Still | Comanche | OK | 2005-2525 | 14 | 6/13/2012 |
| Fort Hood | Bell and Coryell | TX | 2005-2523 | 12 | 6/13/2012 |
| Fort Polk | Vernon Parish | LA | 2005-2229 | 12 | 6/13/2012 |
| Fort Bragg | Cumberland | KY | 2005-2497 | 15 | 6/13/2012 |
| Fort Carson | El Paso | CO | 2005-2079 | 13 | 6/13/2012 |
| Fort Knox | Hardin | KY | 2005-2223 | 14 | 6/13/2012 |
| Fort Drum | Jefferson | NY | 2005-2377 | 11 | 6/13/2012 |
| Fort Sam Houston | Bexar and Comal | TX | 2005-2521 | 13 | 6/13/2012 |
| Fort Bilss | El Paso | TX | 2005-2511 | 16 | 6/13/2012 |
| Fort Leonard Wood | Pulaski | MO | 2005-2311 | 13 | 6/13/2012 |
| Fort Stewart | Liberty | GA | 2005-2141 | 13 | 6/13/2012 |
| Alaska | Statewide | AK | 2005-2017 | 16 | 6/13/2012 |
| Hawaii | Statewide | Hi | 2005-2153 | 16 | 6/13/2012 |

NOTE:  The Service Contract Act (SCA) applies to all work performed within the United States. For purposes of the SCA, the term "United States" includes any State, the District of Columbia, Puerto Rico, the Virgin Islands, Outer Continental Shelf lands as defined in the Outer Continental Shelf Lands Act, American Samoa, Guam, Wake Island, Johnston Island, and the Commonwealth of the Northern Mariana Islands. The SCA does not apply to work performed in any other territory under the jurisdiction of the United States or any United States base or possession within a foreign country.

6.  The responder shall provide its response with a cover sheet that contains the company's name, address and telephone number, name and title of the person authorized to sign and negotiate the TO, proposal validation period of sixty (60) days, RTOP number W9124C-13-R-TOR1, and the original date of response.  The original date shall be located in the upper right hand corner of the cover sheet.

7.  Response Organization and Format.  The response should consist of two (2) volumes.  The volumes are:  Volume I – Technical Submission and Volume II – Price Submission.  All required copies are due by 19 October 2012, no later than 2:00 p.m. Eastern Daylight Time.  Responses should be submitted via regular mail or express carrier to the following address:

>  Mission and Installation Contract Command – Ft. Jackson
>  Attention:  SFC Terry Trent / Nicole Harris
>  4340 Magruder Avenue
>  Fort Jackson, SC 29207-6810

8.  Responses must comply with the page limitations and format specified for each volume.  Information submitted beyond limitations identified could negatively impact the evaluation during the rating process.  The follow-on paragraphs provide the specific information required for each volume.

| Volume | Format | Page Limitation | Number of Copies |
|---|---|---|---|
| Volume I – Technical Submission | MS Word or PDF | 30 (Excluding the table of contents) <br><br> (8.5 x 11 inch paper; 12 Font or larger) <br><br> Fold-outs used for charts, tables (May not exceed 11" x 17"; 12 Font or larger) | 1 Original, 3 Copies <br><br> 1 CD ROM |
| Volume II – Price Submission | Price Data in Excel | No page limit (8.5 x 11 inch paper or 11x17 fold outs; 12 Font or larger) | 1 Original, 1 Copy <br><br> 1 CD ROM |

9.  Format for responses to Volumes I and II must be as follows:

• A page is defined as one face of a sheet of paper containing information.  Foldouts will be counted as two pages.

• Typing shall not be less than 12 point font.

• The table of contents does not count against the 30 page limitation.

- Documents supporting Relevant Experience do not count against the 30 page limitation.

- Elaborate formats, bindings or color presentations are not desired or required.

10. **Volume I - Technical Submission.**  Volume I should be clearly marked **"Volume I - Technical Submission, W9124C-13-R-TOR1"**, and should include the responder's technical submission.  Volume I should consist of a written narrative that is the responders proposed solution to the requirement contained in the Performance Work Statement (PWS) and Performance Requirements Summary (PRS) for this TO.  The technical discussion should be practical, straightforward, specific, concise, and complete.  **Volume I should not include price information.**  Legibility, clarity and coherence are very important. The Technical volume should not simply rephrase or restate the Government's requirements.  The volume shall provide convincing rationale to address how the responder intends to meet the Government's requirements.  Statements such as "the responder understands, can, or will comply with the PWS," (including referenced publications, technical data, etc.); statements paraphrasing the PWS or parts thereof (including applicable publications, technical data, etc.); and phrases such as "standard procedures will be employed" or "well known techniques will be used," etc., will be considered unacceptable and will negatively impact the responders rating. Responders shall assume that the Government has no prior knowledge of their facilities and experience, and will base its evaluation on the information presented in the responder's Task Order Response.

Technical Submission should be segregated and partitioned into two separate tabs, as described below.  Each section should include a table of contents.  A list of attachments, exhibits, tables, and figures, as required, may be provided.  ***The table of contents will not count against the 30 page limitation. However, any attachments, exhibits, tables, and figures will count against the 30 page limitation.***

The Technical Submission volume shall be organized according to the following general outline:

Factor 1: Technical Acceptability
    Tab A – Subfactor 1: Program Management Approach
    Tab B – Subfactor 2: Staffing Approach

Technical Response.  Responders shall demonstrate an understanding of the tasks required to fulfill the Government requirement through a comprehensive discussion of each of the following:

a. Program Management Approach.  The responder shall demonstrate the program management methods to be employed to accomplish the technical requirements of the PWS, PRS and all associated attachments and technical exhibits.  In the event that subcontractors are proposed, discuss your communications and internal control plans that will ensure successful satisfaction of the requirements.  Discuss how you will update the Government and bring matters to the attention of the Government.  Discuss your performance and schedule control plans. Discuss the need for, and your approach to, adding team members at the TO level to satisfy the

unique requirements of this TO (if applicable).

The responder must demonstrate the capability to provide program management as required by the PWS, PRS and all associated attachments and technical exhibits.  The responder's approach must demonstrate:

(1)  A Program Management Plan that provides a sound, comprehensive and feasible management approach for adapting to changing priorities, enhancing customer service, ensuring adequate levels of performance are maintained, and procedures for problem resolution are sound.

(2)  Appropriate planning, organizing, directing, and controlling of staff in performance of the tasks identified in the RTOP, PWS, and associated attachments.

(3)  A realistic and thorough approach and methodology for the proposed staffing plan to include:

(a)  A realistic and efficient plan to ensure proposed labor category personnel will be available on the first day of the TO performance period, a realistic plan to recruit and retain qualified, licensed, certified, and trained personnel from TO award, to the first day of performance, and throughout the duration of the TO.

(b)  A realistic and effective plan to accommodate fluctuating workloads, minimize turnover, and ensure all PWS requirements are still performed in case of contractor employee absences due to such things as illness.

(4)  Adequate management roles, controls, and lines of communication.

b. <u>Staffing Approach.</u>  Responder should demonstrate a thorough knowledge and understanding of how to fulfill and staff the Government's requirement.  Each response should include sufficient information to describe the responders procedures, processes, controls, etc. that are established at the contract level and employed at the TO level.  The responder shall specifically identify and explain their process to achieve full capability of performance (responder shall ensure process and description at a minimum includes a timeline of events and describe how the responder will support the PWS); identify and explain how they will be staffed to include identifying necessary skill sets and specific qualifications to complete each task;  how work will be scheduled (including use of any automated systems or workloading procedures); and/or assumptions of Government support.  For depicting staffing, responders shall provide the following information:

i. Provide manpower matrices showing the proposed list of labor categories and total overall manning by functional area and supervisory level for each performance period.  Separate sets of matrices are required for the base TO period of performance and each of the option years.  This list of labor categories must be a subset of the labor categories that have been incorporated into basic ID/IQ contract.

ii. Clearly depict the total number of productive man-hours and associated Full Time Equivalents (FTE's) for each proposed labor category.  All cross utilization of the labor force shall be clearly explained and depicted.  Responder shall also describe approach for backfilling positions identified for cross training/cross utilization. The responders approach must also demonstrate:

(1) Proposed key personnel qualifications (without names) that meet all requirements outlined in the PWS.

(2) Reasonable and comprehensive staffing approach to recruit and retain key personnel with required qualifications to satisfy the requirements stated in the RTOP and associated attachments.

(3) Organizational charts reflect all staffing within each organizational block, indicating job titles and whether positions are full time equivalent or part time

(4)  Comprehensive plan for mitigating personnel turn over, sickness and no shows to ensure full complement of staffing for all training events.

11.  **Volume II – Price Submission**. The price submission should be clearly marked "**Volume II, Price Submission, W9124C-13-R-TOR1**" and should include the responder's price submission. The responder's price submission is to include base year and option year pricing.

This section shall provide the name, title and telephone number of the company/division point of contact regarding decisions made with respect to your Task Order Response and who can obligate your company contractually. Also, identify those individuals authorized to negotiate with the Government.

a. The responder shall include a price response per the Contract Line Item Number (CLIN) Structure shown in Attachment 2.  The responder shall submit a completed CLIN Structure (Attachment 2) which includes a firm-fixed price for each CLIN for the base period, option periods, and a base plus option year overall total.

b. The response shall include the labor/pricing matrix(ces) for the Phase-in Period, Initial Train-Up Period, Master Fitness Trainer Course Support Services, Project Management, Travel, Contractor Manpower Reporting, and the option periods shown in Attachment 2.  The labor/pricing matrices should include labor categories as identified in the basic contract, ON/OFF Site CAP rates as identified in the basic contract, the Discount rate (if applicable), the number of full time equivalents (FTEs), the number of total hours per labor category, and the total dollar value.   The responder shall include a comparison between the labor categories/hourly rates proposed in this TO to the Labor/Pricing Matrices in the basic ID/IQ contract.  Responder shall also annotate any discounts.  (See Attachment 2).

c. All information relating to the proposed price must be included in both hard copy and electronic format.  Electronic versions of the price response should be submitted on a CD in MS

Office Excel format, and shall not be read only or password protected.  All formulas, lookup tables, and links should be intact, and no links should exist to files not included with the response.  Spreadsheets shall not contain hidden worksheets.  PDF or flat files will not be considered adequate.  The hard copy version will take precedence for any differences noted between the hard and electronic versions of a response.  Failure to comply with these formatting requirements may result in rejection of your proposal.

# 5-B Evaluation Criteria

The evaluation factors for this TO are Technical Acceptability and Price.  The Technical Acceptability Factor consists of two subfactors, Program Management Approach and Staffing Approach.  The Technical Acceptability Factor will be assigned an acceptable or unacceptable rating based on the definitions in the table below.  The Price factor will be evaluated as discussed in Factor 2 below.

**Technical Acceptable/Unacceptable Ratings**

| Rating | Description |
|---|---|
| Acceptable | Proposal clearly meets the minimum requirements of the TO. |
| Unacceptable | Proposal does not clearly meet the minimum requirements of the TO. |

**The Government will use the criteria set forth below to evaluate and select the TO awardee.**

Factor 1: Technical Acceptability

a. The Technical Acceptability Factor evaluation provides an assessment of the responder's capability to satisfy the Government's minimum requirements. The Government's technical evaluation team will evaluate responses to determine either technically acceptable or technically unacceptable (price excluded). In order to be considered technically acceptable, the response for each subfactor must be determined acceptable and must demonstrate a clear understanding of the requirement on all areas, described below, in the RTOP and the response must demonstrate a practical/functional technical approach that meets the needs of the RTOP. Failure to meet the criteria will render the response to be technically unacceptable and will not be considered for award.

Subfactor 1- Program Management Approach

a. The responder must demonstrate the capability to provide program management as required by the PWS, PRS and all associated attachments and technical exhibits.  The responder's approach must demonstrate:

(1)  A Program Management Plan that provides a sound, comprehensive and feasible management approach for adapting to changing priorities, enhancing customer service, ensuring adequate levels of performance are maintained, and procedures for problem resolution are sound.

(2)  Appropriate planning, organizing, directing, and controlling of staff in performance of the tasks identified in the RTOP, PWS, and associated attachments.

(3)  A realistic and thorough approach and methodology for the proposed staffing plan to include:

(a)  A realistic and efficient plan to ensure proposed labor category personnel will be available on the first day of the TO performance period, a realistic plan to recruit and retain qualified, licensed, certified, and trained personnel from TO award, to the first day of performance, and throughout the duration of the TO.

(b)  A realistic and effective plan to accommodate fluctuating workloads, minimize turnover, and ensure all PWS requirements are still performed in case of contractor employee absences due to such things as illness.

(4)  Adequate management roles, controls, and lines of communication.

Subfactor 2 - Staffing Approach

a. The responder must demonstrate the capability to provide a technical approach as required by the RTOP.  The staffing approach response shall contain sufficient quantitative details (without reference to cost or price) to permit a complete and accurate evaluation of the approach from strictly a technical viewpoint.  All personnel proposed in direct support of the tasks identified in the PWS will be considered and evaluated as key personnel. The responder's approach must demonstrate:

(1) Proposed key personnel qualifications (without names) meet all qualification requirements outlined in the PWS.

(2) Reasonable and comprehensive staffing approach to recruit and retain key personnel with required qualifications to satisfy the requirements stated in the RTOP and associated attachments.

(3) Organizational charts reflect all staffing within each organizational block, indicating job titles and whether positions are full time equivalent or part time

(4)  Comprehensive plan for mitigating personnel turn over, sickness and no shows to ensure full complement of staffing for all training events.

Factor 2:  Price

a. The responder's price submission to include options will be evaluated considering the response to the TO and the pricing matrix of the TO. The techniques and procedures described under FAR Part 15.404 will be the primary means of assessing price submission reasonableness as prescribed in FAR 16.505(b)(3).

b. To be viable for award, responder's price must be determined fair and reasonable.  The Government price team will evaluate responder's price submission for reasonableness based on the following:

(1) Reasonableness will be determined by comparing the responder's total cost proposed to the total costs proposed by the other responders.  Additionally, total proposed prices may be compared to the Independent Government Estimate (IGE) to determine the reasonableness of price.

(2)  The responder's price submission shall represent the responder's best efforts to respond to the RTOP.  Any inconsistency between promised performance and price shall be explained in the submission.  For example, if unique, innovative approaches are the basis for an unusually low price, the nature of these approaches and their impact on price shall be explained. If a responder proposes to absorb a portion of price, the responder must also explain the impact on the estimated price.  Any significant inconsistency, left unexplained, may raise a fundamental question of the responder's understanding of the nature and scope of the work required in the TO, and of the responder's ability to perform the tasks within the fiscal constraints thereof, and may be cause for rejection of the submission.  The burden of proof for price credibility rests with the responder.

(3) The Government will evaluate proposals for award purposes by adding the total cost for all options to the total cost for the basic requirement. The Government may determine that a proposal is unacceptable if the option costs are significantly unbalanced. Evaluation of options shall not obligate the Government to exercise the option(s).

(4) As part of the price evaluation, the Government will evaluate the Option to Extend Services under FAR Clause 52.217-8 by adding one-half of the responder's final option period price to the responder's total price. Thus, the responder's total price for the purpose of evaluation will include the base period, first option, second option and one-half of the second option. Responders are required only to price the base and two options. Responders shall not submit a price for the potential one-half year extension of services period.

# 5-C Basis of Award

a. The Government will utilize a Lowest Price Technically Acceptable (LPTA) evaluation method for this requirement. Subject to the provisions contained within the RTOP, the Government intends to award a single TO resulting from the RTOP, to the responder who is deemed responsible in accordance with the FAR, as supplemented, whose Task Order Response conforms to the RTOP's requirements (to include all stated terms, conditions, and all other information required by the RTOP), provides the lowest priced, technically acceptable response to satisfy the requirements of this RTOP and the PWS. Responses that fail to address all the requirements set forth in the RTOP and PWS will be rejected.

b. The Government will evaluate the total estimated price proposed. The Government will evaluate the price for award purposes by adding the total price for all options to the total price for the base period, and comparing the total prices proposed for all of the responses found to be technically acceptable.

c. The Government will evaluate the responder's technical proposal to determine whether it satisfies the requirements of the PWS and is executable as proposed. In order to be considered for award, there must be an "acceptable" rating in every non-price subfactor.

d. The response evaluation and discussion procedures in Federal Acquisition Regulation (FAR) Part 15, Contracting by Negotiation, does not apply to this acquisition.  Task evaluation procedures will be conducted in accordance with FAR Part 16 and supplements thereto.  The Government does not intend to conduct discussions.  Initial responses should include the responder's best terms from a price and technical standpoint.  Although the Government does not anticipate conducting discussions, the Government reserves the right to make clarifications or request revised responses if later determined by the Contacting Officer to be necessary. Additional oral or written information from one or more responder's may be requested, but not necessarily from all.

Final Task Order Decision Document, RTOP W9124C-13-R-TOR1

Master Fitness Trainer Contract

| Final Ratings | | | | | | |
|---|---|---|---|---|---|---|
| | **Technical Acceptability** | | **Price - No Adjectival Rating** | | | |
| **Responder** | **Program Management Approach** | **Staffing Approach** | **Total Price** | **% Variance from IGE** | **$ Variance from IGE** | **Total Price Inclusive of 6 Month Option to Extend** |
| ANAUTICS, INCORPORATED | Acceptable | | ██████ | ██ | ██████ | $9,702,656.56 |
| | *Acceptable* | *Acceptable* | | | | |
| CHARLES F. DAY & ASSOCIATES | Acceptable | | ██████ | ██ | ██████ | $10,944,642.26 |
| | *Acceptable* | *Acceptable* | | | | |
| ████████ | Acceptable | | ██████ | ██ | ██████ | ██████ |
| | *Acceptable* | *Acceptable* | | | | |
| ████████ | Acceptable | | ██████ | ██ | ██████ | ██████ |
| | *Acceptable* | *Acceptable* | | | | |
| ████████ | Acceptable | | ██████ | ██ | ██████ | ██████ |
| | *Acceptable* | *Acceptable* | | | | |

SOURCE SELECTION INFORMATION – SEE FAR 3.104
FOR OFFICIAL USE ONLY

A. 131